**No. 22-1226**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

---

**ROYAL BRUSH MANUFACTURING INC.,**

Plaintiff-Appellant,

v.

**UNITED STATES, DIXON TICONDEROGA COMPANY,**

Defendants-Appellees.

---

Appeal from the United States Court of International Trade in
Case No. 19-cv-00198, Chief Judge Mark A. Barnett

---

# CORRECTED NON-CONFIDENTIAL BRIEF OF APPELLEE DIXON TICONDEROGA COMPANY

---

Felicia Leborgne Nowels
Michael J. Larson
**AKERMAN LLP**
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Fax: (850) 222-0103
felicia.nowels@akerman.com
michael.larson@akerman.com

Julia Padierna-Peralta
**AKERMAN LLP**
750 9th Street, N.W.
Suite 750
Washington, D.C.
Telephone: (202) 393-6222
Fax: (202) 393-5959
julia.padierna-peralta@akerman.com

*Attorneys for Appellee Dixon Ticonderoga Company*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1226

**Short Case Caption** Royal Brush Manufacturing, Inc. v. US

**Filing Party/Entity** Dixon Ticonderoga Company

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/09/2021

Signature: /s/Felicia Leborgne Nowels

Name: Felicia Leborgne Nowels

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Dixon Ticonderoga Company | | F.I.L.A. SpA |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Sheryl D. Rosen of Akerman LLP | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST

TABLE OF AUTHORITIES .......... iii

STATEMENT REGARDING ORAL ARGUMENT .......... 1

STATEMENT OF RELATED CASES .......... 2

STATEMENT OF ISSUES .......... 3

STATEMENT OF CASE AND FACTS .......... 4

SUMMARY OF ARGUMENT .......... 20

ARGUMENT .......... 24

A. Standard of Review .......... 24

B. The Flexible Standard Of Due Process Was Satisfied, And Royal Brush Received Due Process .......... 26

1. Royal Brush Fails To Address The Applicable Due Process Standard .......... 26

2. CBP Complied With Its Own Regulations Governing The Treatment of Business Confidential Information .......... 30

C. CBP Complied With Its Own Regulations And Properly Rejected Royal Brush's Unauthorized Rebuttal Filing .......... 34

1. The Verification Report Did Not Contain "New Factual Information" .......... 35

2. The Verification Report Did Not Contain A New Theory Of Proof .......... 40

D. CBP's Findings Are Supported By Substantial Evidence And Are Not Arbitrary And Capricious .......... 43

1. Substantial Evidence May Be Present Even If Inconsistent Conclusions Can Be Drawn From The Same Evidence ........ 44

2. CBP's Evasion Determination Was Not Based Solely On Overall Production Capacity ........ 45

3. CBP Applied The Correct Burden Of Proof ........ 48

CONCLUSION ........ 50

CERTIFICATE OF SERVICE ........ 52

CERTIFICATE OF COMPLIANCE WITH RULE 32 ........ 53

**<u>Description of Redacted Confidential Material Pursuant to Fed. Cir. R. 25.1(e)(1)(B)</u>**

The material redacted on pages 6, 12, and 45 contains entity name information, production capacity information, and production volume information subject to the U.S. Court of International Trade's standing Protective Order entered on December 16, 2019.

# TABLE OF AUTHORITIES

**CASES** **Page**

*Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986) ..... 30

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ..... 44

*Am. Express Co. v. United States*, 262 F.3d 1376 (Fed. Cir. 2001) ..... 38, 39

*Bayer CropScience AG v. Dow AgroScience LLC*, 851 F.3d 1302 (Fed. Cir. 2017) ..... 24

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792 (Fed Cir. 1990) ..... 27

*BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) ..... 25

*Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137 (Fed. Cir. 1987) ..... 37

*Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66,909 (U.S. Dep't of Commerce Dec. 28, 1994) ..... 4, 5

*Certain Cased Pencils from the People's Republic of China*, 82 Fed. Reg. 41,608 (U.S. Dep't of Commerce Sept. 1, 2017) ..... 4

*Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229 (C.I.T. 1999) ..... 37

*Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324 (C.I.T. 2021) ..... 31

*F.LLi De Cecco Di Filipo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ..... 24

*Hines on Behalf of Servier v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 1518 (Fed. Cir. 1991) ..... 24

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369 (Fed. Cir. 2003) ..... 25

*Hylete LLC v. Hybrid Athletics, LLC*, 931 F.3d 1170 (Fed. Cir. 2019) ................. 45

*Jowett, Inc. v. Dep't of Navy*, 729 F. Supp. 871 (D. D.C. 1989)............................ 37

*Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565 (Fed. Cir. 1994)................... 25

*Magnesium Corp. of Am. v. United States*, 166 F.3d 1364 (Fed. Cir. 1999).......... 26

*Mass Mut. Life Ins. Co. v. United States*, 782 F.3d 1354 (Fed. Cir. 2015) ............ 38

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................................... *passim*

*Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017)................ 44

*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017)......... 43

*Minebea Co., Ltd. v. United States*, 984 F.2d 1178 (Fed. Cir. 1993).............. 44, 48

*NEC Corp. v. United States*, 151 F.3d 1361 (Fed. Cir. 1998).......................... 26, 28

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)............. 44, 45

*Novosteel SA v. United* States, 284 F.3d 1261 (Fed. Cir. 2002)............................ 44

*Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio*,
301 U.S. 292 (1937)........................................................................................... 30

*Patlex Corp. v. Mossinghoff*, 771 F.2d 480 (Fed. Cir. 1985) .......................... 26, 27

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012) ...... 33

*Ray v. Lehman*, 55 F.3d 606 (Fed. Cir. 1995)......................................................... 24

*Royal Brush Manufacturing, Inc. v. United States*, 483 F. Supp. 3d 1294
(C.I.T. 2020)................................................................................................ *passim*

*Royal Brush Manufacturing, Inc. v. United States*, 545 F. Supp. 3d 1357
(C.I.T. 2021)......................................................................................... 17, 19, 37

*Rumsfeld v. Freedom, NY, Inc.*, 346 F.3d 1359 (Fed. Cir. 2003) ........................... 27

*Sichuan Changhong Elec. Co., Ltd. v. United States*, 466 F. Supp. 1323 (C.I.T. 2006)........................................................................................ 33, 37

*SmithKline Diagnostics, Inc. v. Helena Labs Corp.*, 859 F.2d 878 (Fed. Cir. 1988)........................................................................................... 33

*Standley v. Dep't of Energy*, 26 F.4th 937 (Fed. Cir. 2022).................................. 47

*Udall v. Tallman*, 380 U.S. 1 (1965) ...................................................................... 38

*Viet I-Mei Frozen Foods Co., Ltd. v. United States*, 839 F.3d 1099 (Fed. Cir. 2016)..................................................................................... 44, 48

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998)................. 36

**STATUTES AND CODE PROVISIONS**

18 U.S.C. § 1905.................................................................................................30

19 U.S.C. § 1484(a) ............................................................................................50

19 U.S.C. § 1517....................................................................................................5

19 U.S.C. § 1517(a)(5)(A) ....................................................................................26

19 U.S.C. § 1517(c)(1).........................................................................................48

19 U.S.C. § 1517(c)(2)(B) ....................................................................................35

19 U.S.C. § 1517(g)(2)(B) ....................................................................................24

**RULES AND REGULATIONS**

19 C.F.R. § 165......................................................................................................5

19 C.F.R. § 165.15(a)..............................................................................................5

19 C.F.R. § 165.23 ................................................................................................36

19 C.F.R. § 165.23(c)(1) ........ *passim*

19 C.F.R. § 165.24 ........ 8

19 C.F.R. § 165.25(a) ........ 35, 36, 41

19 C.F.R. § 165.27 ........ 36

19 C.F.R. § 165.27(a) ........ 48

19 C.F.R. § 165.4 ........ *passim*

19 C.F.R. § 165.4(a)(2) ........ 31, 32

19 C.F.R. § 165.4(e) ........ 3, 31

Fed. R. App. P. 32(a) ........ 53

Fed. R. App. P. 32(a)(5) ........ 53

Fed. R. App. P. 32(a)(6) ........ 53

Fed. R. App. P. 32(f) ........ 53

Fed. R. App. P. 34(a)(1) ........ 1

Fed. Cir. R. 25.1(d) ........ 3

Fed. Cir. R. 25.1(e)(1)(B) ........ ii

Fed. Cir. R. 32(b) ........ 53

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY (11th ed. 2019) ........ 39

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/factual ........ 39

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a)(1), Appellee Dixon Ticonderoga Company ("Dixon") asserts oral argument is unnecessary because it would not aid the Court in its decision-making process and would be a waste of judicial and party resources.

## STATEMENT OF RELATED CASES

Dixon is unaware of any other appeal in or from the same action that was previously before this Court or any other appellate court. It also is unaware of any pending cases that will directly affect or be directly affected by the Court's decision in this appeal.

# STATEMENT OF ISSUES[1]

The issue on appeal is whether the U.S. Court of International Trade ("CIT") correctly sustained U.S. Customs and Border Protection's ("CBP") anti-dumping duty evasion determination after CBP:

(i) provided public summaries of business confidential information as set forth in 19 C.F.R. § 165.4(e);

(ii) did not place any "new factual information" on the administrative record in its Verification Report that would permit "rebuttal information" under 19 C.F.R. § 165.23(c)(1);

(iii) determined the Philippine entity from which Appellant Royal Brush Manufacturing, Inc. ("Royal Brush") imported pencils lacked capacity to produce significant numbers of pencils that were imported to the United States during the relevant time period; and

(iv) was unable to confirm the Royal Brush-specific pencil production information that the Philippine entity submitted to CBP.

---

[1] References to Royal Brush's corrected confidential and non-confidential opening briefs filed on March 31, 2022 are collectively noted as [Op. Br.]; Royal Brush's corrected opening briefs prepared in response to the Court's August 19, 2022 order were not received before the filing of this brief. References to the corrected Joint Appendix are to corrected Joint Appendix page number (*e.g.*, Appx000001 references corrected Joint Appendix page 1). The People's Republic of China is referenced as "China." Confidential information under Federal Circuit Rule 25.1(d) is shown by double brackets: "[[ ]]".

## STATEMENT OF CASE AND FACTS

This case involves a final evasion determination sustained by the CIT in which CBP found Royal Brush evaded antidumping duties on imports of cased pencils manufactured in China by transshipping the pencils through the Philippines. [Appx000101.]

The applicable antidumping duty order covers "certain cased pencils . . . that feature cores of graphite or other materials encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (e.g., with erasers, etc.) in any fashion, and either sharpened or unsharpened." *Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66,909, 66,909 (U.S. Dep't of Commerce Dec. 28, 1994) ("Antidumping Duty Order A-570-827"); *Certain Cased Pencils from the People's Republic of China*, 82 Fed. Reg. 41,608 (U.S. Dep't of Commerce Sept. 1, 2017) (continuation of order) (collectively "Antidumping Order").

Under Antidumping Duty Order A-570-827, "all entries of certain cased pencils from the People's Republic of China, entered or withdrawn from warehouse, for consumption, made on or after the date on which the ITC publishes its final affirmative determination of threat of material injury in the Federal Register (which is currently scheduled for December 21, 1994), will be liable for the assessment of antidumping duties." *Certain Cased Pencils from the People's*

*Republic of China*, 59 Fed. Reg. 66,909, 66,910 (U.S. Dep't of Commerce Dec. 28, 1994). Antidumping duties were imposed because certain cased pencils from China were being sold at less than fair value in the United States, causing material harm to an industry in the United States. *Id*. at 66,909.

**Dixon's Allegation**

On February 27, 2018, Dixon filed its Allegation with CBP under the Enforce and Protect Act, 19 U.S.C. § 1517 ("EAPA") and 19 C.F.R. Part 165, asserting Royal Brush was transshipping pencils that were manufactured in China through the Philippines in violation of the Antidumping Order. [Appx000110.] Dixon's Allegation contained various supporting materials, including a production contract between Chinese companies, production order, warehouse records, shipping and U.S. import records, and pictures. [Appx000110-170; Appx001292-1306.] Dixon supplemented its Allegation on March 13, 2018 with further materials in support of an alleged "pattern of evasion." [Appx000147-170; Appx001302-1306.]

**CBP's Investigation**

CBP began its initial investigation into the transshipment Allegation by Dixon on March 27, 2018 pursuant to the EAPA and 19 C.F.R. § 165.15(a). [Appx000171.] CBP's Memo to the File on the matter noted, "[t]he allegation

therein reasonably suggests that covered merchandise has been entered into the customs territory of the United States by means of evasion." [*Id*.]

A CBP Attaché subsequently performed an unannounced visit to the facility of [[ **Redacted: Name of Foreign Shipper Entity** ]] ("Philippine Shipper") to assess the facility and its pencil manufacturing capabilities. [Appx000175.] The Attaché report, dated June 15, 2018, relayed that staff were taking pencils from boxes with Chinese characters on them and repackaging the pencils into boxes labeled "Made in the Philippines": "We clearly observed staff opening boxes and repacking pencils into boxes labeled, 'Made in the Philippines' while we were outside the facility. The original boxes had Chinese characters and it appeared the staff were simply repacking the pencils." [Appx000174 (emphasis added).]

The Attaché report elaborated: "[s]taff appeared to be making minor alterations or simply sharpening pencils. Staff appeared to be repacking China origin products into boxes labeled, 'Made in Philippines' for export . . . . The painting machines had dust covering the machinery. The separate manufacturing warehouse did not indicate production of any products for some time. The manufacturing warehouse looked like the staging area for the pictures sent to Office of Trade, some of the machinery had cobwebs." [Appx000175.] Further, "[t]he pictures and captions provided in [this] report indicate a clear story line of repacked Chinese pencils bound for the United States in boxes labeled, Made in

the Philippines." [*Id.* (emphasis added).] When the Attaché asked an employee "about all the Chinese boxes with completed finished products, [the employee] did not say anything" and when the Attaché "stated it appears the pencils are obviously made in China and repacked in [the Philippine Shipper's] facility, he also didn't say anything. He simply nodded and his body language was clearly indicating a resignation of admission including slumped shoulders." [*Id.*]

The Attaché report concluded that while the Philippine Shipper appeared to have capacity to "finish some product," it "does not have the resources, staffing, or capacity to manufacture pencils." [Appx000174.]

CBP then commenced a formal evasion investigation, and Royal Brush received a Notice of Initiation of Investigation and Interim Measures on June 26, 2018. [Appx000771-776.] This investigation covered "entries for consumption of allegedly covered merchandise into the . . . United States, made within the one-year period prior to the receipt of the allegation [made by Dixon]." [Appx000771.] Consequently, "the entries covered by [CBP's] investigation are those that were entered for consumption, or withdrawn from a warehouse for consumption, from March 6, 2017 through the pendency of this investigation." [*Id.*] However, the Notice of Initiation of Investigation and Interim Measures advised, "[a]t its discretion, CBP may also investigate entries of covered merchandise outside of that period." [*Id.*]

CBP imposed interim measures under 19 C.F.R. § 165.24 suspending liquidation of entries made on or after March 27, 2018 and extending liquidation of pre-initiation entries. [Appx000773-776.] CBP's Notice of Initiation of Investigation and Interim Measures explained, "[b]ecause the evidence on the record establishes a reasonable suspicion that [Royal Brush] has entered merchandise covered by the Order into the United States through evasion, CBP has imposed interim measures pursuant to 19 C.F.R. §165.24." [Appx000771.]

CBP subsequently submitted requests for information to Royal Brush and the Philippine Shipper, and those entities provided various responses. [*See, e.g.*, Appx000818-847; Appx000848-997; Appx001318-1355.] Among documents provided by Royal Brush were "certification service provider forms" relating to quality compliance testing of Royal Brush pencils by a lab located in China. [Appx000093; Appx001393.] While Royal Brush asserted clerical error, CBP found such forms indicated China was the country of origin for the tested pencils. [Appx000093-94; Appx000056; Appx001256.] One form expressly lists China as the pencils' country of origin, the United States as the destination country, and Royal Brush as the applicant. [Appx000791.]

In November 2018, CBP notified Royal Brush and the Philippine Shipper, via a Site Verification Engagement Letter and Site Verification Agenda, that it would conduct an on-site verification of the Philippine Shipper's facility.

[Appx001167-1173.] The Site Verification Engagement Letter advised that CBP could verify a broad set of information – it could verify "information in the United States or foreign countries . . . as is necessary to make its determination." [Appx001168.] The Site Verification Agenda contains similar disclosure language, noting the purpose of verification site visit was to "verify information . . . as is necessary to make a determination." [Appx001172 (emphasis added).]

The Site Verification Agenda advised that CBP would obtain documents, such as the "production schedule" to "determine what type of processing is performed at the factory and its production capabilities." [*Id*.] Further, the Site Verification Agenda advised CBP would "continue the review of [the Philippine Shipper's] production records and verify any other relevant factory records." [Appx001173.] In the Site Verification Engagement Letter, CBP explained the Philippine Shipper should "be prepared to walkthrough [its] production process in detail using" five identified invoices. [Appx001169.] The articulated process also included that CBP would "request documentation for selected invoices for verification . . . in addition to the five (5) invoices requested in advance." [Appx001172.] The Site Verification Agenda further explained that "PRODUCTION RECORDS," "SHIPMENT RECORDS," and other documents regarding certain invoices would be reviewed. [Appx001172-1173.] CBP

reserved the right to review "[o]ther records . . . as appropriate, for issues that come up as a result of the records being reviewed." [Appx001173.]

CBP performed the verification of the Philippine Shipper's facility, as scheduled, from November 14, 2018 through November 17, 2018. [Appx001192.] A public version of the Verification Report was provided to Royal Brush in February 2019. [Appx001191-1234; Appx001406-1448.] The verification team performed interviews, toured facilities, and reviewed original records. [Appx001192.] The verification also included review of "factual information included in . . . seven (7) invoices associated with imports by Royal Brush[.]" [*Id*.]

The Verification Report concluded the Philippine Shipper had the capacity to produce only some – not all – of the pencils it exported to the United States in 2018 and the number of pencils imported into the United States during the relevant time period significantly exceeded the production capacity of the Philippine Shipper. [Appx001198-1199.] The Verification Report noted the Philippine Shipper failed to provide substantial amounts of requested documentation, provided incomplete documentation without further explanation, presented altered records, provided incomplete payroll and accounting records, and had deleted e-mails. [Appx001195-1199.] CBP was unable to confirm the relevant employees were paid and that there was pencil production during applicable time periods. [Appx001200.]

The Verification Report also described the close association between certain officers of the Philippine Shipper and trading companies located in China and, in some instances, their partial ownership of such Chinese trading companies. [Appx001193.] Per a Philippine Shipper employee, Royal Brush purchase orders and proforma invoices between Royal Brush and the Philippine Shipper are kept in China. [Appx001194.] The Philippine Shipper even acknowledged it had received a shipment of finished pencils from China in 2015 that was intended for the United States, but it failed to meet U.S. importation requirements. [*Id*.]

Royal Brush prepared a rebuttal to the Verification Report after asserting the Verification Report contained "new factual information" and rebuttal information therefore was permissible under 19 C.F.R. § 165.23(c)(1). On March 6, 2019, a Customs "International Trade Specialist," in an e-mail, noted the Verification Report contained new factual information and asserted Royal Brush could submit a rebuttal. [Appx001238.]

Royal Brush filed its rebuttal on March 12, 2019 and separate written arguments on March 15, 2019. [Appx001236.] CBP rejected both filings due to over-bracketing and references to new factual information, and gave Royal Brush time to remedy the deficiencies. [Appx001245.] Before the re-submission deadline, the same International Trade Specialist advised Royal Brush that CBP would not accept the rebuttal filing and noted the original allowance was due to

"misinterpretation" of the CBP regulations. [Appx001240.] The International Trade Specialist explained the Verification Report lacked new factual information that would allow for a rebuttal. [*Id.*]

Royal Brush re-submitted its written arguments in response to the Verification Report on March 25, 2019. [Appx001247-1291.]

**CBP's Evasion Determination**

On May 6, 2019, CBP issued an affirmative evasion determination in its Notice of Final Determination as to Evasion, finding Royal Brush evaded the Antidumping Order by transshipping Chinese pencils subject to the Antidumping Order through the Philippines. [Appx000058-66; Appx000101-109.] CBP reasoned the Philippine Shipper's total shipments to the United States for the subject time period exceeded its production capacity by [[ ]]%. [Appx000105.] **Redacted: Production Capacity Information** CBP found the Philippine Shipper "must have been shipping large volumes of pencils to the United States from sources other than its own production facilities because it lacked capacity to produce pencils in "sufficient quantities as to account for the 2018 total imported pencils." [Appx000105-106.]

CBP concluded the evidence showed that pencils imported into the United States by Royal Brush had been manufactured in China and transshipped through the Philippines. [Appx000105.] It also found the Philippine Shipper failed to fully cooperate with the investigation and provide "substantial amounts" of requested

information, including information concerning the "purchasing, inventorying, and production of pencils." [Appx000108.]

**<u>CBP's Administrative Review</u>**

Royal Brush later filed a request for *de novo* administrative review of CBP's evasion determination. [*See* Appx000082.] Dixon filed a response asserting evasion was supported by substantial evidence. [*See* Appx000084.]

CBP's Office of Trade, Regulations and Rulings, on September 24, 2019, affirmed the evasion determination. [Appx000082-100.] CBP found the evidence established Royal Brush imported pencils subject to the Antidumping Order and the record did not support a conclusion that the pencils were manufactured in the Philippines but did support a finding that such pencils were made in China. [Appx000092.] CBP "g[a]ve credence to CBP's on-site verification team's findings" – which were detailed and included first-hand accounts – in concluding Royal Brush's pencils entered the United States through evasion. [Appx000095.] CBP noted the verification team found the Philippine Shipper lacked the capability to produce pencils in the "quantities alleged for the company's 2018 production." [Appx000096.] CBP explained, "[t]he production in the Philippines for Royal Brush's imports remains unsubstantiated, as amply demonstrated in the verification report drafted by trained CBP auditors." [Appx000097.]

CBP emphasized its auditors had calculated "a [production] capacity figure far less than the [Philippine Shipper's] shipments to the United States." [Appx000098.] CBP also relied on the Attaché's observations and photographs, which CBP noted provide "a clear story line of repackaged Chinese pencils bound for the United States." [Appx000094.] CBP further explained it reasonably relied on adverse inferences, as permitted under statute, to fill "evidentiary gaps" because Royal Brush and the Philippine Shipper "*failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." [Appx000099 (emphasis in the original).]

**Royal Brush I**

Royal Brush appealed CBP's administrative affirmance of the evasion determination to the CIT. In summary, the CIT, in *Royal Brush Manufacturing, Inc. v. United States*, 483 F. Supp. 3d 1294 (C.I.T. 2020) ("*Royal Brush I*"), remanded CBP's determination for reconsideration and additional explanation as to two of Royal Brush's arguments and deferred resolution as to its two other arguments. [Appx000067.]

Royal Brush argued CBP erroneously rejected its rebuttal filing directed at alleged "new factual information" in CBP's Verification Report. [*Id.*] CBP and Dixon responded in opposition, including asserting the Verification Report did not contain new factual information and nothing more than the standard verification

process had been performed in order to test the accuracy of submitted data. [*Id*.; Appx000076.] Royal Brush also contended CBP denied Royal Brush due process, including by erroneously redacting or otherwise withholding record information on which CBP relied to support its evasion determination and by not providing sufficient notice. [*Id*.; Appx000077.] In response, CBP argued Royal Brush neglected to identify any protected interest that was deprived and Royal Brush had adequate notice of the claim against it. [Appx000077-78.]

The CIT, in *Royal Brush I*, ordered CBP to reconsider whether there was "new factual information" in the Verification Report, and, if such information was present, Royal Brush was to be given the opportunity to rebut that information. [Appx000081.] The CIT also determined there was a lack of public summaries of business confidential information to accompany the Attaché report and Verification Report. [*Id*.] On remand, the CIT directed CBP to comply with the public summary provision in 19 C.F.R. § 165.4 requiring public summaries of business confidential information and ordered Royal Brush be given an opportunity to present arguments based on such information. [*Id*.]

**<u>CBP's Final Remand Determination</u>**

After the remand proceedings, CBP issued its Final Remand Determination on April 8, 2021. [Appx000018.] CBP concluded the Verification Report did not contain "new factual information" and accordingly CBP correctly rejected Royal



66209992;1

Brush's rebuttal submission. [*Id*.] CBP found the verification process was correctly used to "test the accuracy of the information that the parties had submitted on the record." [Appx000024.] During this process, CBP found it properly verified invoices, information, documentation, and responses that had already been placed on the record. [Appx000024-25.]

CBP also determined that, in compliance with 19 C.F.R. § 165.4, CBP had placed revised public versions of nine documents containing business confidential documents – including the Verification Report and Attaché report – on the administrative record during remand, and, "after requiring interested parties to do the same, provided parties to the investigation an opportunity to submit rebuttal information and written arguments." [Appx000018-19.] In fact, Royal Brush had filed written arguments in February 2021 "challenging information revealed" by CBP's and Dixon's revised public summaries. [Appx001449; Appx000036.] CBP also accepted certain exhibits contained in a January 2021 submission by Royal Brush responding to the Attaché report and the Dixon Allegation. [Appx000036.]

Further, before issuance of the Final Remand Determination, CBP also had released a draft of its determination to interested parties and gave them a chance to comment on it before final issuance. [Appx000019.] Royal Brush submitted

comments on the draft in February 2021,[2] and such comments were addressed by CBP in its Final Remand Determination. [Appx001469-1491; Appx000019.]

**Royal Brush II**

After issuance of CBP's Final Remand Determination, the CIT reviewed the final evasion determination and issued its affirmance in *Royal Brush Manufacturing, Inc. v. United States*, 545 F. Supp. 3d 1357 (C.I.T. 2021) ("*Royal Brush II*"). [Appx000001.] As to the public summaries issue, the CIT explained that Royal Brush, CBP, Dixon, and the Philippine Shipper all entered revised public summaries into the administrative record. [Appx000007.] The CIT found CBP permitted the parties to submit rebuttal information relating to the revised public summaries, as well as written arguments regarding the same. [*Id*.] The CIT noted Royal Brush submitted such arguments. [*Id*.]

The CIT rejected Royal Brush's assertions that it was deprived of due process as a result of the alleged inadequacy of the revised public summaries. [Appx000007-10.] The CIT based its decision, in part, on application of the due process balancing test articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which it found Royal Brush failed to adequately address. [Appx000007-8.] The CIT also found CBP complied with its own regulation – 19 C.F.R. § 165.4 – setting forth the requirements for public summaries. [Appx000009-10.]

[2] Dixon did not submit comments on the draft.

The CIT further agreed the Verification Report did not contain "new factual information" under 19 C.F.R. § 165.23(c)(1) and therefore a rebuttal submission from Royal Brush was not permitted. [Appx000010-11.] The CIT reasoned: "Royal Brush does not provide authority for the proposition that adequate notice of the evasion investigation required CBP to provide advance notice regarding each aspect of the inquiry that CBP might find relevant to its investigation and determination." [Appx000010.] Additionally, the CIT explained: "with respect to the Philippine Shipper's overall production capacity, CBP noted that all of the Philippine Shipper's entries for the period of investigation were on the record, not just Royal Brush's entries. Thus, Royal Brush should not be surprised that CBP's 'investigation could potentially consider the Philippine[ ] Shipper's overall production capacity' given the relevance of a manufacturer's production capacity to a transshipment investigation." [*Id*.]

The CIT noted Royal Brush was given an opportunity to respond to the Verification Report and the Verification Agenda notified the Philippine Shipper that verification could cover any information provided in its responses to CBP's requests for information. [*Id*.] The CIT stated that while CBP emphasized the verification of information associated with five Royal Brush invoices, the verification was not limited to such invoices. [*Id*.] Thus, the CIT rejected Royal

Brush's contention that the Philippine Shipper's overall production capacity constituted a new issue requiring additional notice. [*Id.*]

The CIT also emphasized CBP did not base its evasion determination solely on its finding that the Philippine Shipper lacked capacity to produce all the pencils it shipped to the United States. [Appx000011.] CBP also was unable to confirm the Royal Brush-specific production information that the Philippine Shipper provided. [*Id.*] Both findings supported CBP's evasion determination.[3] [*Id.*]

The CIT, in *Royal Brush II*, sustained CBP's final evasion determination, as amended by CBP's remand results. [Appx000013.] The CIT entered judgment to this effect on October 29, 2021. [Appx000016-17.]

This appeal by Royal Brush followed.

[3] The CIT determined Royal Brush's argument regarding CBP's alleged improper reliance on adverse inferences, as an alternative basis for the evasion determination, to be moot because the CIT already found Royal Brush's argument regarding overall production lacked merit. [Appx000013.]

## SUMMARY OF ARGUMENT

Royal Brush re-hashes purported procedural defects while ignoring the considerable evidence of evasion supporting CBP's determination during the four-year-long proceedings. In its opening brief, Royal Brush does not contend the record evidence establishes the imported pencils were produced in the Philippines; to the contrary, the record is replete with evidence of transshipment and evasion. The standard of review on appeal is deferential to the CIT and CBP, and the decisions of both are well-reasoned and amply supported. Royal Brush fails to present any reversible error. Affirmance is warranted.

***First***, due process is a flexible standard, and Royal Brush received due process here. On appeal, Royal Brush fails to refute – or even address – the applicable procedural due process test in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Any argument Royal Brush may have as to this test has been waived.

Even if *Mathews* is considered, its "flexible" due process standard confirms Royal Brush received due process. *Mathews* mandates substantial weight be given to the procedures imposed by the agency leading administration of the subject program – *i.e.*, CBP. All *Mathews* factors establish Royal Brush received due process. Engaging in foreign commerce is not a fundamental right. There was no material risk of erroneous deprivation of any private interest Royal Brush may have as to payment of duties because the thorough proceedings – including an in-

depth CBP investigation, administrative appeal, two appeals to the CIT, and an exhaustive CBP remand determination – afforded Royal Brush substantial evidence supporting CBP's findings and gave Royal Brush numerous opportunities to respond and present evidence. Review of business confidential information not belonging to Royal Brush was a necessary part of the investigation. Royal Brush cites no authority entitling it to unredacted business confidential information of other entities. Revised summaries of business confidential information were given to Royal Brush on remand in accord with 19 C.F.R. § 165.4 and *Royal Brush I*, and Royal Brush was able to respond. CBP has a strong interest in protecting business confidential information, which can significantly harm business and economic interests if released, and CBP faces punishment under statute if it divulges such information. CBP properly balanced competing interests, complied with the law and its own regulations, and afforded Royal Brush due process.

***Second***, CBP complied with its own regulations and properly rejected Royal Brush's unauthorized rebuttal submission to the Verification Report. CBP did not place "new factual information" on the record in its Verification Report, and, consequently, Royal Brush was not authorized to submit rebuttal information under 19 C.F.R. § 165.23(c)(1). The verification process performed by CBP was expressly permitted by statute and regulations. The verification process and resulting Verification Report did not present "new factual information" entitling

rebuttal information from Royal Brush because they were merely part of the lawful, routine process of corroborating matters previously put on the record during the investigation. CBP also must ultimately be able to close the factual record to comply with statutory deadlines to complete its investigation. If CBP allowed post-verification rebuttal information in the absence of new factual information, it could cause an endless cycle of efforts to verify post-verification submissions – resulting in needless delay and potential prejudice to parties.

Case law also confirms the performance of calculations in the Verification Report based on information already in the record did not create new factual information. In addition, CBP did not place a "new theory of proof" on the record in its Verification Report by discussing the Philippine Shipper's overall production capacity. Royal Brush should not have been surprised that overall production capacity of the Philippine Shipper was at issue. Whether the Philippine Shipper had the capacity to produce all the product that it exports is undoubtedly relevant to this transshipment investigation. Further, the Philippine Shipper's entries for the period of investigation had been placed on the administrative record. Royal Brush also had notice before the on-site verification – via the Site Verification Engagement Letter and Site Verification Agenda – that the Philippine Shipper's overall production capacity was at issue.

***Finally***, CBP's findings are supported by substantial evidence and are not arbitrary and capricious. Substantial evidence is evidence a reasonable mind might accept as sufficient – it need not be the weight of the evidence. A finding may be supported by substantial evidence even if two inconsistent conclusions can be drawn. CBP determined the total U.S. imports of pencils from the Philippine Shipper in 2018 greatly surpassed that company's yearly production capacity. The Philippine Shipper lacked capacity to even come close to producing all the pencils that it exported to the United States. Royal Brush even undercuts its own argument by admitting CBP's findings "may support the conclusion that some pencils exported by the Philippine Manufacturer entered the U.S. through evasion" and such findings produce "the possibility . . . that a given shipment of pencils to the U.S. was not manufactured in the Philippines."

CBP's evasion determination also did not rest solely on the Philippine Shipper's overall production capacity. The record contains significant evidence of the Philippine Shipper re-packaging pencils from China into boxes stamped "Made in the Philippines" for shipment to the United States. CBP also was unable to confirm the Royal Brush-specific production information. The lack of production capacity – together with evidence reflecting transshipment and the wholly deficient records from the Philippine Shipper – is plainly sufficient for a reasonable mind to conclude the pencils imported by Royal Brush were manufactured in China.

# ARGUMENT

## A. Standard of Review.

When reviewing CBP's anti-dumping determination, this Court "applies anew the standard of review applied by the Court of International Trade in its review of the administrative record." *F.LLi De Cecco Di Filipo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000) (involving anti-dumping determination made by Commerce). Accordingly, this Court considers "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2)(B).

Arbitrary and capricious is a "highly deferential" standard of review. *Hines on Behalf of Servier v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991). If the agency "has considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Id.* The "arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency." *Ray v. Lehman*, 55 F.3d 606, 608 (Fed. Cir. 1995).

The abuse of discretion standard also is "highly deferential." *Bayer CropScience AG v. Dow AgroScience LLC*, 851 F.3d 1302, 1306 (Fed. Cir. 2017). The complainant must show there has been "a clear error of judgment in weighing

relevant factors or in basing [the] decision on an error of law or on clearly erroneous factual findings." *Id*.

In reviewing CBP's construction of a statute that it administers, this Court "defer[s] to the agency's reasonable statutory interpretation if not contrary to an unambiguous legislative intent as expressed in the words of the statute." *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1375-76 (Fed. Cir. 2003). CBP's statutory interpretation need not be the only reasonable or most reasonable interpretation. *Koyo Seiko Co., Ltd. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) ("[A]n agency's construction need not be the *only* reasonable interpretation or even the *most* reasonable interpretation. … Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another.") (emphasis in original). The Court also "accord[s] substantial deference" to an agency's "interpretation of its own regulations." *Huaiyin*, 322 F.3d at 1376.

Further, this Court gives "great weight to the informed opinion of the CIT and it is nearly always the starting point of [this Court's] analysis." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1300 (Fed. Cir. 2019) (citation omitted). The Court "will not ignore the informed opinion of the [CIT]" because the CIT "reviewed the record in considerable detail" and "[i]ts opinion deserves due

respect." *Magnesium Corp. of Am. v. United States*, 166 F.3d 1364, 1368 (Fed. Cir. 1999).

## B. The Flexible Standard Of Due Process Was Satisfied, And Royal Brush Received Due Process.

Contrary to Royal Brush's contentions [Op. Br. 16-28], Royal Brush received due process[4] during the evasion proceeding.[5] CBP did not base its findings on "secret" or withheld evidence. [*See* Op. Br. 16.] Evidence was not withheld. Instead, CBP fully complied with its own regulations governing business confidential information and afforded Royal Brush ample due process.

### 1. Royal Brush Fails To Address The Applicable Due Process Standard.

The U.S. Supreme Court's procedural due process test in *Mathews v. Eldridge*, 424 U.S. 319 (1976) controls and confirms Royal Brush received procedural due process. *See also Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 484

[4] The due process arguments raised by Royal Brush in its opening brief relate to purported lack of procedural due process rather than substantive due process. The CIT's due process analysis also pertains to procedural due process. [Appx000007.] In addition, Royal Brush lacks substantive due process rights here. *See NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998) ("Indisputably, engaging in foreign commerce is not a fundamental right protected by notions of substantive due process.").

[5] "Evasion" is defined as "entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise." 19 U.S.C. § 1517(a)(5)(A).

(Fed. Cir. 1985) (noting *Mathews* test is "general test for due process in administrative procedures"). As happened before the CIT, Royal Brush again fails to refute *Mathews* on appeal. [Appx000007 ("Royal Brush does not frame its argument in terms of the *Mathews* balancing test and makes no argument as to the first and third factors.").]

Royal Brush does not rebut, or even reference, *Mathews*, or the procedural due process set forth therein, in its opening brief and, therefore, any argument Royal Brush might have regarding *Mathews* has been waived. *See Rumsfeld v. Freedom, NY, Inc.*, 346 F.3d 1359, 1361 (Fed. Cir. 2003) ("[A]n issue not raised by an appellant in its opening brief . . . is waived.") (internal quotations omitted); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed Cir. 1990) ("[W]e see no reason to depart from the sound practice that an issue not raised by an appellant in its opening brief . . . is waived.").

Even if the *Mathews* due process factors are examined, application of this "flexible" test establishes Royal Brush received due process. As explained in *Mathews*, "due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." 424 U.S. at 334 (internal parentheses and quotation omitted). Instead, due process is "flexible and calls for such procedural protections as the particular situation demands." *Id*. In short, "[a]ll that is necessary is that the procedures be tailored, in light of the

decision to be made, to the capacities and circumstances of those who are to be heard[.]" *Id*. at 349 (internal quotation omitted). Substantial weight must be afforded to the procedures imposed by those leading administration of the program at issue – *i.e*., CBP. *Id*.

Under *Mathews*, in administrative proceedings, determination of whether "the administrative procedures provided . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Id*. at 335. To resolve whether "administrative procedures" are "constitutionally sufficient," a court reviews three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335.

Here, all factors confirm Royal Brush received due process. As to Royal Brush's private interest, engaging in foreign commerce is not a fundamental right. *See NEC Corp*, 151 F.3d at 1369. There also was no material risk of erroneous deprivation of any private interest Royal Brush may have as to payment of duties because the extensive and thorough four-year-long proceedings afforded Royal Brush ample evidence supporting CBP's findings and provided Royal Brush with

numerous opportunities to present evidence and/or respond. Royal Brush does not challenge whether business confidential information is at issue – it indisputably is. During the administrative proceedings, pertinent business confidential information not belonging to Royal Brush was necessarily under review by CBP in connection with its investigation. Revised public summaries of business confidential information were provided to Royal Brush on remand in accordance with 19 C.F.R. § 165.4 and *Royal Brush I* [Appx000058-66; Appx001370-1448], and Royal Brush responded with filed written arguments [Appx001449].

Royal Brush further fails to cite any authority establishing that it was entitled to receive the underlying business confidential information itself.[6] It also has failed to show any "probable value" would have resulted had it received such sensitive information when it had the revised summaries and ample notice of the issues under review. The record contains significant evidence of transshipment and duty evasion, of which Royal Brush had substantial notice and opportunity to respond.

Additionally, CBP has a strong interest in protecting sensitive business confidential information, which can adversely affect the business and economic interests of applicable parties if released, and CBP faces punishment if it divulges

[6] Royal Brush also admits it "gained access to [CBP's] figures during its first appeal to the CIT when its counsel received the complete administrative record." [Op. Br. 20.]

such information. *See* 18 U.S.C. § 1905 (punishing employee or officer of U.S., or any department or agency thereof, for disclosing confidential information learned during course of employment); *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1483 (Fed. Cir. 1986) ("[W]here confidential material is disclosed to an employee of a competitor, the risk of the competitor's obtaining an unfair business advantage may be substantially increased."). CBP appropriately weighed competing interests and complied with the law and its own regulations. Royal Brush received due process under *Mathews*.

Royal Brush incorrectly asserts this case is controlled by *Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio*, 301 U.S. 292 (1937). [Op. Br. 28.] *Ohio Bell* involved a utility commission, not CBP or the EAPA. It also did not involve 19 C.F.R. § 165.4 governing the summarization of business confidential information or an agency's interpretation of its own regulations. In addition, summaries of business confidential information were not provided in that case. Instead, it was unknown as to what "particular or evidential facts" the Commission judicially noticed and there was "no way to find them out." *Ohio Bell*, 301 U.S. at 302. *Ohio Bell* is wholly inapt.

**2. CBP Complied With Its Own Regulations Governing The Treatment of Business Confidential Information.**

Further underscoring that Royal Brush received due process is CBP's compliance with its own regulations governing the treatment of business

confidential information. *See Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1343 (C.I.T. 2021) ("Customs complied with its regulation concerning public summarization of confidential information. As such, the court finds that Customs did not violate DTT USA's due process rights.").

CBP's regulation – 19 C.F.R. § 165.4 – strikes a balance that provides for the protection of business confidential information while allowing other parties to review a public summary of such information. This regulation provides that if an interested party claims a filing contains business confidential information, it "must also file a public version of the submission" that "contain[s] a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information." 19 C.F.R. § 165.4(a)(2). If a party asserts that summarization is impossible, then the claim "must be accompanied by a full explanation of the reasons supporting that claim." *Id*. The public summaries of the business confidential information are to be placed on the administrative record. 19 C.F.R. § 165.4(e). 19 C.F.R. § 165.4 contains no reference to obtaining or requiring a protective order, and the EAPA does not reference protective orders.

Here, as correctly explained by the CIT, CBP adhered to 19 C.F.R. § 165.4: "[o]n remand, CBP required the submission of public summaries to accompany confidential documents when necessary for compliance with 19 C.F.R. § 165.4(a)(2) and (e). . . . Royal Brush, Dixon, the Philippine Shipper and CBP all

placed revised public summaries on the record." [Appx000007.] As noted by CBP – and as confirmed by review of the revised public summaries [Appx000058-66; Appx001370-1448] – CBP "summarized business confidential information with reasonable specificity." [Appx000037.] "The revised public versions of documents containing confidential import data describe the information included in each document, while explaining that the summarization of data itself is not possible. Such summary permits reasonable understanding that the document contains business confidential import data, elements of such data, and relevant dates."[7] [Appx000037-38.]

The revised public summaries accordingly provided Royal Brush with adequate description of the substance of the information in compliance with 19 C.F.R. § 165.4. Royal Brush had notice of the allegation against it and the relevant issues. It knew, or should have known, the types of evidence it needed to submit to demonstrate that its pencils are manufactured in the Philippines. It simply failed to provide such evidence.

CBP further allowed the parties to submit rebuttal material relating to the revised public versions of the administrative record documents and "allowed the submission of written arguments responsive to the public summaries." [*Id.*] Royal

[7] CBP also provided public summaries of confidential business information in the Attaché report and the Verification Report in accordance § 165.4(a)(2). [Appx000038.]

Brush indeed submitted arguments in response to the public summaries. [*Id.*] Accordingly, Royal Brush had ample opportunity to be heard.

Royal Brush fails to adequately explain how the outcome would have changed had it seen the business confidential information during the administrative proceeding. *See SmithKline Diagnostics, Inc. v. Helena Labs Corp.*, 859 F.2d 878, 892 (Fed. Cir. 1988) ("On appeal it is [appellant's] burden to show not only that the district court erred, but also to persuade this court that had such error not occurred the result might have been different."). While Royal Brush claims the public summaries were not adequately specific, it has not explained how the result of the proceeding would have changed had different summaries or unredacted business confidential information been provided. The record reflects significant evidence of transshipment and duty evasion separate from the redacted information. CBP's final evasion determination is robustly supported.

In sum, Royal Brush actively participated in these proceedings and had ample opportunity to be heard – it simply disagrees with the outcome, which does not amount to a denial of due process. *See Sichuan Changhong Elec. Co., Ltd. v. United States*, 466 F. Supp. 1323, 1327 (C.I.T. 2006) ("In order to succeed in its due process claim . . . [plaintiff] must show that its opportunity to be heard was unreasonably curtailed.") (emphasis added); *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 762 (Fed. Cir. 2012) ("Avisma cannot claim to have been

unaware that Commerce might opt to reject its proposed new methodology. Avisma had the opportunity to put forth evidence supporting its proposed accounting methodology but failed to do so. Avisma was not deprived of due process.").

## C. CBP Complied With Its Own Regulations And Properly Rejected Royal Brush's Unauthorized Rebuttal Filing.

Despite Royal Brush's arguments [Op. Br. 28-36], CBP comported with its own regulations and correctly rejected Royal Brush's rebuttal filing because CBP did not place "new factual information" on the administrative record.

CBP regulation 19 C.F.R. § 165.23(c)(1) provides:

> *(1) Responses to CBP requests for factual information*. Factual information requested by CBP pursuant to paragraph (a) of this section must be submitted to CBP within the timeframe set forth by CBP in the request. The public version must also be served via an email message or through any other method approved or designated by CBP on the parties to the investigation. If CBP places new factual information on the administrative record on or after the 200th calendar day after the initiation of the investigation (or if such information is placed on the record at CBP's request), the parties to the investigation will have ten calendar days to provide rebuttal information to the new factual information.

19 C.F.R. § 165.23(c)(1) (underline emphasis added). Therefore, if CBP places "new factual information" on the record on or after 200 calendar days from investigation initiation, then parties may provide rebuttal information – but only to the "new factual information." While neither the CBP regulations nor the EAPA define "new factual information," such information was not presented.

### 1. The Verification Report Did Not Contain "New Factual Information."

As explained below, CBP's Verification Report did not contain "new factual information" to which Royal Brush was entitled to provide rebuttal information. However, before addressing that matter, it is important to note Royal Brush was permitted to submit – and, in fact, did submit – written arguments in response to the Verification Report. [Appx001247-1291.] Additionally, before issuance of its Final Remand Determination, CBP released a draft determination – which addressed the Verification Report and purported new factual information – and gave Royal Brush a chance to comment on it before final issuance. [Appx000019.] Royal Brush submitted comments on the draft, and such comments were addressed by CBP in its Final Remand Determination. [Appx001469; Appx000019.] Thus, Royal Brush was given an opportunity to be heard on the issue.

Further, Royal Brush was not authorized to submit rebuttal information because CBP did not place "new factual information" on the record in its Verification Report. Verification was performed by CBP as expressly authorized by 19 U.S.C. § 1517(c)(2)(B) and 19 C.F.R. § 165.25(a). And, as correctly explained by CBP, it is "the process by which CBP checks, reviews, and corroborates factual information previously submitted or placed on the record." [Appx000022 (emphasis added)]; *see also* 19 U.S.C. § 1517(c)(2)(B) ("the Commissioner may collect such additional information as is necessary to make the

determination through such methods as the Commissioner considers appropriate, including by . . . conducting verifications, including on-site verifications, of any relevant information."); 19 C.F.R. § 165.25(a) ("Prior to making a determination under § 165.27, CBP may in its discretion verify information in the United States or foreign countries collected under § 165.23 as is necessary to make its determination."). In short, the "verification report serves only to document CBP's verification of information previously placed on the record." [Appx000022 (emphasis added).]

The verification process and resulting Verification Report did not present "new factual information" entitling rebuttal information because they were simply part of the routine process of corroborating and confirming matters already on the administrative record. [*See* Appx000023.] In practical terms, CBP must also be able to close the factual record to comply with applicable statutory deadlines to complete its investigation, and, if CBP permitted post-verification rebuttal submissions, it could cause an "endless cycle of attempts to verify those post-verification submissions or CBP would simply be unable to verify those submissions." [*Id.*] CBP's position on this matter is well-reasoned and not arbitrary, capricious, or an abuse of direction – it should be upheld. *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998) (in determining whether agency action is arbitrary, capricious, or an abuse of discretion, "[c]ourts

look for a reasoned analysis or explanation for an agency's decision"); C*eramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("A court may 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.").

Further, CBP's performance of calculations in the Verification Report based on information already in the record did not create "new factual information." As correctly explained by the CIT in *Royal Brush II,* in the Verification Report, "CBP used the data to identify discrepancies and perform basic calculations for the purposes of verification." [Appx000015.] Royal Brush erroneously argues such calculations constitute new factual information. [Op. Br. 14, 32-33.] However, calculations and analysis made from the record do not constitute new factual information. *See Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 241 (C.I.T. 1999) (distinguishing between "calculations or analysis gleaned from record" and new factual information); *Jowett, Inc. v. Dep't of Navy*, 729 F. Supp. 871, 877 (D. D.C. 1989) ("Just because part of a document contains numbers and mathematical calculations does not necessarily mean that it is factual . . . ."); *see also Sichuan Changhong Elec. Co. v. United States*, 466 F. Supp. 2d 1323, 1329 (C.I.T. 2006) ("This Court has found that limiting the submission . . . of new factual information is reasonable because an agency 'clearly cannot complete its work unless it is able at some point to

'freeze' the record and make calculations and findings based on that fixed and certain body of information.").

CBP's calculations in the Verification Report were not new factual information; instead, as properly explained by CBP, they were "simply CBP using and verifying the factual data on the record and therefore are a natural part of CBP's investigation as to whether evasion occurred." [Appx000026 (emphasis added).] CBP's interpretation of its own regulations – concluding that new factual information was not present – is entitled to significant deference and should be upheld here due to its reasonableness. *See Udall v. Tallman*, 380 U.S. 1, 16 (1965) ("[T]his Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one or even that it is the result we would have reached . . . . When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order.") (internal quotations omitted).

In addition, when terms are undefined in a regulation, "the court may consider the definitions of those terms in order to determine their meaning." *Mass Mut. Life Ins. Co. v. United States*, 782 F.3d 1354, 1367 (Fed. Cir. 2015). "It is appropriate to consult dictionaries to discern the ordinary meaning of a term not explicitly defined by statute or regulation." *Am. Express Co. v. United States*, 262

F.3d 1376, 1384 n.5 (Fed. Cir. 2001). Accordingly, dictionaries may be used to understand the meaning of the phrase "new factual information" in the regulation.

Here, the term "new" means "recently come into being." BLACK'S LAW DICTIONARY (11th ed. 2019). The dictionary definition of "factual" is "of or relating to facts."[8] The word "fact" is defined as "[s]omething that actually exists; an aspect of reality." BLACK'S LAW DICTIONARY (11th ed. 2019).

The Verification Report did not contain new factual information because it did not set forth new matters into existence. Rather, it appropriately contained mathematical computations – *i.e.*, analysis – based on underlying facts that already existed in the administrative record. [*See* Appx000010 ("CBP explained that 'calculations based on the data submitted in response to [requests for information ('RFIs')]' were not new factual information but instead represented 'CBP using and verifying the factual data on the record."; "CBP explained that the findings in the [Verification] report did not constitute new factual information but instead identified 'discrepancies in the information that was placed on the record,' or, in other words, represented '[t]he results of the verification of that information.').]

[8] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/factual (last accessed June 8, 2022).

### 2. The Verification Report Did Not Contain A New Theory Of Proof.

Royal Brush further incorrectly asserts CBP placed a "new theory of proof" on the record in its Verification Report, to which Royal Brush was entitled to respond. [Op. 13-14, 32-33.] Royal Brush argues that, after verification, CBP shifted, for the first time, to relying on whether the Philippine Shipper could have produced all the pencils it exported to the United States in 2018 rather than just the pencils imported by Royal Brush. [*Id*.] This argument fails for multiple reasons.

First, Royal Brush neglects to provide any authority for the proposition that sufficient notice of the evasion investigation necessitated CBP provide advance notice as to every aspect of the inquiry that CBP might find relevant to its investigation. Second, 19 C.F.R. § 165.23(c)(1) permits rebuttal to "new factual information" not a "new theory of proof." The term "new theory of proof" is not contained in that regulation, and the regulation affords no permission to provide rebuttal to a new theory of proof. Third, Royal Brush should not have been surprised that the Philippine Shipper's overall production capacity was at issue. As cogently explained by CBP, whether the Philippine Shipper had the capacity to produce all of the product that it exports is "<u>plainly relevant to any transshipment investigation</u>." [Appx000031 (emphasis added).]

Further, both the Philippine Shipper and Royal Brush had advance notice before the on-site verification – via the Site Verification Engagement Letter and

Site Verification Agenda – that the Philippine Shipper's overall production capacity was at issue. Royal Brush's counsel received e-mails containing the public version of the Site Verification Engagement Letter and the Site Verification Agenda before the site visit, which contained all the notice language discussed below. [Appx001167; Appx001171.] The Philippine Shipper's counsel received these documents as well, in addition to the confidential version of the Site Verification Engagement Letter. [*Id.*]

The Site Verification Engagement Letter advised that CBP, pursuant to 19 C.F.R. § 165.25(a), could verify a broad set of information – it could verify "information in the United States or foreign countries . . . <u>as is necessary to make its determination</u>." [Appx001168.] The Site Verification Agenda contains similar disclosure language, noting the purpose of verification site visit was to "verify information . . . <u>as is necessary to make a determination</u>." [Appx001172 (emphasis added).]

The Site Verification Agenda also advised that CBP would obtain documents, such as the "production schedule" to "determine what type of processing is performed at the factory <u>and its production capabilities</u>." [*Id.* (emphasis added).] Further, the Site Verification Agenda advised CBP would "continue the review of [the Philippine Shipper's] production records and verify any other relevant factory records." [Appx001173.] The Site Verification

Engagement Letter advised the Philippine Shipper "to be prepared to walkthrough [its] production process in detail" using certain invoices. [Appx001169.] The Site Verification Agenda noted that "PRODUCTION RECORDS" would be reviewed regarding certain invoices. [Appx001172-1173.] CBP also reserved the right to review "[o]ther records . . . as appropriate, for issues that come up as a result of the records being reviewed." [Appx001173.] The Philippine Shipper and Royal Brush had ample prior notice that the Philippine Shipper's overall production capacity was at issue – this matter was not raised for the first time in the Verification Report.

In addition, as explained by the CIT, "with respect to the Philippine Shipper's overall production capacity, CBP noted that <u>all of the Philippine Shipper's entries for the period of investigation were on the record, not just Royal Brush's entries</u>." [Appx000010 (emphasis added); Appx000026 (CBP's Final Remand Determination stating: "[T]he Philippines Shipper's CBP entries are on the record of the investigation and are not new information.").] Similarly, as noted in CBP's Final Remand Determination, "the Philippines Shipper placed information regarding its overall production capacity on the record" and "all entries from the Philippine Shipper, from FY2014 through FY2018, were placed on the record and therefore within the scope of verification." [Appx000030.] Thus, the Philippine Shipper's overall production capacity was not a "new theory

of proof" as claimed by Royal Brush and Royal Brush should not have been surprised that it was contained in the Verification Report.

Finally, Royal Brush erroneously suggests CBP relied on the "logical outgrowth" to support its position regarding new factual information and that such test precludes the action taken by CBP. [Op. Br. 24.] CBP did not rely on the logical outgrowth test and made no reference to that test. Accordingly, Royal Brush's arguments on the matter are irrelevant and merely detract from the applicable issues. The logical outgrowth test applies to agency rulemaking and recognizes "a certain degree of change between a[] [notice of proposed rulemaking] and a final rule is inherent" to the rulemaking process. *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017). A final rule is a "logical outgrowth of a proposed rule" when "interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject." *Id*. Rulemaking is not at issue here. Accordingly, the logical outgrowth test pertaining to rulemaking is not applicable.

**D. CBP's Findings Are Supported By Substantial Evidence And Are Not Arbitrary And Capricious.**

While Royal Brush concedes "the [CBP's] verification team's findings <u>may support the conclusion that some pencils exported by the Philippine Manufacturer entered the U.S. through evasion</u>" and such findings produce "<u>the possibility . . . that a given shipment of pencils to the U.S. was not manufactured in the</u>

Philippines" [Op. Br. 40 (emphasis added)], it nonetheless contends CBP's evasion determination is arbitrary and capricious because it is not supported by substantial evidence [Op. Br. 36-42]. This argument fails.

**1. Substantial Evidence May Be Present Even If Inconsistent Conclusions Can Be Drawn From The Same Evidence.**

Substantial evidence is evidence "a reasonable mind might accept as adequate to support a conclusion." *Novosteel SA v. United* States, 284 F.3d 1261, 1269 (Fed. Cir. 2002); *see also Maverick Tube Corp. v. United States*, 857 F.3d 1353, 1359 (Fed. Cir. 2017). Critically, a finding may be supported by substantial evidence "even if two inconsistent conclusions can be drawn from the evidence." *Viet I-Mei Frozen Foods Co., Ltd. v. United States*, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (emphasis added); *see also Minebea Co., Ltd. v. United States*, 984 F.2d 1178, 1182 (Fed. Cir. 1993) ("The possibility of drawing different and inconsistent conclusions from the evidence does not prevent the [agency's] determination from being supported by substantial evidence.").

Substantial evidence does not need to amount to the weight of the evidence and can be present even if conflicting conclusions may be drawn from the same evidence. *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (substantial evidence is "more than a mere scintilla[]" . . . but is satisfied by "something less than the weight of the evidence"); *Viet I-Mei*, 839 F.3d at 1106. In short, the substantial evidence standard is a deferential standard of review. *Nippon*

*Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (noting "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential").

Here, in the detailed Verification Report, CBP found the Philippine Shipper's average annual production capacity to be [[ **Redacted: Production Capacity Information** ]] gross pencils per year. [Appx001202.] However, CBP determined the total U.S. imports of pencils from the Philippine Shipper in 2018 was [[ **Redacted: Production Volume Information** ]] gross pencils, which surpassed that company's yearly production capacity by [[ **Redacted: Production Capacity Information** ]]%. [*Id.*] Therefore, CBP appropriately concluded the Philippine Shipper lacked the capacity to even come close to producing all the pencils that it exported to the United States.[9] This conclusion is plainly supported by the record information and calculations.

### 2. CBP's Evasion Determination Was Not Based Solely On Overall Production Capacity.

Additionally, as noted by the CIT, CBP's evasion determination did not rest exclusively on the Philippine Shipper's overall production capacity. Royal Brush's own evidence supports a finding of evasion. A quality compliance testing form provided by Royal Brush relating to Royal Brush pencils expressly lists China as

[9] For the first time on appeal, Royal Brush asserts the Philippine Shipper had the capacity to produce [[ **Redacted: Production Capacity Information** ]]% of all the pencils that it shipped to the United States in 2018. [Op. Br. 15, 39.] This argument is waived. *Hylete LLC v. Hybrid Athletics, LLC*, 931 F.3d 1170, 1175 (Fed. Cir. 2019) ("We hold that Hylete's arguments . . . are raised for the first time on appeal and are therefore waived."). Further, as explained herein, CBP's finding that the Philippine Shipper lacked sufficient capacity is supported by substantial evidence.

the pencils' country of origin, the United States as the destination country, and Royal Brush as the applicant seeking testing. [Appx000791.]

The Attaché's report is also compelling. For example, the Attaché's report – complete with supporting photographs – noted staff at the Philippine Shipper's facility were taking pencils from boxes with Chinese characters on them and repackaging the pencils into boxes labeled "Made in the Philippines": "We clearly observed staff opening boxes and repacking pencils into boxes labeled, 'Made in the Philippines' while we were outside the facility. The original boxes had Chinese characters and it appeared the staff were simply repacking the pencils." [Appx000174 (emphasis added).] That report elaborated: "Staff appeared to be repacking China origin products into boxes labeled, 'Made in Philippines' for export . . . . The painting machines had dust covering the machinery. The separate manufacturing warehouse did not indicate production of any products for some time. The manufacturing warehouse looked like the staging area for the pictures sent to Office of Trade, some of the machinery had cobwebs." [Appx000175.] This report found there was a "clear story line of repacked Chinese pencils bound for the United States in boxes labeled, Made in the Philippines." [*Id.*]

CBP's Verification Report also contains substantial support for evasion. It explained the close relationship between officers of the Philippine Shipper and trading companies located in China and, in some instances, their partial ownership

of such Chinese trading companies by employees of the Philippine Shipper. [Appx001193.] Royal Brush purchase orders and proforma invoices between Royal Brush and the Philippine Shipper were even kept in China. [Appx001194.] As noted in the Verification Report, the Philippine Shipper even conceded it had received a shipment of finished pencils from China in 2015 that was intended for the United States, but it failed to meet U.S. importation requirements. [*Id*.]

CBP also was unable to confirm the Royal Brush-specific production information that the Philippine Shipper provided. [Appx000011.] The Verification Report asserted the Philippine Shipper failed to provide significant amounts of requested documentation, provided incomplete documentation without further explanation, presented altered records, provided incomplete payroll and accounting records, and had deleted e-mails. [Appx001195-1199.] CBP was unable to confirm that the relevant employees were paid and that there was pencil production during applicable time periods. [Appx001200.]

The Philippine Shipper's significant lack of production capacity, together with considerable evidence reflecting the transshipment of pencils made in China by the Philippine Shipper, is sufficient to reasonably conclude the pencils imported by Royal Brush were not produced by the Philippine Shipper and instead were manufactured in China. *See Standley v. Dep't of Energy*, 26 F.4th 937, 944 (Fed. Cir. 2022) ("[Appellant's] suggested alternative conclusion is certainly possible,

but it does not detract from the substantial evidence supporting the Board's conclusion. . . . [W]e cannot reverse or vacate on this record given the standard of review."); *Viet I-Mei*, 839 F.3d at 1106 (finding may be supported by substantial evidence "even if two inconsistent conclusions can be drawn from the evidence"); *Minebea*, 984 F.2d at 1182 (Fed. Cir. 1993) ("The possibility of drawing different and inconsistent conclusions from the evidence does not prevent the [agency's] determination from being supported by substantial evidence."). CBP's findings are supported by substantial evidence.

**3. CBP Applied The Correct Burden Of Proof.**

Finally, CBP did not improperly allocate the burden of proof. [*See* Op. Br. 14, 38.] Under the applicable burden of proof, CBP only needed to make a "determination" based on substantial evidence as to whether covered merchandise was entered into the United States through evasion. 19 U.S.C. § 1517(c)(1) (". . . the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion"); 19 C.F.R. § 165.27(a) ("Upon conclusion of the investigation, CBP will make a determination based on substantial evidence as to whether covered merchandise was entered into the customs territory of the United States through evasion. "). Neither the statute nor

regulations require CBP make a determination that all of Royal Brush's cased pencil imports were entered through evasion.

Here, in accordance with the correct burden of proof, as stated in its Notice of Final Determination as to Evasion, CBP expressly made a determination as to whether covered merchandise was entered into the United States through evasion: "[CBP] has determined that there is substantial evidence that [Royal Brush], entered into the customs territory of the United States through evasion merchandise covered by" the Antidumping Order and further that "[s]ubstantial evidence demonstrates that Royal Brush imported cased pencils made in China by transshipping the pencils through the Subic Bay, Philippines and falsely declaring the country of origin." [Appx000058; Appx000066 (noting CBP's "determination" as to evasion).] CBP's Final Remand Determination further confirms CBP made an evasion determination per the statutory standard of proof. [Appx000018 (noting "CBP's affirmative determination of evasion of the antidumping duty order"); Appx000019 (noting CBP's "determination of evasion"); Appx000023 (noting CBP's "evasion determination"); Appx000041 (noting CBP's "final determination of evasion"); Appx000056 (noting CBP's "determination" of evasion).]

CBP finding Royal Brush failed to provide support that the pencils were produced in the Philippines was merely one aspect of the overall analysis

employed CBP to make its determination – CBP did not erroneously shift the burden of proof to Royal Brush. Royal Brush was required to exercise reasonable care when importing into the United States. 19 U.S.C. § 1484(a) (importer of record shall use "reasonable care" when making and completing entry). CBP properly made its evasion determination under the EAPA.

## CONCLUSION

Royal Brush received due process – it simply disagrees with the result of the extensive and thorough four-year-long proceedings. This is not a valid basis for reversal. CBP complied with the law and its own regulations. Royal Brush fails to present any reversible error. For the reasons expressed above, Dixon respectfully requests this Court affirm the appealed opinion and judgment entered by the CIT.

Respectfully submitted,

*/s/ Felicia Leborgne Nowels*
Felicia Leborgne Nowels
Michael J. Larson
**AKERMAN LLP**
201 East Park Avenue, Suite 300
Tallahassee, Florida 32301
Telephone: (850) 224-9634
Fax: (850) 222-0103
felicia.nowels@akerman.com
michael.larson@akerman.com

Julia Padierna-Peralta
**AKERMAN LLP**
750 9th Street, N.W.
Suite 750
Washington, D.C.
Telephone: (202) 393-6222
Fax: (202) 393-5959
julia.padierna-peralta@akerman.com

*Attorneys for Appellee*
*Dixon Ticonderoga Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2022, the foregoing was electronically filed with the Court through the CM/ECF system and a true and correct copy of the foregoing was served on counsel of record for all parties via e-mail through the Court's CM/ECF system.

*/s/ Felicia Leborgne Nowels*
Felicia Leborgne Nowels

## **CERTIFICATE OF COMPLIANCE**

With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) and Fed. Cir. R. 32(b) because:

The brief contains 10,512 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 8, 2022

*/s/ Felicia Leborgne Nowels*
Felicia Leborgne Nowels