2022-1226

# United States Court of Appeals for the Federal Circuit

**ROYAL BRUSH MANUFACTURING, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, DIXON TICONDEROGA COMPANY,**
*Defendants-Appellees*

Appeal from the United States Court of International Trade in No. 1:19-cv-00198-MAB, Judge Mark A. Barnett.

# CORRECTED NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT ROYAL BRUSH MANUFACTURING, INC.

STEVEN D. GORDON
RONALD A. OLEYNIK
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 955-3000
*Counsel for Plaintiff-Appellant*

September 9, 2022

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 22-1226

**Short Case Caption** Royal Brush Manufacturing, Inc. v. US

**Filing Party/Entity** Royal Brush Manufacturing, Inc.

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/09/2022

Signature: /s/ Steven D. Gordon

Name: Steven D. Gordon

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Royal Brush Manufacturing, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Antonia I. Tzinova of Holland & Knight LLP | Dariya V. Golubkova of Holland & Knight LLP | Libby Bloxom of Holland & Knight LLP |
| Liliana V. Farfan of Holland & Knight LLP | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST
STATEMENT OF RELATED CASES ....................1
JURISDICTIONAL STATEMENT ....................1
STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................1
STATEMENT OF THE CASE ....................2
A. The Allegation and Initial Investigation ....................2
B. Formal Investigation ....................3
1. Attaché Report ....................4
2. Verification Report ....................5
3. Rejected Rebuttal Filing ....................6
C. Initial Agency Determination as to Evasion ....................8
D. Administrative Determination on Appeal ....................8
E. Initial Appeal to the CIT ....................9
F. Proceedings on Remand to Customs ....................10
G. Return to the CIT ....................11
SUMMARY OF APPELLANT'S ARGUMENT ....................13
ARGUMENT ....................15
A. Standard of Review. ....................15
B. Customs Withheld Evidence on Which It Relied from Royal Brush, Thereby Depriving Royal Brush of Due Process ....................16
1. An agency cannot use secret evidence in its adjudications. ....................16
2. Customs adjudicated Royal Brush's liability on the basis of secret evidence. ....................18
3. Customs' due process violations are a direct result of its flawed adjudication procedures. ....................23
4. Customs' use of secret evidence cannot be upheld. ....................25
C. Customs Erred By Rejecting Royal Brush's Rebuttal Filing. ....................28
1. Customs changed course during the verification process ....................29

2. Customs offered the CIT differing constructions of "new factual information." .......... 30

3. Royal Brush was entitled to submit a rebuttal to the Verification Report because it contained new factual information and a new theory of proof. .......... 32

D. Customs' Finding Of Evasion Is Arbitrary And Capricious .......... 36

CONCLUSION .......... 43

ADDENDUM

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

CERTIFICATE OF CONFIDENTIAL MATERIAL

CERTIFICATE OF SERVICE

**USE OF SLIP SHEETS & CITATION GUIDE:**

To ensure consistent pagination across the confidential and public versions of the Addenda and, in turn, the Appendix, the parties rely on slip sheets and page breaks. Specifically, slip sheets are used to account for any differences in document length, and page breaks are used, in the confidential version of the Addenda and Appendix, to account for there being two public versions ("original" and "revised") of certain record documents. Approach presented to and endorsed by the CAFC Clerk's Office, via phone, on August 31, 2022, and described in greater detail following the Addenda's and Appendices' tables of contents.

**DESCRIPTION OF CONFIDENTIAL MATERIAL THAT HAS BEEN DELETED**

The material omitted on pages 2, 5, 15, 16, 39–41 disclose the dollar amount of potential damages, information about the parties' inventory and production processes, and calculations based on materials that are subject to the U.S. Court of International Trade's standing Protective Order.

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. Patterson, Inc. v. United States*,
585 F. App'x 778 (Fed. Cir. 2014) ....................36

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
70 F.3d 1045 (9th Cir. 1995) ....................18

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
935 F.3d 1319 (Fed. Cir. 2019) ....................34

*BMW of North America LLC v. United States*,
926 F.3d 1291 (Fed. Cir. 2019) ....................16

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*,
419 U.S. 281 (1974)....................17, 29

*Brenner v. Dept. of Veterans Affs.*,
990 F.3d 1313 (Fed. Cir. 2021) ....................36

*Creswell Trading Co. v. United States*,
15 F.3d 1054 (Fed. Cir. 1994) ....................39

*CSX Transp. Inc. v. Surface Transp. Bd.*,
584 F.3d 1076 (D.C. Cir. 2009)....................35

*Dickinson v. Zurko*,
527 U.S. 150 (1999)....................16, 37

*Doty v. United States*,
53 F.3d 1244 (Fed. Cir. 1995) ....................18

*Flyers Rights Education Fund, Inc. v. Federal Aviation Admin.*,
864 F.3d 738 (D.C. Cir. 2017)....................18

*Gen. Dynamics Ordnance and Tactical Sys., Inc.*,
ASBCA Nos. 56870, 56957, 2010 WL 3119469 (June 1, 2010) ....................27

*Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*,
936 F.3d 1353 (Fed. Cir. 2019) ....................37

*Hudick v. Wilkie*,
755 F. App'x 998 (Fed. Cir. 2018) ....................26

*Jones Total Health Care Pharmacy, LLC v. D.E.A.*,
881 F.3d 823 (11th Cir. 2018) ....................26

*In re Kumar*,
418 F.3d 1361 (Fed. Cir. 2005) ....................33

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ....................37

*McClelland v. Andrus*,
606 F.2d 1278 (D.C. Cir. 1979)....................26

*Mid Continent Nail Corp. v. United States*,
846 F.3d 1364 (Fed. Cir. 2017) ....................35

*NEC Corp. v. United States*,
151 F.3d 1361 (Fed. Cir. 1998) ....................17

*NSK Corp. v. U.S. Intern. Trade Com'n*,
542 F. App'x 950 (Fed. Cir. 2013) ....................16

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*,
301 U.S. 292 (1937)....................19, 28

*Pesquera Mares Australes Ltda. v. United States*,
266 F.3d 1372 (Fed. Cir. 2001) ....................17

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) ....................29, 32

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
758 F.3d 296 (D.C. Cir. 2014)....................27

*Ramirez v. Dep't of Homeland Sec.*,
975 F.3d 1342 (Fed. Cir. 2020) ....................17

*Rodriguez v. Dept. of Veterans Affs.*,
8 F.4th 1290 (Fed. Cir. 2021) ....................42

*Royal Brush Manufacturing, Inc. v. United States*,
483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) ....................26, 31

*Royal Brush Manufacturing, Inc. v. United States*,
No. 19-00198, --- F. Supp. 3d ----, 2021 WL 5033650 (Ct. Int'l Trade Oct. 29, 2021) ....................26

*Roytberg v. United States*,
No. 15-cv-5560, 2016 WL 1559151 (E.D.N.Y. Apr. 18, 2016)....................27

*SeAH Steel VINA Corp. v. United States*,
950 F.3d 833 (Fed. Cir. 2020) ....................40

*Hines ex rel. Sevier v. Sec'y of HHS*,
940 F.2d 1518 (Fed. Cir. 1991) ....................36

*Siemens Energy, Inc. v. United States*,
806 F.3d 1367 (Fed. Cir. 2015) ....................37

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
17 C.I.T. 146, 818 F.Supp. 348 (1993)....................40

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*,
841 F.3d 1141 (10th Cir. 2016) ....................40

**Statutes**

15 U.S.C. § 46(f)....................24

18 U.S.C. § 1905....................27

19 U.S.C. § 1517(c)(1)....................38

19 U.S.C. § 1517(c)(1)(A) ....................36

19 U.S.C. § 1517(g)(1)....................1

19 U.S.C. § 1517(g)(2)(B) ....................15

19 U.S.C. § 1677f(b)(1)(A)....................23

28 U.S.C. § 1291 ....................1

28 U.S.C. § 1581(c) ....................1

108 Stat. 3243, 3290-91 § 1403(c) (Oct. 13, 1994) .......... 24

**Regulations**

16 C.F.R. § 3.31(d) .......... 24

19 C.F.R. Part 165 .......... 23

19 C.F.R. § 165.4(e) .......... 5

19 C.F.R. § 165.23(c) .......... 7

19 C.F.R. § 165.23(c)(1) .......... 7, 28, 30

19 C.F.R. § 165.24 .......... 3

19 C.F.R. § 165.45 .......... 8, 12

19 CFR § 165.4 .......... 25, 27

**Federal Register Notices**

*Bid Protest Regulations*,
56 Fed. Reg. 3,759 (Jan. 31, 1991) .......... 24

*Certain Cased Pencils from the People's Republic of China*,
59 Fed. Reg. 66,909 (Dec. 28, 1994) (antidumping duty order A-570-827), as continued by, 82 Fed. Reg. 41,608, 41,609 .......... 3, 16

*Investigation of Claims of Evasion of Antidumping and Countervailing Duties*,
81 Fed. Reg. 56,477, 56,479 (Aug. 22, 2016) .......... 23

*Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties*,
86 Fed. Reg. 53,335, 53,336 (Sept. 27, 2021) .......... 16

*Rules of Practice*,
74 Fed. Reg. 1,804, 1,812 (May 1, 2009) .......... 24

**Miscellaneous**

Henry J. Friendly, *Some Kind of Hearing*, U. Pa. L. Rev. 1267 (1975) .......... 18

## STATEMENT OF RELATED CASES

This case has not previously been before this Court or any court other than the U.S. Court of International Trade ("CIT") below. There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The CIT had jurisdiction pursuant to 19 U.S.C. § 1517(g)(1) and 28 U.S.C. § 1581(c). On October 29, 2021, the CIT issued an Opinion (Appendix ("Appx") at Appx000001-000013) that sustained a determination by U.S. Customs and Border Protection ("Customs" or "CBP") that certain pencils imported by Royal Brush Manufacturing, Inc. ("Royal Brush") had entered through evasion of an antidumping duty order. Royal Brush filed a timely notice of appeal on November 29, 2021. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether Customs deprived Royal Brush of due process by withholding evidence that it used to conclude that Royal Brush's imports entered the United States through evasion.

2. Whether Customs violated its own regulation and Royal Brush's right to due process by refusing to let Royal Brush respond to new factual information

and a new theory of proof that Customs placed in the record and ultimately relied upon.

3. Whether Customs' conclusion that pencils imported by Royal Brush entered the United States through evasion is arbitrary and capricious, and is not in accordance with law because it is not supported by substantial evidence.

## STATEMENT OF THE CASE

This case involves a proceeding under the Enforce and Protect Act of 2015, 19 U.S.C. § 1517 ("EAPA"), in which Customs concluded that Royal Brush had evaded anti-dumping duties in importing certain pencil products from [ **Redacted Name of Foreign Manufacturer** ] ("Philippine Manufacturer"). Royal Brush is a small family business, based in Munster, Indiana. *See* Appx000967-000968. As part of its operations, Royal Brush develops, imports, and sells artist supplies, including pencils. The company began buying pencils from the Philippine Manufacturer in 2015. *See* Appx000960.

### A. The Allegation and Initial Investigation

On February 27, 2018, Royal Brush's competitor, Dixon Ticonderoga Company, filed an allegation with Customs claiming that Royal Brush was transshipping pencils manufactured in the People's Republic of China ("China") through the Republic of the Philippines ("Philippines") in order to avoid paying antidumping duties. *See* Appx000110-000146; *see also Certain Cased Pencils from*

#153506421_v5

*the People's Republic of China*, 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994) (antidumping duty order A-570-827), as continued by, 82 Fed. Reg. 41,608, 41,609 ("ADD Order").

On March 27, 2018, Customs commenced an initial investigation to determine whether Royal Brush had caused merchandise subject to the antidumping order on certain cased pencils from China to enter into the United States. *See* Appx000171-000173.

Between March 2018 and June 2018, Customs requested a number of documents from Royal Brush, in connection with an inquiry as to the country of origin of pencils contained in one specific entry. Royal Brush responded to all requests. However, Royal Brush was not aware that it was the subject of an initial investigation.

## B. Formal Investigation

After completing its initial investigation, Customs commenced a formal investigation as to evasion against Royal Brush and imposed interim measures pursuant to 19 C.F.R. § 165.24. Royal Brush received notice thereof on June 26, 2018. *See* Appx000771-000776. Customs' investigation covered all entries of cased pencils made by Royal Brush between March 6, 2017, and through the end of the investigation. *Id*.

Customs' investigation focused on whether the Philippine Manufacturer had

sufficient capacity, raw materials, and staff to produce the pencils Royal Brush had purchased. Its requests for information to Royal Brush and the Philippine Manufacturer addressed these issues. *See generally* Appx000957-000987, Appx000995-000997, Appx000829-000847. Customs did not seek, nor did the Philippine Manufacturer provide, data about its overall production capacity.

Throughout the investigation, Royal Brush encountered the same difficulty—Customs would only provide it with redacted copies of key evidence obtained by the agency and on which the agency ultimately relied to support its determination of evasion.

### 1. Attaché Report

Royal Brush learned that twenty days before the formal investigation commenced, a Customs Attaché ("Attaché") from the U.S. Embassy in Seoul had conducted an unannounced site-visit at the Philippine Manufacturer's plant in the Subic Bay Freeport Zone in the Philippines. The purpose of this visit was to assess the plant's manufacturing capabilities. The Attaché's report, dated June 15, 2018, concluded that, although the Philippine Manufacturer could finish "some" product, it "does not have the resources, staffing, or capacity to manufacture pencils." *See*

Appx000174.[1]

The version of the Attaché's report that Customs provided to Royal Brush redacted photographs the Attaché had taken to document his observations, and other information constituting the basis for his findings. *See* Appx000176-000189; *see generally* Appx001373-001384. Royal Brush and its counsel requested unredacted copies of the Attaché's report, but Customs refused to provide them. *See* Appx001177-001178, Appx001182-001183. Furthermore, Customs did not provide public summaries of the redacted photographs, in conformance with its own regulation. 19 C.F.R. § 165.4(e).

### 2. Verification Report

On November 8, 2018, Customs notified Royal Brush of its intent to conduct an on-site verification of the Philippine Manufacturer's facility. Customs' agenda for this procedure announced that "[v]erification will be made of merchandise contained on specific invoices[,]" each connected to Royal Brush's orders. *See* Appx001171-001173.

The following week, Customs, supported by members of the Regulatory Audit and Agency Advisory Services, carried out an on-site verification of the Philippine Manufacturer's facility. The stated goal of the verification, per Customs, was to

---

[1] However, the Attaché's report appears not to account for the cyclical nature of the Philippine Manufacturer's production, which peaks during Back-to-School and Christmas seasons and [ ] towards the end of [ ]. Appx001001.

**Both Redacted Terms: confidential details about production cycles**

verify "factual information included in . . . seven (7) invoices associated with imports by Royal Brush[.]" Appx001192. However, during verification, Customs decided to analyze the Philippine Manufacturer's overall production capacity by extrapolating from information the Manufacturer produced relating to Royal Brush's seven invoices. The verification team concluded that the Philippine Manufacturer had sufficient capacity to produce some, but not all, of the pencils it exported into the United States in 2018. *See* Appx001198-001199; Appx001413-001414. A public and heavily redacted version of the Verification Report was provided to Royal Brush in February 2019. *See generally* Appx001191-001234. This redacted version did not disclose the actual production capacity calculated by the verification team nor any of the actual numbers Customs used in making that calculation.

### 3. Rejected Rebuttal Filing

Although Royal Brush lacked access to the actual calculations in the Verification Report, it saw Customs' conclusion that the Philippine Manufacturer lacked the capacity to produce all of the pencils it had exported to the U.S. in 2018. Royal Brush believed that this was new factual information about a new issue – theretofore, the investigation had not addressed the overall production capacity of the Philippine Manufacturer. Accordingly, Royal Brush prepared a rebuttal submission addressing that issue. Customs' EAPA regulations generally forbid submissions by the parties more than 200 days after initiation of an investigation, but permit the filing

of rebuttal information when Customs places new factual information on the record after that deadline. 19 C.F.R. § 165.23(c)(1).

On March 6, 2019, a Customs "International Trade Specialist" confirmed that the Verification Report "does have new information" and, as such, that Royal Brush was entitled to file rebuttal information. *See* Appx001238. Royal Brush filed its rebuttal information on March 12, 2019, and its written arguments on March 15, 2019, and Customs acknowledged receipt of these submissions as timely.[2] *See* Appx001245. The agency, however, rejected both filings on account of over-bracketing and references to new factual information, and gave Royal Brush until March 21, 2019, to remedy these deficiencies. *Id.* Then, shortly before the new deadline, the same International Trade Specialist informed Royal Brush's counsel that Customs would not accept the rebuttal submission, explaining that the original allowance was the result of a "misinterpretation" of the governing regulations. Appx001240; *see also* 19 C.F.R. § 165.23(c).[3]

---

[2] The administrative record filed by Customs omits certain email communications Royal Brush's counsel exchanged with the Trade Specialist between March 6, 2019, and March 19, 2019. Nonetheless, it is clear from the communications that are included in the record that Royal Brush requested an extension of time to submit its rebuttal and written argument, and that Customs granted this request.

[3] To preserve its right to appeal, Royal Brush nevertheless filed its rebuttal information with Customs. *See* Appx001235-001237. The record, however, does not reproduce the contents of that rejected submission. *Id.*

### C. Initial Agency Determination as to Evasion

On May 6, 2019, Customs' Trade Remedy and Law Enforcement Directorate published its determination as to evasion, concluding that Royal Brush had evaded the antidumping order by transshipping Chinese pencils through the Philippines. The agency cited two bases for its conclusion. First, the Philippine Manufacturer's total U.S. shipments for the year at issue exceeded its production capacity. Second, other evidence, particularly the Attaché's observations, showed that the Philippine Manufacturer's pencils were of Chinese origin. Appx000058-000066; Appx000101-000109.

### D. Administrative Determination on Appeal

Royal Brush timely filed a request for *de novo* administrative review of the May 6, 2019 Determination. *See* 19 C.F.R. § 165.45. On September 24, 2019, Customs' Office of Trade, Regulations and Rulings affirmed the finding of evasion, relying on the same evidence. Appx000092-000100.

Specifically, Customs "g[a]ve credence to CBP's on-site verification team's findings" in concluding that Royal Brush's pencils entered the U.S. through evasion. Appx000095. Customs noted that the verification team "found that while the Philippine facility <u>did</u> appear to have the capability to produce pencils, it did not appear to be able to produce pencils in the quantities alleged for the company's 2018 production." Appx000096 (emphasis in the original). Customs concluded that

"[t]he production in the Philippines for Royal Brush's imports remains unsubstantiated, as amply demonstrated in the verification report drafted by trained CBP auditors." Appx000097. "In particular," Customs noted that its auditors had calculated "a capacity figure far less than the [Philippine Manufacturer's] shipments to the United States." Appx000098. In addition, Customs relied on its Attaché's observations and photographs, which the agency claims provide "a clear story line of repackaged Chinese pencils bound for the United States." Appx000094.

Further, Customs asserted that it reasonably relied on adverse inferences to fill "evidentiary gaps" because Royal Brush and the Philippine Manufacturer "*failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." Appx000099 (emphasis in the original).

## E. Initial Appeal to the CIT

Royal Brush appealed Customs' decision to the CIT. On December 1, 2020, the CIT issued an opinion and order remanding the matter to Customs for further proceedings. Appx000081. The court concluded that "[t]he lack of public summaries accompanying the Attaché Report and Verification Report are particularly concerning given CBP's reliance on those reports in its determination." Appx000080. It found no indication that the redacted information in those reports was not susceptible to public summarization and ruled that Customs' failure to

provide public summaries deprived Royal Brush of an opportunity to be heard in a meaningful time and in a meaningful manner. *See* Appx000078-000081. The court remanded the matter to Customs to remedy the lack of public summaries. *See* Appx000081.

In addition, the court held that Customs had not adequately explained why the Verification Report did not contain "new factual information" to which Royal Brush was entitled to respond. It rejected Customs' argument that its "verification" process, by definition, cannot give rise to new factual information, and ordered the agency to reconsider and further explain the issue on remand. Appx000076-000077.

### F. Proceedings on Remand to Customs

On remand, Customs created public summaries of a series of documents to comply with the CIT's order. However, its revised public version of the Attaché Report merely provided generic descriptions of the redacted information or photographs. For example, it described them as "customer names," "country names," "date," "photo of sign," photo of "different sign," "machine," "equipment," "labeled box and production document," "finished merchandise," and "Chinese character boxes with complete pencils." *See, e.g.*, Appx001375-001384.

Likewise, the agency's revised public version of the Verification Report contained only generic descriptions of the redacted information (including photographs). For example, it described them as "date," "number," "no.,"

"company," "location," "different company," "section name," "photo of many boxes," "facility," "step of production process," "photo of raw materials in box." *See, e.g.*, Appx001413-001414; Appx001417-001448. Of particular significance, the agency still did not provide the numerical value of the Philippine Manufacturer's production capacity as calculated by the verification team, or the values of the inputs the team used to calculate that production capacity. It merely described this critical information as "number" or "no." Appx001413-001414.

Customs filed its Remand Results with the CIT on March 22, 2021. It "continue[d] to find that Royal Brush evaded the [antidumping] order on pencils." Appx000057. Customs also adhered to its position that the Verification Report did not contain any new factual information, but it offered a new rationale. The agency asserted that its calculations were not new factual information because they were "simply [Customs] using and verifying the factual data on the record and therefore [were] a natural part of [Customs'] investigation as to whether evasion occurred." Appx000026.

### G. Return to the CIT

Following remand, the matter returned to the CIT and, on October 29, 2021, the CIT sustained Customs' evasion determination. The court found that Customs' revised public summaries were sufficient, when evaluated against the limits on disclosure imposed by the regulatory framework. Appx000007-000010. It also

rejected Royal Brush's argument that it had a due process right to access all of the evidence on which Customs relied. *Id.*

Further, the court ruled that Customs' revised construction of "new factual information" was reasonable and justified Customs' decision to reject Royal Brush's rebuttal to the Verification Report. *See* Appx000011. It also rejected Royal Brush's argument that Customs did not provide sufficient notice that the overall production capacity of the Philippine Manufacturer was an issue under investigation. The court reasoned that the Verification Agenda had apprised the Philippine Manufacturer that the verification could cover any information it had provided to Customs. Although Customs had "emphasized the verification of information associated with five Royal Brush invoices," the court concluded that the Manufacturer's overall production capacity was within the scope of the verification process. Appx000010.

The CIT also rejected Royal Brush's argument that the evidence was insufficient to support Custom's finding of evasion and that the agency's conclusion was arbitrary. It asserted that Customs was not "required to assume that [Royal Brush's] pencils were among the orders that the Philippine [Manufacturer] had the capacity to produce." Appx000012.

Finally, the court found that Royal Brush's challenge to Customs "alternative reliance on adverse inferences" to support its decision was moot. The parties had

agreed that the court need not reach this issue if it found the evidence of evasion to be sufficient without reference to any adverse inference. Appx000012-000013.

This appeal followed.

## SUMMARY OF APPELLANT'S ARGUMENT

**1.** Customs deprived Royal Brush of due process by withholding evidence on which the agency relied to conclude that pencils imported by Royal Brush entered the United States through evasion. Customs withheld this evidence on the ground that it cannot disclose another party's business confidential information. This is a flagrant violation of Royal Brush's right to due process of law, which requires that Royal Brush be given access to all the evidence on which Customs relied and be afforded an opportunity to rebut that evidence.

There is no exception to these due process requirements for business confidential information. Customs created a flawed process for adjudicating complaints of duty evasion by providing for the protection of business confidential information but omitting a mechanism to share that information with the respondent. The result is that only Customs has access to all of the evidence on which the adjudication is based. This flawed process violates the Constitution and cannot be upheld.

**2.** Customs violated its own regulation and Royal Brush's right to due process by refusing to let Royal Brush respond to new factual information and a new theory

of proof that Customs placed in the record after its verification process. The agency's Verification Report included calculations of the Philippine Manufacturer's overall production capacity based on other information in the record. These calculations assumed the weight of evidence and Customs relied heavily on them. They constituted new factual information to which Royal Brush was entitled to respond.

Moreover, these calculations introduced a new theory into the proceeding, which theretofore had focused on whether the Philippine Manufacturer had the capacity to produce the pencils imported by Royal Brush. The agency shifted, for the first time, to analyzing whether the Manufacturer could have produced all the pencils it exported to the United States in 2018. This was a brand new method of proof and Royal Brush was entitled to respond to it. This Court has held repeatedly that an agency may not change theories in mid-stream without giving a respondent reasonable notice of the change and an opportunity for response.

**3.** Customs' evasion determination is arbitrary and capricious, and is not in accordance with law because it is not supported by substantial evidence. A finding of evasion is a statutory condition that Customs must establish before it may assess duties and the agency bore the burden of proof. But the evidence upon which the agency relied was insufficient to establish evasion.

Customs relied principally on the verification team's calculation that the production capacity of the Philippine Manufacturer was "far less" than its total shipments to the United States in 2018. Appx000098. In fact, the team's calculations showed that the Philippine Manufacturer had the capacity to produce [ **Redacted: confidential production-capacity calculations** ] of all the pencils it shipped to the U.S. during that period and that Royal Brush's imports constituted a minuscule [ **Redacted: confidential production-capacity calculations** ] of the Manufacturer's production capacity. These findings create only the possibility – not the probability – that Royal Brush's pencils were not manufactured in the Philippines. And the other evidence before the agency did not alter this calculus. A mere possibility does not constitute substantial evidence. It is arbitrary to infer from this evidence, as Customs did, that Royal Brush's pencils entered the U.S. through evasion.

## ARGUMENT

### A. Standard of Review.

When reviewing Customs' anti-dumping determinations, this Court applies anew the standard of review applied by the CIT in its review of the administrative record. *See BMW of North America LLC v. United States*, 926 F.3d 1291, 1300 (Fed. Cir. 2019). Thus, it examines "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2)(B).

"A reviewing court reviews an agency's reasoning to determine whether it is 'arbitrary' or 'capricious,' or, if bound up with a record-based factual conclusion, to determine whether it is supported by 'substantial evidence.'" *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999). This Court conducts a *de novo* review of this issue. *See NSK Corp. v. U.S. Intern. Trade Com'n*, 542 F. App'x 950 (Fed. Cir. 2013).

This Court reviews *de novo* all questions of law. *BMW of North America, supra.*

### B. Customs Withheld Evidence on Which It Relied from Royal Brush, Thereby Depriving Royal Brush of Due Process.

Customs' finding of evasion is based on evidence that the agency withheld from Royal Brush. The company is liable for hundreds of thousands of dollars in duties based on this Star Chamber finding.[4] This is a blatant violation of Royal Brush's right to due process of law.

#### 1. An agency cannot use secret evidence in its adjudications.

"[T]he courts have recognized that one 'relatively immutable' principle of due

[4] Between March 2017 and July 2018, Royal Brush made five entries of covered merchandise, valued at approximately [Redacted: potential damages]. *See* Appx000848-000941; *see also* Appx000191-000770. Given the applicable antidumping rate of 114.9 percent, *see ADD Order*, Royal Brush may be assessed antidumping duties in excess of [Redacted: potential damages], inclusive of interest. *See Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds on Customs Duties*, 86 Fed. Reg. 53,335, 53,336 (Sept. 27, 2021).

process is that 'where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.'" *Ramirez v. Dep't of Homeland Sec.*, 975 F.3d 1342, 1350 (Fed. Cir. 2020) (quoting *Greene v. McElroy*, 360 U.S. 474, 496 (1959)).

There is no doubt that Royal Brush was entitled to all evidence that Customs placed into the record. Investigations under the EAPA are "fairly characterized as 'relatively formal administrative procedure[s]' that adjudicate parties' rights." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1381 (Fed. Cir. 2001). Royal Brush has a significant financial stake in the outcome of the EAPA investigation and has a right to procedural due process in the course of the proceeding. *See NEC Corp. v. United States*, 151 F.3d 1361, 1370-71 (Fed. Cir. 1998).

Due process means that: "A party is entitled . . . to know the issues on which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it. Indeed, the Due Process Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 288 n.4 (1974). "[T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *Am.-*

*Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995).[5]

Just as a court "cannot affirm the sufficiency of [agency evidence that it] cannot see," *Flyers Rights Education Fund, Inc. v. Federal Aviation Admin.*, 864 F.3d 738, 746 (D.C. Cir. 2017), a respondent cannot defend itself against evidence it cannot see. This Court has recognized that an agency's decision to withhold evidence on which it purports to rely is an egregious violation of the standard of fairness agencies are expected to uphold when administering their responsibilities. *See Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995). Yet that is precisely what happened in this case.

### 2. Customs adjudicated Royal Brush's liability on the basis of secret evidence.

Customs' primary basis for concluding that evasion occurred was its finding that the Philippine Manufacturer could not have produced all of the pencils it exported to the United States over the period at issue. *See* Appx001198-001199. Customs bolsters that finding with the observations of its Attaché during his site visit, who reported seeing some repackaging activities involving finished Chinese pencils. Coupling these two points together, Customs concluded that Royal Brush's

[5] *See also* Henry J. Friendly, *Some Kind of Hearing*, U. Pa. L. Rev. 1267 (1975) ("There can . . . be no fair dispute over the right to know the nature of the evidence on which the administrator relies.").

pencils entered through evasion. But Customs refused to provide Royal Brush with critical evidence regarding each of these points.

First, Customs refused to disclose its calculation of the Philippine Manufacturer's overall production capacity and the numerical data on which that calculation is based. When Customs made its initial finding of evasion, it redacted these figures entirely from the information provided to Royal Brush. Upon remand after the CIT's first decision, Customs purported to "summarize" the figures by inserting the words "no." and "number" where the actual figures should appear. No actual numbers were provided. *See, e.g.*, Appx001413. Based on its undisclosed calculations, Customs again concluded that the Philippine Manufacturer could produce only some of its 2018 U.S. exports. Customs, however, did not explain what it meant by some, so that Royal Brush could not discern what proportion of the Manufacturer's total exports (5%, 20%, 50%) evidently were transshipped.

This "take our word for it" approach to administrative adjudication was condemned by the Supreme Court long ago. An agency may not "content[] itself with saying that . . . 'I looked at the statistics . . . and they teach me thus and so.' This will never do if hearings and appeals are to be more than empty forms." *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 303 (1937).

Royal Brush obviously could not respond to the quantitative evidence on which Customs relied without knowing what the relevant figures are. This is a gross

violation of due process, especially for a company with hundreds of thousands of dollars in duties riding on Customs' decision.

Royal Brush subsequently gained access to Customs' figures during its first appeal to the CIT when its counsel received the complete administrative record, and it learned that Customs had taken a one-sided view of this evidence. As discussed in the final section of this brief, a dispassionate examination of Customs' figures does not establish that its pencils entered the U.S. through evasion. But Royal Brush was precluded from making this argument to Customs because it did not have the figures when Customs made its initial evasion decision. Further, Royal Brush could not discuss the figures during the remand process either because the agency still refused to disclose them. In short, Royal Brush was systematically precluded from responding to critical evidence being used against it. This is a quintessential deprivation of due process.

Second, Customs relied on the conclusion of its Attaché that the Manufacturer was repacking finished pencils from China. The Attaché noted that the storage area contained "boxes with Chinese characters and English language boxes stating, 'Made in the Philippines.'" The Attaché took photographs to document his observations, which Customs relied on to find a "clear story line" of evasive practices. Appx000094-000095. However, Customs withheld these photographs from Royal Brush, again depriving it of due process.

On remand, Customs still refused to disclose these photographs, instead providing "public summaries" of them, which offered only superficial descriptions. Further, despite Royal Brush's protest, the agency refused to disclose relevant details from the photographs such as: (i) the country of export for boxes containing the "Made in China"" pencils; (ii) the type of "completed pencil product" contained in the boxes that its Attaché observed; and (iii) the overall condition of the boxes used to store the supposedly "completed" product. *See, e.g.*, Appx000040-000041; Appx000047-000048; Appx000052-000053.

Without access to the photographs, however, Royal Brush could not adequately respond to, much less contradict or challenge, the Attaché's observations and associated conclusions. For example, Royal Brush could not ascertain whether: (i) the repackaged pencils were of the same type as those exported to Royal Brush; (ii) the Chinese characters identify a company name, a type of raw material used in pencil-production, or a color, all of which might have probative value; (iii) the contents of a given box match the label affixed thereto (or whether, instead, the boxes were being re-used); and (iv) a particular box of supposedly "completed" product was packaged for export to the U.S., or for export somewhere else, or for storage. These sorts of details could have enabled Royal Brush to challenge the Attaché's conclusions directly or to adduce evidence that cast doubt on his conclusions.

In addition, Customs redacted other highly relevant evidence from the Verification Report, which the agency had gathered relating to the Philippine Manufacturer. This evidence included (i) 32 pages of photographic content and eleven exhibits containing documents subject to verification; (ii) identifying information about certain invoice and purchase order numbers; and (iii) the identity of Manufacturer personnel whom the agency interviewed. The "revised" public summaries that Customs created fail to provide the substance of the redacted information and, instead, simply offer superficial, non-informative descriptions, rendering them completely useless. For example, instead of giving the name of a country, the summary says: "country name(s)." Instead of stating numerical values, the summary says: "number." Instead of giving actual dates, the summary says: "dates." Likewise, the summary uses other generic terms such as: "completed pencil product," "manufacturer name," and "equipment." *See generally* Appx001406-001448.

In sum, Customs relied on all of this secret evidence to reach its ultimate conclusion of evasion. Yet it precluded Royal Brush from testing the accuracy of any of this evidence, proffering an alternative interpretation of it, or challenging the conclusions Customs reached on the basis of this evidence. This was a blatant deprivation of Royal Brush's right to due process.

### 3. Customs' due process violations are a direct result of its flawed adjudication procedures.

Customs' rationale for withholding all of this evidence from Royal Brush is that the information is "business confidential information" of the Philippine Manufacturer and the agency cannot share it with Royal Brush. Customs' regulations implementing the EAPA do not provide for sharing business confidential information among the parties through an administrative protective order mechanism such as the one used in antidumping and countervailing duty proceedings.[6] *See* 19 C.F.R. Part 165.

Customs claims that its omission of a protective order process reflects congressional intent because the EAPA does not provide for one. *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 56,477, 56,479 (Aug. 22, 2016). In contrast, the statute governing antidumping and countervailing duty proceedings expressly addresses the protection of proprietary information, 19 U.S.C. § 1677f(b)(1)(A), and protective orders to permit the parties to have access to such information. *Id.* § 1677f(c)(1)(A)–(B).

However, the EAPA does not bar Customs from protecting business confidential information or from using protective orders. It is simply silent about

---

[6] The EAPA was enacted in 2015 and the implementing regulations were promulgated in 2016. This is evidently the first EAPA case to reach the CIT and this Court.

these issues. The absence of explicit statutory authorization does not preclude federal agencies from taking steps to protect proprietary information used in their adjudications, while making that information available to the parties. For example, in 1991 the General Accounting Office promulgated a regulation creating a protective order mechanism for bid protests even though there was no explicit authority for protective orders in the Competition in Contracting Act. *See Bid Protest Regulations*, 56 Fed. Reg. 3,759 (Jan. 31, 1991). Congress later enacted statutory authority for GAO protective orders in 1994. P.L. 103-355 § 1403(c), 108 Stat. 3243, 3290-91 (Oct. 13, 1994). Similarly, in 2009, the Federal Trade Commission provided for the issuance of a standard protective order in its adjudications, *see* 16 C.F.R. § 3.31(d); *Rules of Practice*, 74 Fed. Reg. 1,804, 1,812 (May 1, 2009), although its authorizing statute provides that the Commission cannot make public any trade secret or confidential commercial or financial information, and only provides for disclosure to law enforcement agencies who certify that such information will be maintained in confidence. *See* 15 U.S.C. § 46(f).

Here, the EAPA's silence did not stop Customs from promulgating a regulation that protects business confidential information, to aid the agency in obtaining such information in order to adjudicate EAPA cases. Customs provided for (1) treating trade secrets and commercial or financial information it obtains as confidential, and (2) substituting redacted versions of any such business confidential

information on the public record. *See* 19 CFR § 165.4. But Customs chose not to include a protective order provision that would enable such business confidential information to be shared with the other parties. The result is that only Customs has access to all evidence submitted in connection with an EAPA proceeding. The other parties, including the respondent(s), are limited to the public version of any business confidential information submitted by another party or entity. The omission of an protective order provision in EAPA proceedings is attributable to Customs, not to Congress.[7]

#### 4. Customs' use of secret evidence cannot be upheld.

The CIT mistakenly believed that Customs' defective EAPA regulations define the limits of the process to which Royal Brush is entitled. In its initial decision, the court remanded the matter to Customs because the agency had failed to comply with its own regulation by providing public summaries of the confidential information redacted from the Attaché Report and Verification Report. *See* Appx000080-000081. But, after Customs "checked the box" by providing superficial public summaries, the CIT ruled that due process required nothing more. *See* Appx000007-000010. The CIT erred in so ruling.

[7] Furthermore, the agency's construction of congressional silence as precluding the use of protective orders in EAPA proceedings is not only illogical but violates the canon that a statute should be interpreted in a way that avoids placing its constitutionality in doubt.

Customs cannot circumvent its constitutional due process obligations by creating a one-sided procedure that gives the agency access to business confidential information but denies access to a respondent whose rights are adjudicated using that information. "[An] agency is bound to ensure that its [discovery] procedures meet due process requirements." *McClelland v. Andrus*, 606 F.2d 1278, 1286 (D.C. Cir. 1979). "[D]iscovery must be granted if in the particular situation a refusal to do so would so prejudice a party as to deny him due process." *Id.*; *accord Jones Total Health Care Pharmacy, LLC v. D.E.A.*, 881 F.3d 823, 834-35 (11th Cir. 2018). When an agency's adjudicative proceedings omit "procedures [that] would have provided protection against arbitrary and inaccurate adjudication, this Court has not hesitated to find the proceedings violative of due process." *Hudick v. Wilkie*, 755 F. App'x 998, 1007 (Fed. Cir. 2018) (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 430 (1994)).

The CIT incorrectly treated the confidential nature of the information at issue as being dispositive of Royal Brush's due process rights.[8] It opined that Customs

[8] Indeed, the CIT criticized Royal Brush for not explaining how Customs could have provided the information at issue given the constraints imposed by Customs' own regulations. "Instead, Royal Brush simply complains that it needed the actual figures." Appx000009. This flawed analysis turns the constitutional principle on its head. The burden is on the agency to provide Royal Brush with due process. Royal Brush is entitled to complain that it needs access to all the evidence to defend itself.

was prohibited from disclosing such information by its own regulation, 19 C.F.R. § 165.4, and by statute, 18 U.S.C. § 1905. This is incorrect.

Customs' regulation provides that qualifying information will receive "business confidential treatment" but does not spell out what that entails; it does not preclude disclosure of confidential information to other parties pursuant to some form of protective mechanism. And the statute merely prohibits government employees from disclosing trade secrets to any extent "not authorized by law;" it is not violated by discovery to a party in an administrative adjudication. *See Gen. Dynamics Ordnance and Tactical Sys., Inc.*, ASBCA Nos. 56870, 56957, 2010 WL 3119469 (June 1, 2010); *see also Roytberg v. United States*, No. 15-cv-5560, 2016 WL 1559151, at *2 (E.D.N.Y. Apr. 18, 2016) ("[d]isclosure pursuant to the discovery rules is disclosure 'authorized by law.'") (citation omitted).

In any event, it is absurd to claim that an agency can avoid its constitutional due process obligations by simply promulgating a regulation that absolves itself of them. Due process is a constitutional right, and it requires that Royal Brush have access to all the evidence on which Customs relies to make an adjudication against it. "[D]ue process requires, at the least, that an affected party . . . be given access to the unclassified evidence on which the official actor relied and be afforded an opportunity to rebut that evidence." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319 (D.C. Cir. 2014). If Customs cannot disclose certain evidence to

Royal Brush because it is confidential, then due process forbids Customs from relying on that evidence to adjudicate Royal Brush's duty obligations. One way or the other, Royal Brush is entitled to a new proceeding before the agency at which it receives access to -- and can respond to -- all of the evidence which the agency considers.

This case is controlled by the Supreme Court's decision in *Ohio Bell Tel. Co. v. Public Utilities Comm'n of Ohio*, which held that due process forbids an agency from requiring an utility to make refunds on the basis of undisclosed evidence, with "the [Agency] reporting its conclusion, but not the underlying proofs." 301 U.S. at 300. Likewise, Customs cannot require an importer to pay hundreds of thousands, or millions, of dollars for evaded duties based on evidence that is not disclosed to it. The notion that Customs can do so is directly at war with the Fifth Amendment to the Constitution.

### C. Customs Erred By Rejecting Royal Brush's Rebuttal Filing.

Customs also denied Royal Brush adequate notice and an opportunity to respond to new evidence and issues that first appeared in the Verification Report. This abridged Royal Brush's right, under the agency's own regulations, to respond to "new factual information" placed in the administrative record. 19 C.F.R. § 165.23(c)(1). It also deprived Royal Brush of its due process right to notice and a meaningful opportunity to be heard. "A party is entitled . . . to know the issues on

which decision will turn and to be apprised of the factual material on which the agency relies for decision so that he may rebut it." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. at 288 n.4; *see also PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761-62 (Fed. Cir. 2012).

### 1. Customs changed course during the verification process.

Customs' finding of evasion is based on evidence that the agency developed during the verification process, namely that the Philippine Manufacturer lacked the capacity to manufacture all of the pencils it shipped to its U.S. customers during the period at issue. Before then, however, Customs' investigation had focused far more narrowly: on whether the Philippine Manufacturer had sufficient capacity, raw materials, and staff to produce the seven orders of pencils that Royal Brush had purchased. Customs did not seek, nor did the Philippine Manufacturer provide, data about its overall production capacity. Likewise, Customs' agenda for the Site Verification announced that "[v]erification will be made of merchandise contained on specific invoices[,]" each of which were connected to Royal Brush's orders. *See* Appx001172. And Customs admitted in its decision that the purpose of the verification "was to determine whether the Philippine supplier could show that it was capable of producing the amount of pencils allegedly manufactured for Royal Brush, as well as to clarify the country of origin for pencils imported by Royal Brush." Appx000095.

During verification, however, Customs changed course and decided to analyze the Philippine Manufacturer's overall production capacity by extrapolating from the information produced about Royal Brush's orders, even though those orders constituted far less than one percent of the overall production capacity that Customs ended up calculating. Customs treated these calculations as findings of "trained CBP auditors" which carried the "weight of evidence." Appx000097.

Royal Brush received only a redacted version of the Verification Report and, although it could not see the calculations made by Customs, it saw the agency's conclusion that the Philippine Manufacturer lacked the capacity to manufacture all of the pencils that were exported to the U.S. Initially, Customs acknowledged that this was new factual information, and said it would allow Royal Brush to submit rebuttal information about the Manufacturer's capacity, as provided by 19 C.F.R. § 165.23(c)(1). But Customs subsequently reversed its position and rejected Royal Brush's submission on the ground that the Verification Report had not placed any new factual information on the administrative record.

### 2. Customs offered the CIT differing constructions of "new factual information."

Trying to defend its *volte face*, Customs argued during Royal Brush's first appeal to the CIT that its "verification" process, by definition, cannot give rise to new factual information. The CIT rejected this argument. *See* Appx000076 ("The

Government's argument that the purpose of verification is to test the accuracy of submitted data is not persuasive."). The court remanded the issue to Customs for reconsideration and explication of its basis for deciding that the Verification Report did not contain new factual information. Appx000076-000077.

On remand, Customs adhered to its position that the Verification Report had not placed new information on the administrative record, but it adopted a different rationale. The agency asserted that its calculations were not new factual information because they were "simply [Customs] using and verifying the factual data on the record and therefore [were] a natural part of [Customs'] investigation as to whether evasion occurred." Appx000026. But there was nothing "natural" or inevitable about Customs taking information relating to a handful of specific orders from Royal Brush and "verifying" them by extrapolating the Philippine Manufacturer's overall production capacity for the entire year. Nonetheless, the CIT ruled that Customs' construction of "new factual information" was reasonable and that it justified the agency's decision to reject Royal Brush's rebuttal submission. Appx000010-000011.

The CIT also dismissed Royal Brush's argument that Customs had not given it notice that the overall production capacity of the Philippine Manufacturer was an issue to be addressed. The court reasoned that the Verification Agenda had apprised the Philippine Manufacturer that the verification could cover any information

provided in its responses to Customs' requests for information. Although Customs had "emphasized the verification of information associated with five Royal Brush invoices," the court concluded that the Manufacturer's overall production capacity was within the scope of the verification process. Appx000010-000011.

### 3. Royal Brush was entitled to submit a rebuttal to the Verification Report because it contained new factual information and a new theory of proof.

Customs' calculations of the Philippine Manufacturer's overall production capacity clearly constitute new factual information to which Royal Brush was entitled to respond. This Court has held that "expert opinion analyzing reported information [already in the record] clearly assumes the weight of evidence and, as such, amounts to [d]ata or statements of fact in support of allegations, i.e., factual information." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d at 760 (emphasis added) (internal quotations omitted). The Court reasoned that such expert analysis was intended as "evidence," not mere "argumentation." *Id.* Here, likewise, Customs treated the calculations in the Verification Report as "findings" of "trained CBP auditors" which carried the "weight of [ ] evidence," and on which the agency relied in its decision. Appx000097. Thus, these calculations were "factual information" newly added to the administrative record.

This conclusion in reinforced by the Court's decision in *In re Kumar*, 418 F.3d 1361 (Fed. Cir. 2005). There, the Board of Patent Appeals based its decision, in part, on certain calculations it made that appeared for the first time in the Board's opinion. This Court rejected the agency's contention that these calculations "were not new evidence, but simply an additional explanation of the Board's decision." *Id.* at 1367. Instead, the calculations were "values produced and relied on by the Board [which] had not previously been identified by the examiner or the Board." *Id.* Accordingly, "Kumar was entitled to respond to these calculations, and the Board committed procedural error in refusing to consider the evidence proffered in response." *Id.* The same is true here.

Moreover, the calculations in the Verification Report introduced an entirely new and different theory of proof into the proceeding. Previously, Customs had focused its investigation and its requests for documentation on Royal Brush's specific orders from the Philippine Manufacturer. The Verification Report shifted, for the first time, to calculating the Manufacturer's capacity to produce all the pencils it had exported to the United States during 2018 even though Customs had not sought or been provided data by the Philippine Manufacturer on that issue (which is why Customs had to extrapolate from the tiny amount of data on the record relating to Royal Brush's purchases). While this may have been a valid line of inquiry for Customs to pursue, it was still a brand new area of inquiry and theory of proof.

This Court has held repeatedly that "an agency may not change theories in mid-stream" in an adjudication without giving a respondent reasonable notice of the change and an opportunity to respond to it. *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1326 (Fed. Cir. 2019) (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015)). Where an agency "depart[s] markedly from the evidence and theories [previously] presented . . . [it] creat[es] unfair surprise." *Id.* at 1328.

Customs contends that its production capacity calculations were not new factual information but rather "a natural part of its investigation as to whether evasion occurred." Appx000026. This argument smacks of the "logical outgrowth" test that courts apply to determine whether an agency gave the public adequate notice of a final rule that differs from the proposed rule that was published for comment.[9] "The logical outgrowth doctrine recognizes that a certain degree of change between [a proposed rule] and a final rule is inherent to the APA's scheme of rulemaking through notice and comment" and seeks "to 'balance' the values served by adequate

[9] The agency asserted that "[i]t should not be <u>surprising</u> to Royal Brush that [its] investigation <u>could potentially consider</u> the Philippines Shipper's overall production capacity, since whether a manufacturer has the capacity to produce all of the product it exports is plainly relevant to any transshipment investigation." Appx000031 (emphasis added). An investigation "could potentially consider" a vast number of things. But due process requires that Customs identify the facts and theories on which it is focusing in order to provide respondents with notice and an opportunity to be heard on the issues that the agency will consider in its adjudication.

notice . . . with 'the public interest in expedition and finality.'" *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1373 (Fed. Cir. 2017) (citations omitted). Although balancing these values is appropriate where prospective rulemaking is concerned, it has no place in a retrospective adjudication of liability, and courts have not applied the "logical outgrowth" test in assessing the adequacy of notice in an agency adjudication. Respondents like Royal Brush are not required to defend against theories the agency might, but has not yet, advanced.[10]

In sum, Royal Brush was entitled to rebut the Verification Report's conclusion that the Philippine Manufacturer lacked the capacity to produce all of the pencils it exported to the U.S. in 2018. Customs wrongfully denied Royal Brush the opportunity to do so, in contravention of its own regulation and Royal Brush's right to due process. Royal Brush was prejudiced by the agency's action because its rebuttal adduced evidence which challenged Customs' conclusion about the limits of the Philippine Manufacturer's production capacity. *See* Appx001235-001237 (reproducing Royal Brush's submission email and Customs' rejection email,

[10] Furthermore, the agency's switch to analyzing overall production capacity in this case would not pass muster under the "logical outgrowth" test. This Court recently cited with approval a decision invalidating a regulation for lack of notice where the agency switched in its final rule from using one year to four years' worth of data to resolve rate disputes. *See Mid Continent Nail Corp.* at 1377-78 (discussing *CSX Transp. Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1078, 1082 (D.C. Cir. 2009)).

explaining that the "rebuttal submission will not be placed on the administrative record."). Royal Brush was entitled to have that evidence considered by the agency.

**D. Customs' Finding Of Evasion Is Arbitrary And Capricious.**

Finally, Customs' decision that all of the pencils Royal Brush imported from the Philippine Manufacturer entered the U.S. through evasion is arbitrary and capricious, and is not in accordance with law because it is not supported by substantial evidence. *See* 19 U.S.C. § 1517(c)(1)(A) (a finding of evasion must be supported by substantial evidence).

"[T]he Supreme Court 'has stressed the importance of not simply rubber-stamping agency fact-finding.'" *A.L. Patterson, Inc. v. United States*, 585 F. App'x 778, 782 (Fed. Cir. 2014) (quoting *Dickinson v. Zurko*, 527 U.S. at 162). "A decision is arbitrary and capricious where the agency fails to articulate a 'rational connection between the facts found and the choice made.'" *Brenner v. Dept. of Veterans Affs.*, 990 F.3d 1313, 1324 (Fed. Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A "reviewing court must 'guard against an agency's drawing inferences that are "arbitrary" in relation to the facts found . . . .'" *Hines ex rel. Sevier v. Sec'y of HHS*, 940 F.2d 1518, 1528 (Fed. Cir. 1991) (quoting *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1498 (D.C. Cir. 1988)).

The "substantial evidence" standard "requir[es] a court to ask whether a 'reasonable mind might accept' a particular evidentiary record as 'adequate to support a conclusion.'" *Dickinson v. Zurko*, 527 U.S. at 162. It "requires judges to apply logic and experience to an evidentiary record . . . .." *Id.* at 163. "Substantial evidence must be sufficient 'to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.'" *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, 936 F.3d 1353, 1358 (Fed. Cir. 2019) (citation omitted). "Support by substantial evidence is determined on the entirety of the record, taking into account the evidence that supports and the evidence that detracts from the agency's conclusion." *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1369 (Fed. Cir. 2015).

Some agency antidumping decisions, such as whether to impose or revoke an anti-dumping order, "do[] not depend on the 'weight' of the evidence, but rather on the expert judgment of the [agency] based on the evidence of record." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).[11] In contrast, this case involves a factual adjudication -- did certain imports enter the U.S. through evasion -- which does not implicate the expert judgment of the agency. Accordingly,

[11] In general, these sorts of decisions are akin to rulemakings rather than adjudications.

the validity of the agency's decision in this case depends entirely on the weight of the evidence.

Here, Customs "g[a]ve credence to CBP's on-site verification team's findings" in concluding that Royal Brush's pencils entered the U.S. through evasion. Appx000095. Customs noted that the verification team "found that while the Philippine facility did appear to have the capability to produce pencils, it did not appear to be able to produce pencils in the quantities alleged for the company's 2018 production." Appx000096 (emphasis in the original). Customs concluded that "[t]he production in the Philippines for Royal Brush's imports remains unsubstantiated, as amply demonstrated in the verification report drafted by trained CBP auditors." Appx000097. "In particular," Customs noted that its auditors had calculated "a capacity figure far less than the [Philippine Manufacturer's] shipments to the United States." Appx000098.

Customs' analysis was fundamentally flawed. First, it improperly allocated the burden of proof. Customs placed the burden on Royal Brush to "substantiate" that production of its imports occurred in the Philippines. But the statute requires Customs to determine whether covered merchandise was entered into the U.S. through evasion, 19 U.S.C. § 1517(c)(1), and, if so, to take various corrective actions. *Id.* § 1517(d)(1). The finding of evasion is a statutory condition that Customs must establish before it may assess duties and take additional enforcement

measures. "The ultimate burden of proof is thus upon [Customs] to establish by a preponderance of the evidence that [the statutory condition exists]." *Creswell Trading Co. v. United States*, 15 F.3d 1054, 1060 (Fed. Cir. 1994).

Second, Customs took a completely one-sided view of the verification team's findings. The team quantified the Philippine Manufacturer's average annual production capacity to be [ **Redacted: confidential inventory data** ] gross pencils per annum. Appx001198. Royal Brush's [ **same** ] imports of [ **same** ] gross pencils were approximately [ **Redacted: confidential production-capacity calculations** ] of the Manufacturer's capacity.[12] The verification team noted that total U.S. imports of pencils from the Philippine Manufacturer in 2018 was [ **same** ] gross pencils, which exceeded the company's annual production capacity by [ **same** ]%. *Id.* But, stated differently, this means that the Philippine Manufacturer had the capacity to produce [ **same** ] (essentially [ **same** ] of all the pencils it shipped to the U.S. in 2018. While Customs construed the verification team's calculations to mean that the Manufacturer could produce only "some" of the pencils it exported, in reality they demonstrate that it could produce "most" of those pencils.

According to Customs, "[t]he central issue was whether the Philippine manufacturer could sustain sufficient production commensurate to the quantities of

[12] Royal Brush's orders are evidenced by three invoices / purchase orders produced on the record. *See* Appx000942-000947; Appx001087-001100; Appx001166.

#153506421_v5

Royal Brush's imports to the United States and whether production records could be tied to Royal Brush's imports." Appx000097. Based on the verification team's findings, the answer to the first question was a resounding yes. Royal Brush's imports constituted a fraction of one percent of the Philippine Manufacturer's production capacity.

While the verification team's findings may support the conclusion that some pencils exported by the Philippine Manufacturer entered the U.S. through evasion, they do not support the conclusion that all or even most of its pencils did so. They create only the possibility – not the probability – that a given shipment of pencils to the U.S. was not manufactured in the Philippines. A mere possibility does not constitute substantial evidence. *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 17 C.I.T. 146, 175, 818 F.Supp. 348, 373 (1993) ("a mere *possibility* . . . is not substantial evidence"); *Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1152 (10th Cir. 2016) ("we are confident that mere possibility falls short of [substantial evidence]"); *see also SeAH Steel VINA Corp. v. United States*, 950 F.3d 833, 848 (Fed. Cir. 2020) (agency decision lacked substantial evidence to support it where the evidence did not permit a conclusion to be drawn one way or the other).

**Redacted Term confidential production capacity calculations**

In terms of probability, the verification team's findings show that it is twice as likely (a [ ] chance that the pencils purchased by Royal Brush were

manufactured by the Philippine Manufacturer than that they were not (a [ ] chance). The other evidence before the agency did not alter this calculus or demonstrate that Royal Brush's pencils were transshipped from China. The Philippine Manufacturer's production records, even if deemed deficient by Customs, do not establish that Royal Brush's pencils were manufactured elsewhere. Nor was the evidentiary gap filled by the Attaché's observations of finished pencils being repackaged at the Manufacturer's facility. His observations corroborate the verification team's conclusion that some pencils (a minority of them) exported by the Philippine Manufacturer to the U.S. were transshipped, but they do not establish the extent of such transshipment or whether any of the transshipped pencils were sent to Royal Brush.

**Redacted term: confidential production-capacity calculations**

This is not a case where the agency's conclusion turns on its determination about what evidence to credit. Rather, it is a case that turns on what inferences can fairly be drawn from the evidence that Customs deemed credible. All of that evidence, taken together, establishes only a possibility – not a probability – that Royal Brush's pencils were manufactured in China rather than the Philippines. Indeed, based on this evidence, it is far more probable that Royal Brush's orders were manufactured in the Philippines. Customs cannot lawfully conclude that Royal Brush's pencils were transshipped from China, and impose hundreds of thousands of dollars in duties, because that "might" be what happened. It was arbitrary and

#153506421_v5

capricious for Customs to conclude on this record that Royal Brush's pencils entered the U.S. through evasion.[13]

[13] Customs' erroneous evaluation of the record may have stemmed, in part, from mistakenly treating "substantial evidence" as its *standard of proof* rather than as the standard of review a court will apply to the agency's findings. *See* Appx000098. This Court recently explained that "using substantial evidence as the burden of proof would . . . be contrary to the well-established principle that preponderance of the evidence is the minimal appropriate burden of proof in administrative proceedings." *Rodriguez v. Dept. of Veterans Affs.*, 8 F.4th 1290, 1301 (Fed. Cir. 2021).

## CONCLUSION

The EAPA proceeding that Customs conducted in this case was a travesty of due process because crucial evidence on which the agency relied was withheld from Royal Brush. Further, Royal Brush was denied the opportunity to respond to significant new evidence, involving a new theory of proof that Customs placed on the administrative record after the verification process. Finally, Customs' finding of evasion is erroneous because the burden of proof was on the agency and the evidence, at most, establishes a possibility -- but not a probability -- of evasion. For all of these reasons the decisions of the CIT and Customs should be reversed.

Dated: September 9, 2022

Respectfully submitted,

/s/ Steven D. Gordon
Steven D. Gordon
Ronald A. Oleynik
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone: (202) 955-3000
Facsimile: (202) 955-5564
Steven.Gordon@hklaw.com
Ron.Oleynik@hklaw.com
*Attorneys for Appellant Royal Brush Manufacturing, Inc.*

2022-1226

---

# United States Court of Appeals
# for the Federal Circuit

---

**ROYAL BRUSH MANUFACTURING, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, DIXON TICONDEROGA COMPANY,**
*Defendants-Appellees*

---

Appeal from the United States Court of International Trade in No. 1:19-cv-00198-MAB,
Judge Mark A. Barnett.

---

## CORRECTED NON-CONFIDENTIAL ADDENDUM

---

# TABLE OF CONTENTS



| Document | Date | Appx |
|---|---|---|
| Copy of 19 U.S.C. § 1517 | – | i-xi |
| USCIT Opinion (Sustaining CBP's Remand Redetermination) (*Royal Brush Manufacturing Inc. v. United States*, No. 19-00198, Slip. Op 21-152 (Ct. Int'l Trade Oct. 29, 2021) | October 29, 2021 | Appx000001-000015 |
| CIT Judgement | October 29, 2021 | Appx000016-000017 |
| CBP's Final Remand Redetermination | March 22, 2021 | Appx000018-000057 |
| **Revised Public Version** - CBP's Notice of Final Determination as to Evasion | January 5, 2021 | Appx000058-000066 |
| USCIT Opinion & Order (Remanding for Further Proceedings) (*Royal Brush Manufacturing Inc. v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) | December 1, 2020 | Appx000067-000081 |
| CBP's Administrative Determination on Appeal | September 24, 2019 | Appx000082-000100 |
| **Original Public Version** - CBP's Notice of Final Determination as to Evasion | May 6, 2019 | Appx000101-000109 |



**EXPLANATION FOR "REVISED" PUBLIC SUMMARIES**

On December 1, 2020, the U.S. Court of International Trade ("USCIT") ordered U.S. Customs and Border Protection ("CBP") to comply with the public summary requirements imposed by 19 C.F.R. § 165.4. As a result, CBP and the parties created "revised" public versions of a number of record documents, including those produced in this Addendum. To confirm, the USCIT's remand order did not impact the confidential version of the "revised" documents.

The parties cite to the "revised" documents in their submissions on appeal; necessitating the documents' production. The CAFC's Rules require record documents appear in chronological order and that pagination remain consistent

between the public and confidential versions of the appendix. The "revised" documents were published to the record more than a year after their "original" publication (specifically, between December 28, 2020, and January 5, 2021, and during the period of judicial remand). As such, the "revised" documents appear later, chronologically. Including the "revised" documents, as such, creates a gap in the corresponding confidential version.

On August 31, 2022, via phone, the CAFC's Clerk's Office advised the parties produce the "revised" documents in chronological order and stated there can be a natural "break" in numbering of the confidential version to match that of the public version. The parties, however, do not need to insert slip-sheets to identify the page breaks or produce the confidential versions of the "revised" documents twice. Instead, the CAFC's Clerk Office advised the parties include an explanation like this one in the Table of Contents and identify the affected pages —which, in this filing, are Appx000058-000066.

**EXPLANATION FOR REDACTED INFORMATION**

Pursuant to Federal Circuit Rule 25.1(e)(1)(B), Appellant prepared this non-confidential version of the Corrected Addendum. Confidential information was removed from Appx000059-000063; Appx000066; Appx000102-000106; and Appx000109.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

United States Code Annotated
Title 19. Customs Duties
Chapter 4. Tariff Act of 1930
Subtitle III. Administrative Provisions
Part III. Ascertainment, Collection, and Recovery of Duties

19 U.S.C.A. § 1517

§ 1517. Procedures for investigating claims of evasion of antidumping and countervailing duty orders

Currentness

**(a) Definitions**

In this section:

**(1) Administering authority**

The term "administering authority" has the meaning given that term in section 1677(1) of this title.

**(2) Commissioner**

The term "Commissioner" means the Commissioner of U.S. Customs and Border Protection.

**(3) Covered merchandise**

The term "covered merchandise" means merchandise that is subject to--

**(A)** an antidumping duty order issued under section 1673e of this title; or

**(B)** a countervailing duty order issued under section 1671e of this title.

**(4) Enter; entry**

The terms "enter" and "entry" refer to the entry, or withdrawal from warehouse for consumption, of merchandise into the customs territory of the United States.

**(5) Evasion**

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(A) In general**

Except as provided in subparagraph (B), the term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

**(B) Exception for clerical error**

**(i) In general**

Except as provided in clause (ii), the term "evasion" does not include entering covered merchandise into the customs territory of the United States by means of--

**(I)** a document or electronically transmitted data or information, written or oral statement, or act that is false as a result of a clerical error; or

**(II)** an omission that results from a clerical error.

**(ii) Patterns of negligent conduct**

If the Commissioner determines that a person has entered covered merchandise into the customs territory of the United States by means of a clerical error referred to in subclause (I) or (II) of clause (i) and that the clerical error is part of a pattern of negligent conduct on the part of that person, the Commissioner may determine, notwithstanding clause (i), that the person has entered such covered merchandise into the customs territory of the United States through evasion.

**(iii) Electronic repetition of errors**

For purposes of clause (ii), the mere nonintentional repetition by an electronic system of an initial clerical error does not constitute a pattern of negligent conduct.

**(iv) Rule of construction**

A determination by the Commissioner that a person has entered covered merchandise into the customs territory of the United States by means of a clerical error referred to in subclause (I) or (II) of clause (i) rather than through evasion shall not be construed to excuse that person from the payment of any duties applicable to the merchandise.

**(6) Interested party**

**(A) In general**

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

The term "interested party" means--

**(i)** a foreign manufacturer, producer, or exporter, or the United States importer, of covered merchandise or a trade or business association a majority of the members of which are producers, exporters, or importers of such merchandise;

**(ii)** a manufacturer, producer, or wholesaler in the United States of a domestic like product;

**(iii)** a certified union or recognized union or group of workers that is representative of an industry engaged in the manufacture, production, or wholesale in the United States of a domestic like product;

**(iv)** a trade or business association a majority of the members of which manufacture, produce, or wholesale a domestic like product in the United States;

**(v)** an association a majority of the members of which is composed of interested parties described in clause (ii), (iii), or (iv) with respect to a domestic like product; and

**(vi)** if the covered merchandise is a processed agricultural product, as defined in section 1677(4)(E), a coalition or trade association that is representative of either--

**(I)** processors;

**(II)** processors and producers; or

**(III)** processors and growers.

**(B) Domestic like product**

For purposes of subparagraph (A), the term "domestic like product" means a product that is like, or in the absence of like, most similar in characteristics and uses with, covered merchandise.

**(b) Investigations**

**(1) In general**

Not later than 15 business days after receiving an allegation described in paragraph (2) or a referral described in paragraph (3), the Commissioner shall initiate an investigation if the Commissioner determines that the information provided in the allegation or the referral, as the case may be, reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion.

**(2) Allegation described**

An allegation described in this paragraph is an allegation that a person has entered covered merchandise into the customs territory of the United States through evasion that is--

**(A)** filed with the Commissioner by an interested party; and

**(B)** accompanied by information reasonably available to the party that filed the allegation.

**(3) Referral described**

A referral described in this paragraph is information submitted to the Commissioner by any other Federal agency, including the Department of Commerce or the United States International Trade Commission, that reasonably suggests that a person has entered covered merchandise into the customs territory of the United States through evasion.

**(4) Consideration by administering authority**

**(A) In general**

If the Commissioner receives an allegation under paragraph (2) and is unable to determine whether the merchandise at issue is covered merchandise, the Commissioner shall--

**(i)** refer the matter to the administering authority to determine whether the merchandise is covered merchandise pursuant to the authority of the administering authority under subtitle IV; and

**(ii)** notify the party that filed the allegation, and any other interested party participating in the investigation, of the referral.

**(B) Determination; transmission to Commissioner**

After receiving a referral under subparagraph (A)(i) with respect to merchandise, the administering authority shall determine whether the merchandise is covered merchandise and promptly transmit that determination to the Commissioner.

**(C) Stay of deadlines**

The period required for any referral and determination under this paragraph shall not be counted in calculating any deadline under this section.

**(D) Rule of construction**

Nothing in this paragraph shall be construed to affect the authority of an interested party to commence an action in the United States Court of International Trade under section 1516a(a)(2) of this title with respect to a determination of the administering authority under this paragraph.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(5) Consolidation of allegations and referrals**

**(A) In general**

The Commissioner may consolidate multiple allegations described in paragraph (2) and referrals described in paragraph (3) into a single investigation if the Commissioner determines it is appropriate to do so.

**(B) Effect on timing requirements**

If the Commissioner consolidates multiple allegations or referrals into a single investigation under subparagraph (A), the date on which the Commissioner receives the first such allegation or referral shall be used for purposes of the requirement under paragraph (1) with respect to the timing of the initiation of the investigation.

**(6) Information-sharing to protect health and safety**

If, during the course of conducting an investigation under paragraph (1) with respect to covered merchandise, the Commissioner has reason to suspect that such covered merchandise may pose a health or safety risk to consumers, the Commissioner shall provide, as appropriate, information to the appropriate Federal agencies for purposes of mitigating the risk.

**(7) Technical assistance and advice**

**(A) In general**

Upon request, the Commissioner shall provide technical assistance and advice to eligible small businesses to enable such businesses to prepare and submit allegations described in paragraph (2), except that the Commissioner may deny technical assistance if the Commissioner concludes that the allegation, if submitted, would not lead to the initiation of an investigation under this subsection or any other action to address the allegation.

**(B) Eligible small business defined**

**(i) In general**

In this paragraph, the term "eligible small business" means any business concern that the Commissioner determines, due to its small size, has neither adequate internal resources nor the financial ability to obtain qualified outside assistance in preparing and filing allegations described in paragraph (2).

**(ii) Non-reviewability**

The determination of the Commissioner regarding whether a business concern is an eligible small business for purposes of this paragraph is not reviewable by any other agency or by any court.

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(c) Determinations**

**(1) Determination of evasion**

**(A) In general**

Except as provided in subparagraph (B), not later than 300 calendar days after the date on which the Commissioner initiates an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion.

**(B) Additional time**

The Commissioner may extend the time to make a determination under subparagraph (A) by not more than 60 calendar days if the Commissioner determines that--

**(i)** the investigation is extraordinarily complicated because of--

**(I)** the number and complexity of the transactions to be investigated;

**(II)** the novelty of the issues presented; or

**(III)** the number of entities to be investigated; and

**(ii)** additional time is necessary to make the determination under subparagraph (A).

**(2) Authority to collect and verify additional information**

In making a determination under paragraph (1) with respect to covered merchandise, the Commissioner may collect such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate, including by--

**(A)** issuing a questionnaire with respect to such covered merchandise to--

**(i)** an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise;

**(ii)** a person alleged to have entered such covered merchandise into the customs territory of the United States through evasion;

**(iii)** a person that is a foreign producer or exporter of such covered merchandise; or

**(iv)** the government of a country from which such covered merchandise was exported; and

**(B)** conducting verifications, including on-site verifications, of any relevant information.

**(3) Adverse inference**

**(A) In general**

If the Commissioner finds that a party or person described in clause (i), (ii), or (iii) of paragraph (2)(A) has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner may, in making a determination under paragraph (1), use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.

**(B) Application**

An inference described in subparagraph (A) may be used under that subparagraph with respect to a person described in clause (ii) or (iii) of paragraph (2)(A) without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation.

**(C) Adverse inference described**

An adverse inference used under subparagraph (A) may include reliance on information derived from--

**(i)** the allegation of evasion of the trade remedy laws, if any, submitted to U.S. Customs and Border Protection;

**(ii)** a determination by the Commissioner in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or

**(iii)** any other available information.

**(4) Notification**

Not later than 5 business days after making a determination under paragraph (1) with respect to covered merchandise, the Commissioner--

**(A)** shall provide to each interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise a notification of the determination and may, in addition, include an explanation of the basis for the determination; and

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

**(B)** may provide to importers, in such manner as the Commissioner determines appropriate, information discovered in the investigation that the Commissioner determines will help educate importers with respect to importing merchandise into the customs territory of the United States in accordance with all applicable laws and regulations.

**(d) Effect of determinations**

**(1) In general**

If the Commissioner makes a determination under subsection (c) that covered merchandise was entered into the customs territory of the United States through evasion, the Commissioner shall--

**(A)(i)** suspend the liquidation of unliquidated entries of such covered merchandise that are subject to the determination and that enter on or after the date of the initiation of the investigation under subsection (b) with respect to such covered merchandise and on or before the date of the determination; or

**(ii)** if the Commissioner has already suspended the liquidation of such entries pursuant to subsection (e)(1), continue to suspend the liquidation of such entries;

**(B)** pursuant to the Commissioner's authority under section 1504(b) of this title--

**(i)** extend the period for liquidating unliquidated entries of such covered merchandise that are subject to the determination and that entered before the date of the initiation of the investigation; or

**(ii)** if the Commissioner has already extended the period for liquidating such entries pursuant to subsection (e)(1), continue to extend the period for liquidating such entries;

**(C)** notify the administering authority of the determination and request that the administering authority--

**(i)** identify the applicable antidumping or countervailing duty assessment rates for entries described in subparagraphs (A) and (B); or

**(ii)** if no such assessment rate for such an entry is available at the time, identify the applicable cash deposit rate to be applied to the entry, with the applicable antidumping or countervailing duty assessment rate to be provided as soon as that rate becomes available;

**(D)** require the posting of cash deposits and assess duties on entries described in subparagraphs (A) and (B) in accordance with the instructions received from the administering authority under paragraph (2); and

**(E)** take such additional enforcement measures as the Commissioner determines appropriate, such as--

**(i)** initiating proceedings under section 1592 or 1595a of this title;

**(ii)** implementing, in consultation with the relevant Federal agencies, rule sets or modifications to rule sets for identifying, particularly through the Automated Targeting System and the Automated Commercial Environment authorized under section 58c(f)(4) of this title, importers, other parties, and merchandise that may be associated with evasion;

**(iii)** requiring, with respect to merchandise for which the importer has repeatedly provided incomplete or erroneous entry summary information in connection with determinations of evasion, the importer to deposit estimated duties at the time of entry; and

**(iv)** referring the record in whole or in part to U.S. Immigration and Customs Enforcement for civil or criminal investigation.

**(2) Cooperation of administering authority**

**(A) In general**

Upon receiving a notification from the Commissioner under paragraph (1)(C), the administering authority shall promptly provide to the Commissioner the applicable cash deposit rates and antidumping or countervailing duty assessment rates and any necessary liquidation instructions.

**(B) Special rule for cases in which the producer or exporter is unknown**

If the Commissioner and the administering authority are unable to determine the producer or exporter of the merchandise with respect to which a notification is made under paragraph (1)(C), the administering authority shall identify, as the applicable cash deposit rate or antidumping or countervailing duty assessment rate, the cash deposit or duty (as the case may be) in the highest amount applicable to any producer or exporter, including the "all-others" rate of the merchandise subject to an antidumping order or countervailing duty order under section 1673e of this title or 1671e of this title, respectively, or a finding issued under the Antidumping Act, 1921, or any administrative review conducted under section 1675 of this title.

**(e) Interim measures**

Not later than 90 calendar days after initiating an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall decide based on the investigation if there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion and, if the Commissioner decides there is such a reasonable suspicion, the Commissioner shall--

**(1)** suspend the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the investigation;

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** pursuant to the Commissioner's authority under section 1504(b) of this title, extend the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation; and

**(3)** pursuant to the Commissioner's authority under section 1623 of this title, take such additional measures as the Commissioner determines necessary to protect the revenue of the United States, including requiring a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise.

**(f) Administrative review**

**(1) In general**

Not later than 30 business days after the Commissioner makes a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may file an appeal with the Commissioner for de novo review of the determination.

**(2) Timeline for review**

Not later than 60 business days after an appeal of a determination is filed under paragraph (1), the Commissioner shall complete the review of the determination.

**(g) Judicial review**

**(1) In general**

Not later than 30 business days after the Commissioner completes a review under subsection (f) of a determination under subsection (c) with respect to whether covered merchandise was entered into the customs territory of the United States through evasion, a person determined to have entered such covered merchandise through evasion or an interested party that filed an allegation under paragraph (2) of subsection (b) that resulted in the initiation of an investigation under paragraph (1) of that subsection with respect to such covered merchandise may seek judicial review of the determination under subsection (c) and the review under subsection (f) in the United States Court of International Trade to determine whether the determination and review is conducted in accordance with subsections (c) and (f).

**(2) Standard of review**

In determining whether a determination under subsection (c) or review under subsection (f) is conducted in accordance with those subsections, the United States Court of International Trade shall examine--

**(A)** whether the Commissioner fully complied with all procedures under subsections (c) and (f); and

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**(3) Rule of construction**

Nothing in this subsection shall affect the availability of judicial review to an interested party under any other provision of law.

**(h) Rule of construction with respect to other civil and criminal proceedings and investigations**

No determination under subsection (c), review under subsection (f), or action taken by the Commissioner pursuant to this section shall preclude any individual or entity from proceeding, or otherwise affect or limit the authority of any individual or entity to proceed, with any civil, criminal, or administrative investigation or proceeding pursuant to any other provision of Federal or State law, including sections 1592 and 1595a of this title.

**CREDIT(S)**

(June 17, 1930, c. 497, Title IV, § 517, as added Pub.L. 114-125, Title IV, § 421(a), Feb. 24, 2016, 130 Stat. 161.)

Notes of Decisions (3)

19 U.S.C.A. § 1517, 19 USCA § 1517
Current through P.L. 117-80.

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

## USCIT Opinion (Sustaining CBP's Remand Redetermination)

**(*Royal Brush Manufacturing Inc. v. United States*, No. 19-00198, Slip. Op 21-152 (Ct. Int'l Trade Oct. 29, 2021) ("*Royal Brush II*"))**

KeyCite Blue Flag – Appeal Notification
Appeal Filed by ROYAL BRUSH MANUFACTURING, INC. v. US, Fed.Cir., December 6, 2021

2021 WL 5033650
Only the Westlaw citation is currently available.
United States Court of International Trade.

ROYAL BRUSH MANUFACTURING, INC., Plaintiff,
v.
UNITED STATES, Defendant,
and
Dixon Ticonderoga Co., Defendant-Intervenor.

Slip Op. 21-152
|
Court No. 19-00198
|
October 29, 2021

**Synopsis**
**Background:** Domestic importer of pencils filed suit challenging affirmative determination by United States Customs and Border Protection (CBP) of evasion of antidumping duty order on cased pencils from People's Republic of China issued pursuant to CBP's authority under Enforce and Protect Act (EAPA). Importer moved for judgment on agency record. The Court of International Trade, Mark A. Barnett, J., 483 F.Supp.3d 1294, deferred consideration in part and remanded to agency with instructions. Following redetermination on remand, importer sought review of final evasion determination.

**Holdings:** The Court of International Trade, Mark A. Barnett, J., held that:

[1] regulation requiring public summaries of confidential information comported with procedural due process;

[2] importer failed to establish that disclosure of numerical data in confidential reports was necessary to provide notice and opportunity to rebut evasion allegation;

[3] CBP's failure to disclose photographs from site visit of Philippine shipper did not preclude importer from rebutting evasion allegation;

[4] Philippine shipper's overall production capacity, as discussed in verification report, was not new factual issue entitling importer to additional notice and opportunity to be heard; and

[5] evasion determination was supported by reasoned explanation rationally connected to facts found.

Determination sustained.

**Procedural Posture(s):** Review of Administrative Decision; Motion for Judgment on Administrative Record.

West Headnotes (15)

**[1]** **Constitutional Law** Customs duties

What it means, as a practical matter, for an importer participating in an administrative proceeding before United States Customs and Border Protection (CBP) to be afforded a procedural due process right to notice and a meaningful opportunity to be heard at a meaningful time and in a meaningful manner depends on the circumstances of each case, as due process is flexible and calls for such procedural protections as the particular situation demands. U.S. Const. Amend. 5.

**[2]** **Constitutional Law** Customs duties

In order to determine whether the administrative procedures provided by United States Customs and Border Protection (CBP) to an importer in a given case are sufficient to comport with procedural due process, a court typically undertakes a fact-based inquiry focused on (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, (3) the probable value, if any, of additional or substitute procedural safeguards, and (4) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. U.S. Const. Amend. 5.

[3] **Constitutional Law** Customs duties

**Customs Duties** Proceedings

United States Customs and Border Protection (CBP) regulation requiring public summary of confidential information to be filed whenever confidential information was placed on administrative record provided importers with adequate opportunity to respond to evidence used against them in antidumping evasion proceedings, and, thus, comported with procedural due process, where regulation required public summary to contain sufficient detail to permit reasonable understanding of substance of bracketed information at issue. U.S. Const. Amend. 5; 19 C.F.R. § 165.4(a)(2).

[4] **Constitutional Law** Customs duties

**Customs Duties** Proceedings

Domestic importer failed to establish that disclosure of numerical data, contained in confidential reports, that United States Customs and Border Protection (CBP) used to calculate Philippine shipper's overall production capacity and result of such calculation was necessary to provide importer with notice of and meaningful opportunity to rebut evasion allegation, and, thus, CBP's failure to include underlying data in public summaries of reports did not deprive importer of procedural due process in antidumping evasion proceeding; importer did not identify how CBP could convey substance of such underlying data in manner that protected confidentiality, and data were derived from invoices to which importer had access, allowing it to make desired argument about representativeness of data. U.S. Const. Amend. 14; 18 U.S.C.A. § 1905; 19 C.F.R. §§ 165.4(a)(2), 165.4(e).

[5] **Customs Duties** Proceedings

The regulation requiring United States Customs and Border Protection (CBP), when confidential information has been filed in antidumping-related proceedings, to provide a public summary "conveying the substance of the information" must be understood as nevertheless allowing for the protection of the confidential information. 19 C.F.R. § 165.4(a)(2).

[6] **Constitutional Law** Customs duties

**Customs Duties** Proceedings

Failure by United States Customs and Border Protection (CBP), in antidumping evasion proceeding against domestic importer of purportedly-Philippine pencils, to disclose photographs of boxes of repackaged pencils taken during site visit of Philippine shipper did not preclude importer from rebutting allegation of evasion of antidumping order regarding Chinese pencils, and, thus, did not violate procedural due process, where photographs revealed confidential information about shipper's customers, and CBP only used photographs as evidence that shipper was engaged in transshipment scheme in general rather than that shipper transshipped those specific pencils to importer, such that information on boxes, including destination and contents, would not rebut evasion allegation against importer. U.S. Const. Amend. 5; 19 C.F.R. § 165.4(a)(2), (e).

[7] **Constitutional Law** Customs duties

**Customs Duties** Proceedings

Philippine pencil shipper's overall production capacity, as discussed in verification report following transshipment investigation, was not new factual issue in proceedings before Customs and Border Protection (CBP) involving alleged evasion of antidumping order, and, thus, CBP's rejection of domestic importer's rebuttal submission addressing production capacity did not deny importer notice and opportunity to be heard on such issue; verification agenda apprised shipper in advance that verification could cover production capacity, report's calculations used factual data already on record, and interpreting regulations governing "new factual information" to allow post-verification submissions regarding discrepancies identified at verification would

result in endless cycle of verification. U.S. Const. Amend. 5; 19 C.F.R. §§ 165.23, 165.25(b).

[8] **Constitutional Law** Notice

To comport with procedural due process, in general, notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of an action and afford them an opportunity to present their objections. U.S. Const. Amend. 5.

[9] **Customs Duties** Proceedings

"Verification" is the process by which United States Customs and Border Protection (CBP) checks, reviews, and corroborates factual information previously placed on the record in antidumping evasion proceedings.

[10] **Customs Duties** Proceedings

While substantial evidence, which is necessary to support an antidumping evasion determination by United States Customs and Border Protection (CBP), requires more than a mere scintilla of evidence, it may represent less than the weight of the evidence. 19 U.S.C.A. § 1517(c)(1)(A).

[11] **Customs Duties** Scope of inquiry or review

An abuse of discretion occurs when a decision of the United States Customs and Border Protection (CBP) is based on factual findings that are not supported by substantial evidence. 19 U.S.C.A. § 1517(g)(2).

[12] **Customs Duties** Scope of inquiry or review

The scope of review of a determination by United States Customs and Border Protection (CBP) under the "arbitrary and capricious" standard is narrow, and a court is not to substitute its judgment for that of the agency. 19 U.S.C.A. § 1517(g)(2).

[13] **Customs Duties** Proceedings

For its antidumping evasion determination to survive judicial review, United States Customs and Border Protection (CBP) must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. 19 U.S.C.A. § 1517(g)(2).

[14] **Customs Duties** Proceedings

Determination by United States Customs and Border Protection (CBP) that domestic importer which obtained pencils from Philippine shipper was evading antidumping order applying to certain pencils from China was supported by reasoned explanation rationally connected to facts found, where after investigation of shipper's premises turned up evidence of transshipment, CBP was unable to verify information that shipper submitted to CBP regarding its capacity to produce pencils it provided to importer, shipper subsequently failed verification of its contention that its overall production capacity was adequate to meet its total volume of exports to United States, and importer provided no evidence that its pencils were among those orders that shipper had capacity to produce. 19 U.S.C.A. §§ 1517(c)(2), 1517(g)(2).

[15] **Customs Duties** Proceedings

While United States Customs and Border Protection (CBP) must carry its burden of issuing an antidumping evasion determination that is supported by substantial evidence, interested parties bear the burden of supplying CBP with accurate information that withstands verification. 19 U.S.C.A. §§ 1517(c)(1)(A), 1517(c)(2).

**Attorneys and Law Firms**

Ronald A. Oleynik, Holland & Knight LLP, of Washington, D.C., argued for Plaintiff. With him on the brief were Antonia I. Tzinova, Dariya V. Golubkova, and Libby K. Bloxom.

Ashley Akers, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant. With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Joseph F. Clark, Attorney, Office of the Chief Counsel, U.S. Customs and Border Protection.

Felicia Nowels, Akerman LLP, of Tallahassee, FL, argued for Defendant-Intervenor.

**OPINION**

Barnett, Chief Judge:

***1** This matter is before the court on U.S. Customs and Border Protection's ("Customs" or "CBP") first remand redetermination in connection with EAPA Case No. 7238. *See* Final Remand Redetermination ("Remand Results"), ECF No. 55. [1] CBP issued the Remand Results pursuant to *Royal Brush Manufacturing, Inc. v. United States* ("*Royal Brush I*"), 44 CIT ——, 483 F. Supp. 3d 1294 (2020), which addressed certain challenges to CBP's affirmative determination of evasion of the antidumping duty order on certain cased pencils from the People's Republic of China ("China") brought by Plaintiff Royal Brush Manufacturing, Inc. ("Royal Brush"). CBP issued its evasion determination pursuant to its authority under the Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517 (2018). [2]

Royal Brush opposes the Remand Results. Confidential Pl. [Royal Brush's] Opp'n Cmts. to Agency Final Remand Redetermination Pursuant to Court Remand ("Pl.'s Opp'n Cmts."), ECF No. 64. Defendant United States ("the Government") responded in support of the Remand Results. Def.'s Resp. to Cmts. on Remand Redetermination ("Def.'s Reply Cmts."), ECF No. 68.

***2** For the following reasons, the court sustains CBP's final evasion determination, as amended by the Remand Results.

**BACKGROUND**

**I. Factual and Procedural Background**

The court summarized the legal framework for EAPA investigations and the factual and procedural history of this case in *Royal Brush I*, 483 F. Supp. 3d at 1297–1301. While familiarity with *Royal Brush I* is presumed, the court recounts the background relevant to resolving the remaining issues in this case.

Royal Brush is a domestic importer of pencils exported to the United States from a company located in the Republic of the Philippines ("the Philippines"). [3] *Id.* at 1298. On February 27, 2018, Defendant-Intervenor Dixon Ticonderoga Co. ("Dixon") [4] "lodged an allegation with CBP in which it averred that Royal Brush was transshipping pencils made in China—and subject to an antidumping duty order on certain cased pencils from China—through the Philippines." *Id.* (citations omitted); *see also* *Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994) (antidumping duty order) ("*Pencils Order*"); *Certain Cased Pencils From the People's Republic of China*, 82 Fed. Reg. 41,608 (Dep't Commerce Sept. 1, 2017) (continuation of antidumping duty order). [5]

Customs initiated an investigation into the transshipment allegation on March 27, 2018, and, following a site visit by a CBP Attaché to the Philippine Shipper's facility, imposed interim measures [6] suspending liquidation of entries made on or after March 27, 2018, and extending the liquidation of pre-initiation entries. *Royal Brush I*, 483 F. Supp. 3d at 1298–99. [7]

***3** Then, "[f]rom November 14, 2018, through November 17, 2018, Customs conducted a scheduled verification at the Philippine Shipper's facility." *Id.* at 1299–1300 (citing On-Site Verification Report (Feb. 11, 2019) ("Verification Report") at 2, CR 129). [8] Prior to conducting the verification, CBP informed the Philippine Shipper that the verification could cover any "information in the United States or foreign countries collected under [19 C.F.R.] § 165.23 as is

necessary to make [CBP's] determination."[9] Site Verification Engagement Letter (Nov. 7, 2018) ("Verification Agenda") at 1, CR 121, PR 33–34. CBP also explained that the Philippine Shipper should "be prepared to walkthrough [its] production process in detail using [five identified invoices]." *Id.* at 2.

The Verification Report summarized CBP's attempts to verify production information associated with the five invoices plus two additional invoices and included as attachments 32 photographs taken inside the Philippine Shipper's facility. *See generally* Verification Report. In the report, Customs explained that the Philippine Shipper was unable to provide inventory receipt records for pencils purchased from Chinese suppliers and, at times, handwrote "pencils" with inventory receipts ostensibly related to the purchase of raw materials. *Id.* at 5. CBP was unable to fully verify the production of pencils sold pursuant to the identified invoices as a result of the Philippine Shipper's failure to provide certain documents, deletion of documents such as emails, and provision of documents that had been altered or redacted. *Id.* at 6–8. CBP then attempted to verify the Philippine Shipper's overall production capacity using the payroll records associated with the seven Royal Brush invoices. *Id.* at 9. CBP found that the Philippine Shipper's volume of exports to the United States exceeded its production capacity as calculated by CBP's verification team. *Id.* at 8–9. Lastly, "[e]vidence obtained during the verification" indicated that the Philippine Shipper's previously-submitted payroll documents "were unsupported," *id.* at 9, such that CBP was "unable to verify that the stated employees were, in fact, paid and/or that there was production during those time periods," *id.* at 10.

On May 6, 2019, Customs issued an affirmative evasion determination. Notice of Final Determination as to Evasion, EAPA Case No. 7238 (May 6, 2019) ("May 6 Determination"), CR 131, PR 57. Pursuant to section 1517(c), Customs' determination as to whether covered merchandise entered the United States through evasion must be "based on substantial evidence." 19 U.S.C. § 1517(c)(1)(A). However, when the person alleged to have engaged in evasion, or the person that is the foreign producer or exporter of the covered merchandise, "fail[s] to cooperate by not acting to the best of the party or person's ability to comply with a request for information," Customs may "use an inference that is adverse to the interests of" that person when "selecting from among the facts otherwise available." *Id.* § 1517(c)(3)(A). Consistent with these authorities, CBP concluded "that substantial evidence, in conjunction with an assumption of adverse inferences related to information requested but not provided, indicates [that] Royal Brush's imports were merchandise entered through evasion." May 6 Determination at 5; *see also id.* at 8 (finding substantial evidence to support a finding of evasion based on the available evidence "and the absence of information due to [the] Philippine[ ] Shipper's failure to cooperate and comply to the best of its ability").

***4** Royal Brush requested an administrative review of Customs' May 6 Determination pursuant to 19 U.S.C. § 1517(f). *See* *Royal Brush I*, 483 F. Supp. 3d at 1301. On September 24, 2019, CBP completed its *de novo* Administrative Review. *See* Decision on Request for Admin. Review, EAPA Case No. 7238 (Sept. 24, 2019) ("Admin. Review"), PR 64. In its review, CBP found that there was substantial evidence to support a finding that the pencils imported by Royal Brush during the period of investigation were manufactured in China—not the Philippines. *Id.* at 11–19. CBP explained that, in response to its requests for information, Royal Brush had provided quality compliance certifications that listed China as the country of origin for the tested pencils. *Id.* at 12. CBP also summarized the Attaché's findings indicating the absence of production activity by the Philippine Shipper and the repackaging of pencils made in China into boxes labeled "Made in Philippines" for export to the United States. *Id.* at 13; *see also id.* at 14 (discussing the Attaché Report).

According to CBP, "[t]he question for further development thus became the capacity of the Philippine [Shipper] to manufacture at the level described, given the lack of resources observed during the first on-site visit." *Id.* at 13. CBP explained that verification was conducted in order "to determine whether the Philippine [Shipper] could show that it was capable of producing the amount of pencils allegedly manufactured for Royal Brush, as well as to clarify the country of origin for pencils imported by Royal Brush." *Id.* at 14. CBP noted the Verification Report's summary of the association between the Philippine Shipper and "certain trading companies in China," including that certain officers held positions with both the Philippine Shipper and the Chinese trading companies. *Id.* at 15. CBP also pointed to the inability of the Philippine Shipper to satisfactorily account for the production of the pencils associated with the seven Royal Brush invoices and the verification team's findings regarding overall production capacity. *Id.* at 15, 17. CBP concluded that "[t]he production in the Philippines for Royal Brush's

imports remains unsubstantiated, as amply demonstrated in the verification report by trained CBP auditors." *Id.* at 16.

CBP additionally found that "adverse inferences were warranted, inasmuch as the importer, as well as the alleged foreign producer and exporter, *failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." *Id.* at 18. CBP thus "reasonably filled those evidentiary gaps with some adverse inferences." *Id.*

CBP's finding of evasion in the Administrative Review precipitated this appeal. *See* Summons, ECF No. 1; Compl., ECF No. 2; *see also* 19 U.S.C. § 1517(g) (providing for judicial review following CBP's completion of an administrative review pursuant to subsection (f)).

In due course, Royal Brush moved for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT" or "CIT") Rule 56.2. Confidential Pl. [Royal Brush's] Mot. for J. on the Agency R., ECF No. 33. Royal Brush raised four challenges to Customs' evasion determination, arguing that Customs: (1) improperly rejected Royal Brush's filing seeking to rebut purportedly new factual information contained in Customs' verification report; (2) deprived Royal Brush of due process and redacted or withheld material evidence in an arbitrary and capricious manner; (3) improperly applied adverse inferences; and (4) drew irrational conclusions from the evidence concerning production capacity. Confidential Pl. [Royal Brush's] Mem. in Supp. of its Mot. for J. on the Agency R. ("Pl.'s 56.2 Mem.") at 9–26, ECF No. 33-1; *see also* Confidential Reply Br. of Pl. [Royal Brush] ("Pl.'s 56.2 Reply"), ECF No. 43. The court held a closed hearing on Royal Brush's Rule 56.2 motion on October 6, 2020. *See* Confidential Oral Arg. (Oct. 6, 2020) ("56.2 Hr'g") (on file with the court); Docket Entry, ECF No. 49.

***5** In *Royal Brush I*, the court remanded CBP's determination with respect to issues (1) and (2) and deferred addressing issues (3) and (4) pending CBP's Remand Results. 483 F. Supp. 3d at 1297. The court held that CBP failed to provide a reasoned explanation for its rejection of Royal Brush's rebuttal information because CBP had not identified "the standard CBP used to define 'new factual information' " or explained how it applied any such standard to the Verification Report. *Id.* at 1303. The court further held that a remand was required for CBP to comply with its regulation requiring public summaries of confidential filings. *Id.* at 1305; *see also* 19 C.F.R. § 165.4(a)(2), (e).[10] The court explained that although "EAPA does not require or establish a procedure for the issuance of an administrative protective order ('APO') akin to the procedure used in antidumping and countervailing duty proceedings or otherwise address Customs' management of confidential information," *Royal Brush I*, 483 F. Supp. 3d at 1306, CBP must comply with the requirements in the regulation and CBP's failure to do so deprived Royal Brush the process to which it was entitled, *id.* at 1306–07. The court clarified, however, that it did "not hold that Royal Brush is entitled to receive business confidential information," noting that "Congress has not mandated that Royal Brush be afforded such access and Royal Brush has not shown that due process requires it." *Id.* 1308.

As discussed in more detail below, CBP has now issued its remand results in which it documents the addition of revised public summaries to the administrative record and explains its continued rejection of Royal Brush's rebuttal submission based on the absence of new factual information in the verification report. *See generally* Remand Results.

Oral argument on Royal Brush's opposition to the Remand Results took place on October 6, 2021. *See* Confidential Oral Arg. (Oct. 6, 2021) ("Remand Hr'g") (on file with the court); Docket Entry, ECF No. 71.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 517(g) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1517(g) (2018), and 28 U.S.C. § 1581(c) (2018).

EAPA directs the court to determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review issued pursuant to 19 U.S.C. § 1517(f) was "conducted in accordance with those subsections." 19 U.S.C. § 1517(g)(1). In so doing, the court "shall examine ... whether [CBP] fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of

WESTLAW © 2022 Thomson Reuters. No clai Appx000006 Government Works.

discretion, or otherwise not in accordance with law.” Id. § 1517(g)(2).

## DISCUSSION

The court first addresses the issues discussed on remand before turning to the issues the court deferred in *Royal Brush I*.

### I. Public Summaries

On remand, CBP required the submission of public summaries to accompany confidential documents when necessary for compliance with 19 C.F.R. § 165.4(a)(2) and (e). Remand Results at 15–16. Royal Brush, Dixon, the Philippine Shipper and CBP all placed revised public summaries on the record. *Id.* at 16–17, 20–22. CBP allowed parties to the investigation “to submit rebuttal information pertinent to the revised public versions of the administrative record documents.” *Id.* at 17. CBP also allowed the submission of written arguments responsive to the public summaries. *Id.* at 19. Royal Brush submitted such arguments; Dixon did not. *Id.*

In its written comments, Royal Brush presented several arguments concerning the adequacy of the public summaries accompanying the Attaché Report and Verification Report, including the summaries of the photographs attached to the reports. *Id.* at 22–26. CBP responded that it was precluded from revealing the contested information because it was confidential or, in the case of the photographs, would reveal confidential information. *Id.* at 22–26, 30–33. CBP further noted that it did not rely on the Attaché Report for its final evasion determination. *Id.* at 24. CBP also rejected Royal Brush's challenges to the adequacy of the public summaries of the Allegation and its exhibits. *Id.* at 27, 33–34.

***6** Before the court, Royal Brush contends that the revised public summaries “continue to deprive Royal Brush of due process.” Pl.’s Opp'n Cmts. at 4. Royal Brush argues that due process requires that it “be apprised of all the evidence against it and have a meaningful opportunity to respond to that evidence.” *Id.* at 8. According to Royal Brush, CBP's revised public summaries—which contain descriptors such as “country name(s),” “date,” and “number” in lieu of precise data—fail to convey the substance of the information as required by the regulation and deny Royal Brush due process. *Id.* at 9; *see also id.* at 5 n.6. Royal Brush's arguments are unpersuasive.

**[1]** **[2]** The court previously recognized that “an importer participating in an administrative proceeding has a procedural due process right to ‘notice and a meaningful opportunity to be heard.’ ” *Royal Brush I*, 483 F. Supp. 3d at 1305 (quoting *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012)). “Such opportunity must occur ‘at a meaningful time and in a meaningful manner.’ ” *Id.* at 1306 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)). What that means as a practical matter depends on the circumstances of each case: “[D]ue process is flexible and calls for such procedural protections as the particular situation demands.” *Mathews*, 424 U.S. at 334, 96 S.Ct. 893 (citation omitted) (alteration in original). In order to determine “whether the administrative procedures provided [in a given case] are constitutionally sufficient,” the court typically undertakes a fact-based inquiry focused on the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893; *see also* *Engdahl v. Dep't of Navy*, 900 F.2d 1572, 1575–77 (Fed. Cir. 1990) (applying the *Mathews* balancing test to determine whether the process afforded the appellant before he was suspended without pay complied with due process).

Royal Brush does not frame its argument in terms of the *Mathews* balancing test and makes no argument as to the first and third factors. Instead, Royal Brush raises arguments only on the second factor, asserting that CBP violated its due

process rights by relying on "secret" information to reach its decision. Pl.'s Opp'n Cmts. at 4 (citing *Greene v. McElroy*, 360 U.S. 474, 492–97, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), *Robbins v. U.S. R.R. Retirement Bd.*, 594 F.2d 448 (5th Cir. 1979), and *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) ("*AAADC*")). However, none of the cited cases compel the conclusion that CBP was required to grant Royal Brush access to confidential information during the EAPA investigation.

In *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the petitioner asserted a due process violation when the U.S. Department of Defense ("DOD") revoked his security clearance based on statements made by confidential informants to investigators. 360 U.S. at 492, 475–90, 79 S.Ct. 1400. In relevant part, the Court held that without "explicit authorization from either the President or Congress the respondents were not empowered to deprive [the] petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." *Id.* at 508, 79 S.Ct. 1400. While the Court remanded the case for further consideration without deciding whether the procedures afforded complied with the Fifth Amendment, the Court acknowledged that the right that was ultimately at stake, "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference[,] comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Id.* at 492. *Greene* is inapposite for at least two reasons. First, as noted above, Royal Brush failed to make any argument as to the nature of the private right that it seeks to protect and, in particular, has not established that it seeks the confidential information in order to protect a right comparable to the liberty and property interests at stake in *Greene*. *See* *Royal Brush I*, 483 F. Supp. 3d at 1305 (noting that Royal Brush lacks a fundamental right to engage in foreign commerce); *Mathews*, 424 U.S. at 334, 96 S.Ct. 893 (explaining that the requirements of due process are situation-specific). Second, CBP's authority to provide public summaries of business proprietary information, rather than the information itself, is more established than was the DOD's authority to rely on confidential information to revoke petitioner's security clearance in *Greene*, and Royal Brush has not shown that greater access to confidential information is otherwise constitutionally required.

***7** Royal Brush fares no better with its reliance on *Robbins v. U.S. R.R. Retirement Bd.*, 594 F.2d 448 (5th Cir. 1979). There, the U.S. Railroad Retirement Board ("the Board") denied a claim for unemployment benefits; however, the U.S. Court of Appeals for the Fifth Circuit held that the Board's consideration of evidence withheld from the claimant failed to meet the statutory requirements for a "fair hearing" embodied in the relevant statute. *Id.* at 450. As this court did in *Royal Brush I*, 483 F. Supp. 3d at 1306–07, the appellate court considered whether the plaintiff received the process he was due pursuant to the statute, *id.* at 451–52. Unlike the plaintiff in *Robbins*, Royal Brush has now received public summaries of the information collected by CBP and has had an opportunity to respond to that information before the agency. Remand Results at 15. *Robbins* does not suggest that more is required. *See* 594 F.2d at 451–53.

In *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995), the court held that the Immigration and Naturalization Service ("INS") violated due process when it relied on undisclosed classified information in legalization proceedings. 70 F.3d at 1052, 1068–70. However, like *Robbins*, *AAADC* is distinguishable from this case because the information relied on by INS was withheld *in toto* from the petitioners. *See* *id.* at 1070.

**[3]** Here, CBP has shared information with Royal Brush consistent with its regulation and in a manner that balances the need to disclose evidence against an importer with the need to protect certain information from unauthorized disclosure. Royal Brush does not argue that CBP's regulation, on its face, unreasonably limits Royal Brush's ability to defend itself. Indeed, CBP's regulation, which requires "a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information," 19 C.F.R. § 165.4(a)(2), provides importers such as Royal Brush an "adequate opportunity ... to respond to the evidence used against them," *Royal Brush I*, 483 F. Supp. 3d at 1306.[11]

Royal Brush does, however, contest the adequacy of the public summaries with respect to discrete categories of information in this case. Pl.'s Opp'n Cmts. at 5–9. It

contends that CBP's refusal "to disclose the numerical data it used to calculate the Philippine [Shipper's] overall production capacity or the results of its calculation" rendered Royal Brush unable to respond to this "critical quantitative evidence." *Id.* at 5.[12] Upon examination of the confidential record made available on judicial review, Royal Brush argues that "CBP relied on an unrepresentative sample of data to construct the equation it used to calculate overall production capacity," and CBP's public summaries did not permit Royal Brush the opportunity to present this argument. *Id.* at 5–6. Royal Brush thus suggests that this is a due process violation because it impacted Royal Brush's response to the evidence against it. *Id.*[13]

***8 [4] [5]** Royal Brush does not contest the confidential nature of the information, which CBP is precluded from disclosing by statute and regulation. *See* 19 C.F.R. § 165.4(a); Remand Results at 25 & n.113 (citing 18 U.S.C. § 1905).[14] Thus, conveying the "substance of the information" in public summaries within the meaning of CBP's regulation must be understood as nevertheless allowing for the protection of the confidential information. Royal Brush fails to identify how CBP could convey the substance (but not the specifics) of the information other than describing it as "number" or "no."[15] Instead, Royal Brush simply complains that it needed the actual figures. However, as previously noted, Royal Brush has not demonstrated that due process requires such access. It requires notice and a meaningful opportunity to be heard, *Royal Brush I*, 483 F. Supp. 3d at 1305 (citing *Avisma*, 688 F.3d at 761–62), which were provided here in the form of public summaries and comment procedures.

Further, the Public Verification Report disclosed that CBP relied on invoices specific to Royal Brush to calculate the Philippine Shipper's overall production capacity; the source of CBP's information was not redacted. *See* Public Verification Report at 8–9. Thus, Royal Brush was not precluded from making an argument regarding the unrepresentativeness of its purchases from the Philippine Shipper in its written submission. Accordingly, Royal Brush has not shown that it was prejudiced by CBP's preparation of the public version of the Verification Report. *Cf., e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Royal Brush also contends that CBP failed "to disclose certain *non*-confidential information it relied on to conclude that the Philippine [Shipper] was 'unequivocally' repackaging Chinese-origin pencil products" for export to the United States. Pl.'s Opp'n Cmts. at 6 (citing Admin. Review at 13–14). Such allegedly non-confidential information from photographs taken during the Attaché's site visit included (1) the destination country "for boxes containing the 'Made in China' pencils;" (2) "the type of 'completed pencil product' contained in the boxes;" and (3) the condition of those boxes. *Id.* (citing Remand Results at 23–24, 30–31, 35–36). In response, CBP explained that providing the photographs would reveal the Philippine Shipper's customers, which "information is generally considered as confidential." Remand Results at 31. CBP also explained that the Philippine Shipper had not given "any indication ... that [such information] is not [confidential]." *Id.*

**[6]** While Royal Brush argues that this information is "crucial" in order to know whether (1) "the repackaged pencils were of the same type as exported to Royal Brush;" (2) the Chinese characters on the boxes "identify a company name, a type of raw material used in pencil-production, or a color;" (3) "the contents of a given box match the label affixed thereto;" and (4) the destination for the boxes, Royal Brush does not explain why that information is crucial to undermining CBP's final determination. Pl.'s Opp'n Cmts. at 7–8. Instead, Royal Brush speaks only in generalities about its desire to have access to this information. *See id.*

***9** As CBP explained, "the type of pencils the CBP Attaché witnessed being repackaged at the Philippine[ ] Shipper's facility was not relevant to the CBP determination of evasion and CBP has never stated that they were the same type of pencil exported to Royal Brush." Remand Results at 38. Rather, the Attaché's observations were "consistent with the Philippine[ ] Shipper engaging in a scheme to transship Chinese-origin pencils to the United States" and "[e]vidence that the Philippine[ ] Shipper was engaging in an overall transshipment scheme was plainly relevant to whether the Philippine[ ] Shipper transshipped the specific pencils exported to Royal Brush." *Id.* Thus, Royal Brush has not shown that due process required CBP to disclose the requested information in order to rebut the allegation of evasion that is specific to Royal Brush.

Accordingly, the court finds that CBP has complied with 19 C.F.R. § 165.4 by providing necessary public summaries of the confidential information and that Royal Brush has not

established that CBP has failed to provide Royal Brush the process that it is due.

### II. Verification Report

In the Remand Results, CBP described the scope and purpose of the verification process, explaining that "[a] verification report documents the verification process and therefore is not itself 'new factual information' and as a matter of CBP practice should not contain 'new factual information.' " Remand Results at 6. CBP further explained that if "information outside the scope of the verification and unrelated to the verification of information on the record [is] discovered during a verification ..., such information could be 'new factual information' " and, under that scenario, "CBP would not discuss the information in the verification report but instead would place it on the record pursuant to 19 C.F.R. 165.25(b)" and would permit rebuttal information. *Id.*; *see also id.* at 11.

CBP re-examined the verification report at issue here and again concluded that it did not contain new factual information. *Id.* at 7. CBP therefore concluded that it had properly rejected Royal Brush's rebuttal submission. *Id.* CBP explained that the findings in the report did not constitute new factual information but instead identified "discrepancies in the information that was placed on the record," or, in other words, represented "[t]he results of the verification of that information." *Id.* at 8. Similarly, CBP explained that "calculations based on the data submitted in response to [requests for information ("RFIs")]" were not new factual information but instead represented "CBP using and verifying the factual data on the record." *Id.* at 9. Further, with respect to the Philippine Shipper's overall production capacity, CBP noted that "all entries from the Philippine Shipper, from [fiscal year ("FY")]2014 to FY2018, were placed on the record and therefore [were] within the scope of verification." *Id.* at 13. CBP also rejected the argument that interviews with the Philippine Shipper's employees constituted new factual information, explaining that those interviews were necessary to verify the Philippine Shipper's responses regarding operations and recordkeeping. *Id.* at 9–10.

Royal Brush contends that CBP's consideration of the Philippine Shipper's overall production capacity constituted a new issue; Royal Brush lacked sufficient notice of the issue; and Royal Brush did not have an adequate opportunity to respond to this information. Pl.'s Opp'n Cmts. at 9–11, 14.

**[7]** **[8]** In general, "notice [must be] reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Royal Brush does not provide authority for the proposition that adequate notice of the evasion investigation required CBP to provide advance notice regarding each aspect of the inquiry that CBP might find relevant to its investigation and determination. In particular, with respect to the Philippine Shipper's overall production capacity, CBP noted that all of the Philippine Shipper's entries for the period of investigation were on the record, not just Royal Brush's entries. Remand Results at 9 n.35 (citing CBP NTAG Data, CR 7).[16] Thus, Royal Brush should not be surprised that CBP's "investigation could potentially consider the Philippine[ ] Shipper's overall production capacity" given the relevance of a manufacturer's production capacity to a transshipment investigation. *Id.* at 14.

***10** In support of its argument that CBP was required to give advance notice of the relevance of overall production, Royal Brush relies on *Huzhou Muyun*, 41 CIT ——, ——, 279 F. Supp. 3d 1215, 1224–25 (2017). *See* Pl.'s Opp'n Cmts. at 10. In *Huzhou Muyun*, Commerce placed detailed information on the record close to the deadline for submission of factual information, with only a brief description of the nature of the information, leaving the plaintiff "not clearly apprised of what, specifically, it was meant to rebut." 279 F. Supp. 3d at 1224–25. Here, by contrast, Royal Brush was provided an opportunity to respond to CBP's Verification Report. *See* Remand Results at 14–18. Furthermore, the Verification Agenda apprised the Philippine Shipper, in advance, that the verification could cover any information provided in its responses to CBP's requests for information. *See* Verification Agenda at 1 (citing 19 C.F.R. § 165.23). While CBP emphasized the verification of information associated with five Royal Brush invoices, *id.* at 2, CBP's verification was not limited thereto. *See id.* at 1–3. Royal Brush's assertion that overall production capacity constituted a new issue requiring some additional form of notice is, thus, unpersuasive.

Royal Brush also contends that CBP's assertion that only information beyond the scope of verification may constitute new factual information merely "reprises the discredited argument that information within the scope of the verification cannot be 'new.' " Pl.'s Opp'n Cmts. at 11. Royal Brush

further asserts that information in the Verification Report regarding overall production capacity constitutes new factual information because, before verification, "CBP had not sought, nor had the Philippine [Shipper] provided, data about its overall production capacity." *Id.*; *see also id.* at 11–12 (stating that CBP "generate[d] such data—for the first time—by extrapolating from the information produced about Royal Brush's seven orders"). CBP explained that the calculations it used were not "new factual information" because they were "simply CBP using and verifying the factual data on the record" and were "a natural part of CBP's investigation as to whether evasion occurred."[17] Remand Results at 8.

**[9]** As CBP explained, "[v]erification is the process by which CBP checks, reviews, and corroborates factual information" previously placed on the record. *Id.* at 5. The Verification Report documents CBP's inability to verify that the pencils exported to Royal Brush in the United States were manufactured by the Philippine Shipper, *see* Verification Report at 5–8 (describing various issues with the documents provided), which led CBP reasonably to attempt to verify information provided by the Philippine Shipper regarding its overall production capacity, *See id.* at 9 (citing Resp. to CBP Importer Request for Information (Oct. 3, 2018), Ex. 31, CR 14,). To that end, CBP attempted to use the available payroll records to assess whether sufficient personnel worked the number of shifts required to meet the purported production capacity. *See id.* at 10. CBP explained that it found "discrepancies" in the record and documented those discrepancies in its report. Remand Results at 8. According to CBP, the calculations in the Verification Report represented "CBP using and verifying the factual data on the record and therefore are a natural part of CBP's investigation." *Id.* at 9.

***11** CBP also noted that allowing post-verification submissions to address discrepancies identified at verification, as Royal Brush calls for, would result in "an endless cycle of attempts to verify those post-verification submissions." *Id.* at 5. The court finds that CBP's interpretation of its regulations with regard to "new factual information," in a manner consistent with completing its investigation and meeting its statutory deadlines, is reasonable. In view of the foregoing, the court finds that CBP has provided "a reasoned analysis [and] explanation" for its decision to reject Royal Brush's rebuttal submission. *See* *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

Royal Brush also contends that CBP's evasion determination was arbitrary and capricious because the record fully demonstrates that the Philippine Shipper had the capacity to fulfill Royal Brush's orders. Pl.'s Opp'n Cmts. at 12–13. Royal Brush further argues that "it is impossible for a reasonable mind to conclude that the agency chose the best available information and that its conclusion about the overall production capacity is supported by substantial evidence" when CBP relied on extrapolations drawn from information about Royal Brush's orders and failed to request evidence about overall production capacity from the Philippine Shipper. *Id.* at 14.

CBP did not base its finding of evasion solely on its conclusion that the Philippine Shipper lacked the capacity to produce all the pencils it shipped to the United States. In fact, as CBP's Remand Results make clear, CBP only turned to the Philippine Shipper's overall capacity after the agency was unable to verify the Royal Brush-specific production information that the Philippine Shipper submitted to CBP. Remand Results at 8–9. Thus, CBP made two independent but mutually supportive verification findings, both of which supported its evasion determination. Additionally, Royal Brush's assertion to the court that the Philippine Shipper can "increase or decrease production on demand" such that CBP unreasonably extrapolated from Royal Brush-specific data lacks citation to any record evidence. Pl.'s Opp'n Cmts. at 14. Thus, the court finds that this argument lacks merit.

For these reasons, the court sustains CBP's decision to reject Royal Brush's rebuttal submission.

### III. Deferred Issues

Royal Brush's remaining challenges relate to CBP's use of adverse inferences and its conclusions with respect to the Philippine Shipper's overall production capacity. The court addresses the issue of production capacity first because CBP claimed that finding was based on substantial evidence and any adverse inferences were only made in the alternative. Royal Brush acknowledges that if the court affirms CBP's findings with respect to production capacity, the court need not reach the question of adverse inferences.

**[10]** Royal Brush contends that CBP's affirmative finding of evasion based on the Philippine Shippers' purported insufficient production capacity is irrational. Pl.'s 56.2 Mem. at 24–25; Pl.'s 56.2 Reply at 11–13.[18] Royal Brush argues that record evidence demonstrates that the

Philippine Shipper's production capacity—as quantified by CBP's verification team—exceeded Royal Brush's orders, Pl.'s 56.2 Mem. at 25; Pl.'s 56.2 Reply at 12.[19] According to Royal Brush, CBP's calculations regarding overall production capacity create only the "mere possibility" that Royal Brush's pencils "were not manufactured in the Philippines," which Royal brush claims falls short of the substantial evidence required for CBP's determination pursuant to 19 U.S.C. § 1517(c)(1)(A). Pl.'s 56.2 Reply at 12.[20]

***12** **[11]** **[12]** **[13]** With respect to the court's standard of review, "[a]n abuse of discretion occurs whe[n] the decision is based on ... factual findings that are not supported by substantial evidence ...." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citation omitted); *see also* 19 U.S.C. § 1517(g)(2). Royal Brush does not, however, specifically contest CBP's factual findings; rather, Royal Brush challenges the legal conclusion that CBP reached on the basis of those findings. "The scope of review under the "arbitrary and capricious" standard is narrow," however, "and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). To survive judicial review, Customs "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.' " *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Customs has done so here.

**[14]** As discussed above, CBP was unable to verify the Philippine Shipper's production of pencils tied to the seven Royal Brush invoices reviewed at verification. Admin. Review at 15. CBP then looked to confirm whether the Philippine Shipper's overall production capacity was adequate to meet the company's total volume of exports to the United States. *See id.* at 17. The Philippine Shipper effectively failed verification on that issue as well, because although the company "did appear to have the capacity to produce pencils, it did not appear to be able to produce pencils in the quantities alleged for the company's 2018 operations." *Id.* at 15.

**[15]** Royal Brush suggests, in effect, that CBP was required to assume that its pencils were among the orders that the Philippine Shipper had the capacity to produce. Pl.'s Opp'n Cmts. at 13–14. Royal Brush offers no support for requiring such an assumption. While Customs must carry its burden of issuing a determination that is supported by substantial evidence, 19 U.S.C. § 1517(c)(1)(A), interested parties bear the burden of supplying Customs with accurate information that withstands verification, *id.* § 1517(c)(2). That did not happen here. CBP's finding of evasion, based on its examination of the evidence gathered during the investigation and the well-documented failures at verification, including the Philippine Shipper's failure to verify the production of the pencils shipped to Royal Brush, *see* Admin. Review at 12–17, is supported by a reasoned explanation that contains "a 'rational connection between the facts found and the choice made,' " *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856. Thus, the court finds no reason to disturb it.

With respect to adverse inferences, while Customs must generally base its evasion determination on substantial evidence pursuant to 19 U.S.C. § 1517(c)(1)(A), Customs may "use an inference that is adverse to the interests of" the person alleged to have engaged in evasion or "a person that is a foreign producer or exporter" of the covered merchandise when "selecting from among the facts otherwise available" if that person "failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information." 19 U.S.C. § 1517(c)(3)(A). An adverse inference "may include reliance on information derived from ... (i) the allegation of evasion ...; (ii) a determination by [CBP] in another investigation, proceeding, or other action regarding evasion of the unfair trade laws; or (iii) any other available information." *Id.* § 1517(c)(3)(C).

Royal Brush directs its challenges to Customs' use of adverse inferences in the Administrative Review of Custom's Final Determination. Pl.'s 56.2 Mem. at 21–23; Pl.'s 56.2 Reply at 10–11. Therein, CBP found that substantial evidence supported the conclusion that Royal Brush imported pencils that were not made in the Philippines but were instead made in China. Admin. Review at 11–17. CBP also determined that "adverse inferences were warranted, inasmuch as the importer, as well as the alleged foreign producer and exporter, *failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." *Id.* at 18. While CBP purported to "fill[ ] those evidentiary gaps with some adverse inferences," CBP also stated that, "even without adverse inferences, the record as a whole adequately and reasonably supports a [finding of

evasion].” *Id.* Thus, CBP relied on adverse inferences as an alternative basis for finding evasion that was otherwise based on substantial evidence. For this reason, at oral argument on Royal Brush's Rule 56.2 motion, the court asked the Parties whether it needed to reach the challenge to CBP's use of adverse inferences “if the court resolves Plaintiff's challenges to the substantiality of the evidence regarding production capacity against Plaintiff.” Letter Order (Sept. 30, 2020) at 4, ECF No. 47. The Parties agreed that the court would not need to reach this issue. 56.2 Hr'g, 2:38:25–2:40:05, 2:50:10–2:51:30, 2:51:35–2:52:25 (time stamp from the closed hearing) (on file with the court); *see also* Remand Hr'g, 0:27:20–0:28:00 (confirming same).

***13** Accordingly, because the court finds that Plaintiff's challenges to CBP's findings regarding overall production capacity lack merit, the court finds that Plaintiff's challenge to CBP's alternative reliance on adverse inferences is moot.

## CONCLUSION

Based on the foregoing, the court sustains CBP's final determination of evasion as amended by the Remand Results. Judgment will enter accordingly.

### All Citations

--- F.Supp.3d ----, 2021 WL 5033650

## Footnotes

1 The administrative record for the underlying proceeding is contained in a Confidential Administrative Record (“CR”), ECF Nos. 24-1 (CR 1–12), 24-2 (CR 13–14), 24-3 (CR 15–19), 24-4 (CR 20–27), 24-5 (CR 28–34), 24-6 (CR 35–37), 24-7 (CR 38–41), 24-8 (CR 42–44), 24-9 (CR 45–47), 24-10 (CR 48–50), 24-11 (CR 51), 24-12 (CR 52–54), 24-13 (CR 55–57), 24-14 (CR 58–69), 24-15 (CR 70–86), 24-16 (CR 87–122), 24-17 (CR 123–24), 24-18 (CR 125–26), 24-19 (CR 127–32), and a Public Administrative Record (“PR”), ECF Nos. 23-1 (PR 1–35), 23-2 (PR 36–43), 23-3 (PR 44–64). The administrative record for the Remand Results is likewise contained in a Confidential Remand Record (“CRR”), ECF No. 60-1 (CRR 1–4), and a Public Remand Record (“PRR”), ECF Nos. 59-1 (PRR 1–18), 59-2 (PRR 19–32), 59-3 (PRR 33–39), 59-4 (PRR 40–47), 59-5 (PRR 48–54), and 59-6 (PRR 55–80). The court references the confidential version of the record document, unless otherwise specified.

2 “Evasion” is defined as “entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.” 19 U.S.C. § 1517(a)(5)(A). Congress enacted EAPA as part of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114–125, § 421, 130 Stat. 122, 161 (2016). On August 22, 2016, CBP promulgated final interim regulations to guide Customs' implementation of the EAPA framework. *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 56,477 (CBP Aug. 22, 2016) (interim regulations; solicitation of comments); 19 C.F.R. pt. 165 (2017).

3 To avoid disclosing confidential information, the court will refer to the alleged manufacturer as “the Philippine Shipper.”

4 Dixon did not submit comments on the Remand Results.

5 The *Pencils Order* covers “certain cased pencils ... that feature cores of graphite or other materials encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (e.g., with erasers, etc.) in any fashion, and either sharpened or unsharpened.” 59 Fed. Reg. at 66,909.

6 CBP may impose interim measures within 90 days of initiation of an investigation when the agency determines “there is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion.” 19 U.S.C. § 1517(e).

7 CBP's Attaché prepared a report documenting certain findings. *See* EAPA 7238–Site Visit Report: [Philippine Shipper], Subic Bay, Philippines (June 15, 2018) (“Attaché Report”) at CBP0002540, CR 5, PR 8. The Attaché concluded that the Philippine Shipper has “the capacity to finish some product, but the on-site evidence clearly reveals the repackaging of completely finished products from China.” *Id.* The Attaché observed “staff ... making minor alterations or simply sharpening pencils” and “repacking China origin products into boxes labeled, ‘Made in Philippines.’ ” *Id.* at CBP0002541. The Attaché noted that manufacturing equipment was covered in dust or cobwebs; the “manufacturing warehouse did not indicate production of any products for some time”; they did not observe any raw materials; and the storage area contained “boxes with Chinese characters and English language boxes stating, ‘Made in the Philippines.’ ” *Id.*

8 CBP subsequently released a public version of the Verification Report. *See* On-Site Verification Report (Feb. 25, 2019) (“Public Verification Report”), PRR 61.

9 Section 165.23 addresses the submission of factual information.

10 CBP's regulation permits interested parties to request confidential treatment for information that “consists of trade secrets and commercial or financial information obtained from any person, which is privileged or confidential in accordance with 5 U.S.C. [§] 552(b)(4).” 19 C.F.R. § 165.4(a). A party seeking confidential treatment “must also file a public version of the submission” that “contain[s] a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information.” *Id.* § 165.4(a)(2); *see also id.* § 165.4(e) (extending the public summary requirement to confidential information placed on the record by CBP).

11 Royal Brush appears to suggest that the court should impose an extra-statutory requirement akin to the APO procedure used in Commerce proceedings. Pl.’s Opp'n Cmts. at 8 (citing *Huzhou Muyun Wood Co. v. United States*, 41 CIT ––––, ––––, 279 F. Supp. 3d 1215, 1224–25 (2017), and *Al Haramain Islamic Foundation, Inc. v. U.S. Dept. of Treasury*, 686 F.3d 965, 982-84 (9th Cir. 2012)). Those cases were decided based on their respective facts and do not compel a particular outcome here. *See* *Huzhou Muyun*, 279 F. Supp. 3d at 1224–25 (holding that Commerce's placement of information on the administrative record shortly before the record closed and corresponding inability to permit an extension of time to respond to the new information was unreasonable); *Al Haramain*, 686 F.3d at 979–84, 988–90 (finding that government office erred in withholding classified information as part of its determination to classify the plaintiff as a terrorist organization when the office could have mitigated the use of classified information by providing an unclassified summary of the evidence, but that such error was harmless in that case).

12 CBP summarized the values as “number” or “no.” Public Verification Report at 9–10.

13 Royal Brush appears to base this argument on evidence demonstrating that CBP calculated the Philippine Shipper's overall production capacity to be less than its total U.S. shipments in 2018, yet in excess of Royal Brush's orders in that same year. Pl.’s Opp'n Cmts. at 5 & nn.9–10 (citing Verification Report at 9). Royal Brush cross-references its argument that CBP's determination on remand was arbitrary and capricious. *Id.* at 6 & n.11 (citation omitted). Royal Brush asserts that CBP used information specific to Royal Brush's orders to “extrapolate the Philippine [Shipper's] overall production capacity.” *Id.* at 13.

14 Pursuant to 18 U.S.C. § 1905, a CBP official's disclosure of certain business confidential information could expose that official to a fine or imprisonment of not more than one year.

15 CBP rejected Royal Brush's contention that CBP should have provided a numerical range of the data used to calculate the Philippine Shipper's overall production capacity. Remand Results at 32–33. Royal Brush does not contest that determination specifically but objects generally that designations such as “number” do not comport with the regulatory requirement. Pl.’s Opp'n Cmts. at 5 n.6

16 CBP incorrectly cites this as CR 6. *See* Remand Results at 9 n.35.

17 During Oral Argument, counsel for Royal Brush suggested that using the data in this way constituted "expert analysis," and, thus, new factual information. Remand Hr'g, 0:41:52–0:42:30 (time stamp from the closed hearing). In that vein, in *Apex Frozen Foods Private Ltd. v. United States*, 40 CIT ——, 144 F. Supp. 3d 1308 (2016), *aff'd*, 862 F.3d 1337 (Fed. Cir. 2017), the court recognized that certain expert analysis may assume the weight of evidence and, thereby, amount to "[d]ata or statements of fact in support of allegations, i.e., factual information." *Id.* (citing *PSC VSMPO–Avisma Corp.*, 688 F.3d at 760–61). Here, however, CBP used the data to identify discrepancies and perform basic calculations for the purposes of verification—not expert analysis that "assumes the weight of evidence" by making determinations about the reliability or importance of the data. *Cf.* *Coal. for Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 23 C.I.T. 88, 99, 44 F. Supp. 2d 229, 241 (1999) (finding that calculations and analysis gleaned from the record are not new factual information).

18 Royal Brush also asserts that "CBP's conclusion that the Philippine [Shipper] did not have the capacity to produce enough pencils to fulfill Royal Brush's orders ... is irrational." Pl.'s 56.2 Mem. at 26. Royal Brush mischaracterizes CBP's determination, which found a lack of capacity to produce all the Philippine Shipper's orders for 2018. *See* Admin. Review at 15–17.

19 Royal Brush alludes to other CBP conclusions that it contends are also arbitrary and capricious. Pl.'s 56.2 Mem. at 26. Royal Brush does not, however, develop those arguments and, thus, has waived the opportunity to do so. *See, e.g.*, *United States v. Great Am. Ins. Co. of NY*, 738 F.3d 1320 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

20 Royal Brush claims that a "probability" of evasion is required. *See* Pl.'s 56.2 Reply at 12. While substantial evidence "requires more than a mere scintilla" of evidence, it may represent "less than the weight of the evidence." *Nucor Corp. v. United States*, 34 C.I.T. 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108,1116 (Fed. Cir. 2004)).

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# CIT Judgment
# (October 29, 2021)

**UNITED STATES COURT OF INTERNATIONAL TRADE**

ROYAL BRUSH MANUFACTURING, INC.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

DIXON TICONDEROGA CO.,

Defendant-Intervenor.

Before: Mark A. Barnett, Chief Judge
Court No. 19-00198

**JUDGMENT**

This case having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

**ORDERED** that U.S. Customs and Border Protection's ("CBP") final affirmative evasion determination, set forth in Notice of Final Determination as to Evasion, EAPA Case No. 7238 (May 6, 2019), as affirmed by Decision on Request for Administrative Review, EAPA Case No. 7238 (Sept. 24, 2019), and as modified by CBP's Final Remand Redetermination, ECF No. 55, is **SUSTAINED**; and it is further

**ORDERED** that the subject entries enjoined in this case, *see* Order (Nov. 27, 2019), ECF No. 13, must be liquidated in accordance with the final court decision, including all appeals.

/s/ Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated: October 29, 2021
New York, New York

# CBP's Final Remand Redetermination
# (March 22, 2021)

**FINAL REMAND REDETERMINATION**
***Royal Brush Manufacturing Inc. v. United States***
Court No. 19-00198, Slip Op. 20-177 (Court of International Trade December 1, 2020)
EAPA Case No. 7238

## I. SUMMARY

U.S. Customs and Border Protection (CBP) has prepared this remand redetermination pursuant to the remand order and opinion of U.S. Court of International Trade (the Court) issued on December 1, 2020 in *Royal Brush Manufacturing Inc. v. United States*, 483 F. Supp. 3d 1294 (CIT 2020) (hereinafter, the Remand Order). This remand concerns CBP's affirmative determination of evasion of the antidumping duty order on certain cased pencils from the People's Republic of China (China) against Royal Brush Manufacturing Inc. (Royal Brush).[1] The Court remanded certain aspects of CBP's original determination as to evasion. Specifically, the Court directed CBP to: (1) reconsider and further explain the existence of new factual information in the Verification Report[2] and, to the extent the Verification Report contains new factual information, afford Royal Brush an opportunity to submit a rebuttal;[3] and (2) comply with the public summary requirement set forth in 19 C.F.R. § 165.4 and afford Royal Brush an opportunity to present arguments based on that information.[4]

As explained below, CBP continues to find that the Verification Report does not contain new factual information, and as a result, CBP properly rejected Royal Brush's "rebuttal" submission. Further, as part of remand proceedings, in compliance with 19 C.F.R. § 165.4, CBP placed revised public versions of business confidential documents on the administrative record

---

[1] Confidential Notice of Final Determination as to Evasion in EAPA Case No. 7238 (C.R. 131) (CBP0011643-651) (May 6, 2019) (May 6 Determination); Administrative Review Determination (P.R. 64) (CBP0002449-467) (Sept. 24, 2019) (Admin. Review).
[2] On-Site Verification Report, Enforce and Protect Act (EAPA) Case No. 7238 (C.R. 129) (CBP0011541-85) (Feb. 11, 2019) (Verification Report).
[3] Remand Order at 1308.
[4] *Id.*.

and, after requiring interested parties to do the same, provided parties to the investigation an opportunity to submit rebuttal information and written arguments.

On February 19, 2021, CBP released a draft of its redetermination to interested parties and provided them with an opportunity to comment on the Draft Remand. On February 25, 2021, Royal Brush submitted comments on the Draft Remand. Dixon Ticonderoga Co. did not submit any comments on the Draft Remand.[5] We have addressed the interested parties' comments in detail below.

## II. BACKGROUND

On March 6, 2019, CBP issued an affirmative determination of evasion finding that Royal Brush's imports of pencils were entered into the United States through evasion.[6] Specifically, CBP found that substantial evidence existed that Royal Brush was importing merchandise subject to the antidumping duty order on pencils from China,[7] rather than non-subject merchandise from the Philippines as declared by Royal Brush on entry documentation. On Administrative Review, CBP's Regulations and Rulings Directorate affirmed the findings of the May 6 Determination.[8] In reaching the determination of evasion, CBP applied adverse inferences to the interests of the foreign manufacture for its failure to comply to the best of its ability with CBP's requests for information.[9]

Royal Brush challenged CBP's May 6 Determination and the Administrative Review. In its challenge, Royal Brush argued that CBP's investigation procedures deprived it of its due

---

[5] Royal Brush's Comments to CBP's Draft Remand Determination, dated Feb. 25, 2021 (Comments to Draft Remand Redetermination).
[6] May 6 Determination.
[7] *See* Certain Cased Pencils from the People's Republic of China, 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994); Certain Cased Pencils From the People's Republic of China, 82 Fed. Reg. 41,608 (Dep't Commerce Sept. 1, 2017).
[8] Admin. Review.
[9] May 6 Determination at 8 (CBP0011650); Admin. Review at 18 (CBP0002466).

process rights, and that CBP unlawfully rejected Royal Brush's submission of factual information.[10] Royal Brush further argued that CBP's application of adverse inferences was unlawful,[11] and that CBP's finding regarding the Philippines Shipper's[12] production capacity was unsupported by facts on the record.[13]

The Court deferred ruling on two issues related to the Philippines Shipper's production capacity and CBP's application of adverse inferences, and remanded the matter to CBP for the agency to: (1) reconsider and further explain the existence of new factual information in the Verification Report and, to the extent the Verification Report contains new factual information, afford Royal Brush an opportunity to rebut that information; and (2) comply with the public summary requirement set forth in 19 C.F.R. § 165.4 and afford Royal Brush an opportunity to present arguments based on that information.

## III. REMANDED ISSUES

### A. Royal Brush's Rebuttal Submission To The Verification Report

During the investigation, CBP rejected Royal Brush's attempt to submit information to rebut CBP's verification report, which CBP had placed on the record. In its rejection notification, CBP explained that while 19 C.F.R. §165.23(c) allows for the submission of rebuttal information "{i}f CBP places new factual information on the administrative record on or after the 200th calendar day after the initiation of the investigation," the verification report did not contain new information, and therefore, "a rebuttal to the verification report is not warranted."[14]

---

[10] Royal Brush's Motion for Judgment on Administrative Record, ECF No. 33-1, at 2-3 (Pl.'s Brief).
[11] Pl.'s Brief at 2-3.
[12] In order to keep this document public, CBP does not include the name of the Philippine Shipper in this document.
[13] Pl.'s Brief at 2.
[14] Email from Kareen Campbell to Liliana Farfan (March 21, 2019, 15:14EST) at CBP0002290 (P.R. 50). CBP initially mistakenly accepted the submission but then sent an email to Royal Brush clarifying that the verification did not constitute new factual information and therefore rejected Royal Brush's rebuttal submission. *See* Follow up on Rebuttal Info or Written Argument at CBP0002287 (P.R. 49) (March 6, 2019) (CBP0002287-88); Email from Kareen Campbell to Liliana Farfan (March 21, 2019, 15:14EST) at CBP0002290-96 (P.R. 50).

The Court ordered CBP on remand to reconsider and provide "further explanation regarding the existence of new factual information in the Verification Report."[15] The Court further ordered that "to the extent the Verification Report contains new factual information, Royal Brush must be afforded an opportunity to rebut that information."[16] Upon reconsideration and review of the Verification Report, CBP maintains that the Verification Report does not contain new factual information. CBP provides its further explanation for this determination below. As a result of this determination, Royal Brush is not being afforded an opportunity to submit rebuttal information to the Verification Report.

### 1. A Verification Report Prepared In An EAPA Investigation Is Not "New Factual Information" As Used In 19 C.F.R. 165.23(c)(1).

Pursuant to 19 C.F.R. § 165.23, parties to an EAPA investigation are permitted to make a voluntary submission of factual information to CBP "in order to support the allegation of evasion or to negate or clarify the allegation of evasion."[17] However, due to the statutory deadlines for completing an EAPA investigation and the need to be able to "close" the factual record, the regulations require that any voluntary submissions of factual information to CBP be made "no later than 200 calendar days after CBP initiated the investigation."[18] "Voluntary submissions made after the 200th calendar day after initiation of the investigation will not be considered or placed on the administrative record, except rebuttal information as permitted."[19] Rebuttal information is permitted after the 200th calendar day "{i}f CBP places new factual information on the administrative record after the 200th calendar day."[20]

---

[15] Remand Order at 1308.
[16] Remand Order at 1308.
[17] 19 C.F.R. § 165.23(b).
[18] 19 C.F.R. § 165.23(c)(2).
[19] *Id.*
[20] 19 C.F.R. § 165.23(c). Note that a party to the investigation could submit information to the record on day 200 and the EAPA regulations allow other parties to the investigation to place rebuttal information on the record within 10 days.

The EAPA regulations then provide that "CBP may in its discretion verify information in the United States or foreign countries collected under § 165.23 as is necessary to make its determination."[21] A verification performed pursuant to § 165.25(a) generally consists of an on-site visit, the purpose of which is to verify the information placed on the record pursuant to § 165.23. Verification is the process by which CBP checks, reviews, and corroborates factual information previously submitted or placed on the record pursuant to § 165.23. This includes CBP verifying the completeness of responses to requests for information (RFIs) and further verifying whether those responses contain discrepancies or other errors. A verification is not a continuation of the information gathering stage of the investigation and, accordingly, CBP will usually perform a verification after the time to place information on the record has expired and the factual record is therefore considered "closed."

Following a verification, CBP prepares a verification report and places that report, along with any verification exhibits, on the record.[22] However, CBP does not consider a verification report to be "new factual information" as that phrase is used in § 165.23(c). Rather, a verification report serves only to document CBP's verification of information previously placed on the record pursuant to § 165.23. Because a verification report is not "new factual information," the parties are not able to submit "rebuttal information" in response to a verification report. There at least two important reasons for this. First, CBP must be able to "close" the factual record in order to comply with its statutory deadlines to complete its investigation. Second, if CBP allowed post-verification rebuttal submissions, there could be an endless cycle of attempts to verify those post-verification submissions or CBP would simply be unable to verify those submissions. While parties are unable to submit new factual information

---

[21] 19 C.F.R. § 165.25(a).
[22] 19 C.F.R. § 165.25(b).

to rebut a verification report, the parties have the opportunity to argue against any of the conclusions or any perceived inaccuracies in the verification report in their written arguments, based on the factual information already on the record.

To reiterate, verification is the process by which CBP checks, reviews, and corroborates factual information previously placed on the record. A verification report documents the verification process and therefore is not itself "new factual information" and as a matter of CBP practice should not contain "new factual information." While CBP's position is that a verification report should not contain "new factual information," CBP recognizes the possibility that information outside the scope of the verification and unrelated to the verification of information on the record may be discovered during a verification. For example, if CBP discovered that a foreign shipper or producer was involved in the evasion of AD/CVD orders other than those subject to the instant EAPA investigation, such information could be "new factual information." However, in the event CBP discovers such "new factual information" during a verification, CBP would not discuss the information in the verification report but instead would place it on the record pursuant to 19 C.F.R. 165.25(b). The parties would then be permitted 10 calendar days to provide rebuttal information.[23] Such "new factual information" would not be considered in the verification report, as it would be outside of the scope of verification.

**2. The Verification Report Prepared In This Investigation Does Not Contain New Factual Information**

After the 200-day submission deadline had passed, and CBP had collected all of the information it determined relevant to render its evasion determination, as well as the information parties voluntarily submitted on the record, CBP conducted an on-site verification at the

[23] *See* 19 C.F.R. 165.23(c)(1).

Philippines Shipper's facility to test the accuracy of the information that the parties had submitted on the record. Following the on-site verification, CBP placed on the record a verification report detailing the verification findings. CBP subsequently rejected Royal Brush's attempt to submit information to rebut CBP's Verification Report, because the Verification Report did not contain "new information."

Upon reconsideration and review of the Verification Report, CBP maintains that the Verification Report does not contain new factual information and therefore CBP properly rejected Royal Brush's attempt to submit rebuttal information. As CBP stated in the Verification Report, the purpose of verification was to "*verify the responses placed on the record* of the proceeding by {the Philippines Shipper}."[24] A review of the Verification Report demonstrates this is precisely what CBP did during its verification trip to the Philippines Shipper's facility. For example, during the investigation, CBP requested, and the Philippines Shipper produced, invoices between the Philippines Shipper and Royal Brush.[25] Those invoices were placed on the administrative record.[26] Prior to verification, CBP requested that the Philippines Shipper provide information and supporting documentation related to five of those invoices.[27] During the verification, CBP then verified the invoices and underlying information and documentation[28] relating to those invoices.[29] CBP then prepared and placed on the record a Verification Report

---

[24] Verification Report at 2 (CBP0011543) (emphasis added).
[25] Foreign Party – RFI Narrative Response at CBP0003303 (C.R. 12)
[26] *See* Foreign Party – RFI Response Exhibit Part 1 (C.R.13) (CBP0003310-CBP0003665) (Oct. 2, 2018); Foreign Party – RFI Response Exhibit Part 2 (C.R.14) (CBP0003310-CBP0003666-3952) (Oct. 2, 2018).
[27] *See* Verification Engagement Letter at CBP0010839 (C.R. 121) ("{W}e are requesting that you be prepared to walk through your production process in detail using the following five (5) invoices."); ("For each Invoice Document Number listed above, please provide the following {documents} . . . .").
[28] *E.g.*, original source documents kept in the normal course of business.
[29] In addition, CBP asked to verify the invoices and underlying information and documentation relating to two invoices that were on the record but not specified in the Verification Engagement Letter. *See* Verification Report at CBP0011543 ("scope of the verification of factual information included the following seven (7) invoices associated with imports by Royal Brush").

describing the results of that verification.[30] This process was in accordance with CBP's standard procedures applicable to verifications.

Similarly, as explained in the Verification Report, CBP "verified {Philippine's Shipper's} capability to produce pencils by validating the information provided in the RFI response, Exhibit 31."[31] This included verifying "the list of machinery, functions, quantity of machines on-site, daily production capacity, and numbers of employees needed per machine."[32] CBP also verified payroll information previously placed on the record by comparing it with "supporting documentation" provided during the verification.[33]

Royal Brush argues that the Verification Report contains "new factual information" because it "presents 'findings' of 'CBP auditors{ }' … regarding the Philippine Shipper's business practices, its employees' productivity, and the facility's overall production capability and capacity."[34] However, this argument misunderstands the nature of the verification and the details of the report. As discussed above, while the objective of verification is to test the accuracy of the information submitted in responses to CBP, it is also to verify that such responses did not omit relevant information or otherwise contain discrepancies or other errors. During the verification, CBP verified information that had previously been placed on the record and found discrepancies in the information that was placed on the record. The results of the verification of that information (*i.e.*, CBP's "findings") are not "new factual information," as

---

[30] *See* Verification Report at CBP0011545-49.
[31] Verification Report at CBP0011549; Philippines Shipper RFI Response, Exhibit 31 (CBP0003942-52) (C.R. 14).
[32] Verification Report at CBP0011549.
[33] Verification Report at CBP0011549 (concluding "that time cards submitted by {Philippine's Shipper} differed from the supporting documents provided during our on-site visit {and} … that {Philippine's Shipper}'s payroll documents provided to CBP on their RFIs responses were unsupported.")
[34] Court Ordered Remand Proceedings for EAPA Case No. 7238 – Royal Brush's Written Arguments, at 14 (alterations removed), (February 1, 2021) (hereinafter "Royal Brush Written Arguments").

explained above.[35] Nor are any calculations based on the data submitted in response to RFIs, and the subsequent verification of that data, "new factual information." Rather, those calculations are simply CBP using and verifying the factual data on the record and therefore are a natural part of CBP's investigation as to whether evasion occurred.

Royal Brush has asserted throughout the investigation that the employee interviews conducted at the verification constituted new factual information.[36] However, those interviews were not "new factual information" but were rather part of the verification of information on the record. In fact, asking employees about RFI responses is a quite normal part of the verification of those responses. For example, as explained in the verification report, CBP interviewed company employees about the Philippines Shipper's company operations and record keeping.[37] CBP used this information to verify the accuracy and completeness of Philippines Shipper's RFI responses about company operations and record keeping. For example, in a supplemental RFI, CBP requested that the Philippines Shipper provide information regarding a sales director's role and function as an employee of a trading company and that trading company's relationship to the Philippines Shipper, and then, during the verification, CBP asked the sales director to verify that information.[38] Similarly, when the verification team asked the Philippines Shipper employees

[35] Royal Brush also argues that CBP's "shift in investigatory focus" from the Philippine Shipper's capacity to produce Royal Brush's pencils to its overall pencil production capacity caused the Verification Report to "create new factual information." Royal Brush Written Argument at 15. While CBP disagrees with this characterization of its investigation, Royal Brush fails to explain why a change in "investigatory focus" would constitute "new factual information" or why it would cause the verification of Philippine Shipper's overall production capacity to be "new factual information." Furthermore, the Philippines Shipper's CBP entries are on the record of the investigation and are not new information. *See* TRLED – NTAG Import Data (C.R. 6) (CBP0002559-3138) (6/25/2018). CBP's verification of the Philippine Shipper's overall production capacity did not constitute "new factual information" for the reasons stated above.
[36] *E.g.*, Royal Brush's Written Argument, dated March 25, 2019 (CBP0011624) (C.R. 130) ("CBP interviewed {Philippine Shipper} employees in relation to documents that were not on the Record, summarized its interviews and included these new facts in the Verification Report. Prior to publishing the Verification Report, this information did not exist on the Record.").
[37] Verification Report at 2 (CBP0011543-44).
[38] *Compare* Foreign Party – Email, Cover Ltr., Response to RFI and Exhibits at CBP0010802 (C.R. 120) (CBP0010796-835) (Oct. 23, 2018) *with* Verification Report at CBP0011544.

about production capacity and payroll records, those questions and responses were part of verifying information previously placed on the record rather than "new factual information."[39]

For the reasons stated above, the Verification Report did not contain "new factual information." Rather, at verification CBP sought to verify the accuracy and completeness of information that had already been submitted on the record, and summarized its findings in the Verification Report. Therefore, CBP properly rejected Royal Brush's rebuttal submission during the investigation, and Royal Brush is not being afforded an opportunity to submit rebuttal information to the Verification Report during this remand proceeding.[40]

**Interested Party Comments**

*Royal Brush*:

- CBP fails to explain why a verification report can never constitute new factual information and its position that a verification report "can never contain 'new factual information'" is contrary to law and a reversal of its position before the Court.[41]
- CBP does not define "new factual information" in contravention of the Remand Order and recycles the same arguments previously rejected by the Court.[42]

---

[39] *See* Verification Report at 9-10, (CBP0011550-51). Royal Brush's remaining arguments that the Verification Report contains "new factual information" fail for the same reason. For example, the Philippines Shipper's failure to provide supporting documentation is not "new factual information" as asserted by Royal Brush, but was rather part of the verification of information already on the record.

[40] As explained in more detail below, CBP rejected Royal Brush's additional attempt to submit much of the same information during this remand proceeding in response to the public summaries placed on the record. As explained in CBP's rejection notice, CBP rejected this information because the "submission contain declarations that have nothing to do with the revised public summaries" and "are not pertinent to the revised public versions of the verification report," and CBP additionally explained that "Royal Brush would have been precluded from submitting the same information during the original investigation, even if it had access to the public summaries." Email from Kareen Campbell to Royal Brush, (January 22, 2021 17:23 EST).

[41] Comments to Draft Remand Redetermination at 4-6.

[42] Comments to Draft Remand Redetermination at 6.

- The Philippines Shippers' overall production capacity was a "new issue" and CBP could not use the verification to investigate this "new issue" without allowing Royal Brush an opportunity to respond.[43]

**CBP's Position:**

We disagree with Royal Brush's comments. First, CBP disagrees that it is taking the position that a verification report "can never" contain "new factual information" and notes that the Draft Remand did not take such a position. However, for the sake of clarity, CBP has revised its explanation regarding the existence of new factual information in the Verification Report in response to Royal Brush's comment. As stated above, verification is the process by which CBP checks, reviews, and corroborates factual information previously placed on the record. Therefore, a report which documents the verification process is not itself "new factual information" and as a matter of CBP practice should not contain "new factual information." While a verification report should not contain "new factual information," CBP recognizes the possibility that information outside the scope of the verification and unrelated to the verification of information on the record could be discovered during a verification. CBP would consider such information to be "new factual information." However, in the event CBP discovers such "new factual information" during verification, CBP would place it on the record pursuant to 19 C.F.R. 165.25(b). The parties would then be permitted 10 calendar days to provide rebuttal information.[44] Such "new factual information" would not be considered in the verification report, as it would be outside of the scope of verification. CBP also believes this clarifies its position taken at oral argument before the Court, which was intended to account for situations where such "new factual information" is discovered during verification.

---

[43] Comments to Draft Remand Redetermination at 6-8.
[44] *See* 19 C.F.R. 165.23(c)(1).

CBP further disagrees that its conclusion that a verification report itself is not "new factual information" and should not contain "new factual information" is contrary to law, arbitrary and capricious, or otherwise contrary to the regulatory framework created by CBP. Indeed, CBP does not dispute that the regulatory framework does not specifically prohibit a verification report from containing "new factual information" and that if CBP placed a verification report containing new factual information on the record more than 200 days after the investigation began, parties could submit rebuttal information within 10 days. However, because a verification report is not itself "new factual information" and should not contain "new factual information," such a situation should not arise in practice and has not arisen here.

CBP further disagrees that its redetermination contravenes the Remand Order because it does not define "new factual information" and that its redetermination "recycles" arguments that the Court previously struck down. First, CBP notes that the Remand Order did not require CBP to define "new factual information" but rather the Court ordered "that Customs' evasion determination is remanded to CBP for reconsideration and further explanation regarding the existence of new factual information in the Verification Report…."[45] That is precisely what CBP did above. Second, while CBP does not dispute that it is asserting similar arguments that were presented to the Court, it notes that the Court found those arguments "unpersuasive" because "{t}he cited cases indicate Commerce's views on verification, not Customs' views," and because it was not for the Court to supply a reasoned basis for CBP's actions where CBP did not do so itself."[46] The positions presented in this remand redetermination are CBP presenting its views and the basis for its actions, as directed by Court, even if they are similar to the arguments presented to the Court.

---

[45] Remand Order at 1308.
[46] Remand Order at 1304.

Royal Brush's last comment is that CBP's verification of the Philippines Shipper's overall production capacity was a "new issue" requiring Royal Brush be provided "an opportunity to respond." Royal Brush does not appear to assert this means it was entitled to submit rebuttal information regarding the Philippines Shipper's overall production capacity, as Royal Brush claims this was a "new issue" rather than "new factual information." Rather, Royal Brush only offers a conclusory statement that "CBP developed new factual information in the Verification Report" without even attempting to identify the "new factual information" in the Verification Report.

Even if Royal Brush were asserting that the Philippine Shipper's overall production capacity was "new factual information," CBP has explained why the verification of that production capacity did not constitute "new factual information." As noted above, the Philippines Shipper placed information regarding its overall production capacity on the record, and therefore the verification of that data and the inclusion of the results in the Verification Report did not constitute "new factual information." In addition, as noted above, all entries from the Philippine Shipper, from FY2014 through FY2018, were placed on the record and therefore within the scope of verification, providing a second basis for CBP to verify the Philippine Shipper's overall production capacity and a reason why it was not "new factual information."

Finally, Royal Brush's argument that it was entitled to notice of this "new issue," and also entitled to an opportunity to respond, is outside the scope of the Court-ordered Remand, and is in fact being raised for the first time on remand. As noted above, Royal Brush states that the Philippines Shipper's overall production capacity was a "new issue" rather than "new factual information," and is therefore outside of scope of the reconsideration of "the existence of new factual information in the Verification Report." Even if properly considered here, Royal Brush

cites no authority for its position, and the statutory and regulatory framework for EAPA investigations do not require CBP to share how it is developing and conducting its investigation with the parties. Furthermore, it is undisputed that Royal Brush had notice that CBP was investigating the possible transshipment of Chinese-origin pencils through the Philippines Shipper to Royal Brush. It should not be surprising to Royal Brush that such an investigation could potentially consider the Philippines Shipper's overall production capacity, since whether a manufacturer has the capacity to produce all of the product it exports is plainly relevant to any transshipment investigation.

### B. Public Summaries of Business Confidential Information

Pursuant to 19 C.F.R. § 165.4, and with certain exceptions, interested parties submitting information to CBP may request that CBP treat any part of their submission as business confidential.[47] Parties claiming business confidential treatment must meet the requirements outlined in § 165.4. CBP will grant confidential treatment if the information over which confidential treatment is sought consists of trade secrets and commercial or financial information obtained from any person, which is privileged or confidential in accordance with 5 U.S.C. § 552(b)(4).[48] In addition to identifying business confidential information by placing such information in single brackets, parties must also provide an explanation why such information is entitled to confidential treatment.[49] Further, on the same date as the confidential submission, parties must submit a public version of the confidential document that contains a summary of the confidential information with "sufficient detail to permit a reasonable understanding of the substance of the information."[50] Finally, if the submitting interested party claims that public

---

[47] 19 C.F.R. § 165.4(a)
[48] 19 C.F.R. § 165.4(a)
[49] 19 C.F.R. § 165.4(a)(1)
[50] 19 C.F.R. § 165.4(a)(2)

summarization is not possible, the interested party must provide a full explanation supporting such claim.[51] CBP may reject a submission that does not conform with the requirements of § 165.4(a).[52]

In its Remand Order, the Court noted the lack of public summaries for a number of documents, including the initial allegation submitted by Dixon Ticonderoga Co. (Dixon), the Attaché site visit report, and the Verification Report.[53] The Court held that CBP must "address and remedy the lack of public summaries by providing Royal Brush an opportunity to participate on the basis of information that it should have received during the underlying proceeding."[54] In doing so, the Court acknowledged that EAPA does not mandate that Royal Brush be provided access to confidential information.[55]

As detailed below, CBP has required that all interested parties provide public summaries of all previous submissions that comply with § 165.4(a)(2). In addition, CBP prepared new public versions of business confidential documents that it previously placed on the administrative record. CBP permitted interested parties to submit rebuttal information and written arguments based on the updated public versions of business confidential documents.

**1. Remand Procedure**

On December 18, 2020, CBP issued a letter to the interested parties – Royal Brush, Dixon, and the Philippines Shipper[56] – requiring that the parties submit revised public versions of certain business confidential documents no later than December 30, 2020.[57] CBP advised the

[51] *Id.*
[52] 19 C.F.R. § 165.4(b).
[53] Remand Order at 1306.
[54] Remand Order at 1308.
[55] Remand Order at 1308.
[56] *See* Letter from Brian Hoxie to Counsel for Philippines Shipper, re: *Royal Brush v. United States,* Court No. 19-00198, (December 18, 2020).
[57] Letter from Brian Hoxie to Counsel for Royal Brush Manufacturing, Inc. and Dixon Ticonderoga, Co., re: *Royal Brush v. United States,* Court No. 19-00198, December 18, 2020; Letter from Brian Hoxie to Counsel for Philippine

interested parties which previously submitted administrative record documents did not comply with the public summary requirement in § 165.4(a)(2).[58] CBP requested that revised public versions contain public summaries of the business confidential information with sufficient detail to allow for reasonable understanding of the redacted information.[59] If parties claimed that public summarization of any business confidential document was not possible, CBP required that parties to include a full explanation supporting such claim.[60] Further, CBP advised the parties to the investigation that on or before January 5, 2020, CBP would issue revised public versions of business confidential documents it previously placed on the administrative record and that it would permit the parties to the investigation to submit comments on those documents.[61]

On December 28, 2020, Dixon submitted revised public versions of three documents: (1) Allegation under the Enforce and Protect Act, originally filed on February 27, 2018; (2) Revised Allegation under the Enforce and Protect Act, originally filed on February 27, 2018; and (3) Supplemental Allegation with Exhibits, originally filed on March 13, 2018.[62] On December 30, 2020, the Philippine Shipper submitted revised public versions of some of its administrative record documents, and requested an extension to submit remaining documents on or before January 4, 2021.[63] On December 30, 2020, Royal Brush requested an extension of the deadline for submission of public summaries.[64] CBP extended the deadline for submission until January

Shipper, re: *Royal Brush v. United States,* Court No. 19-00198 (December 18, 2020) (collectively, December 18, 2020 Letters).
[58] December 18, 2020 Letters.
[59] December 18, 2020 Letters.
[60] December 18, 2020 Letters.
[61] Letter from Brian Hoxie to Counsel for Royal Brush Manufacturing, Inc. and Dixon Ticonderoga, Co., re: *Royal Brush v. United States,* Court No. 19-00198, (December 18, 2020).
[62] Dixon Ticonderoga, Co., "Public Summary of February 27, 2018 Email of Allegation Cover Letter and Attachments of Exhibits 1-7 EAPA Case Number: 7238 Remand s December 28, 2020 Submission," (December 28, 2020) (Dixon's December 28, 2020 Submission).
[63] Philippine Shipper, "EAPA Case Number: 7238 Remand; Public Summary of Documents," (December 30, 2021).
[64] Email from Pam Collins to Victoria Cho, (December 30, 2020, 16:52 EST)

Case: 22-1226 Document: 42 Page: 104 Filed: 09/08/2022

4, 2021.[65] On January 4, 2021, Royal Brush submitted revised public versions of 149 business confidential documents it had placed on the administrative record during the original investigation.[66] The Philippine Shipper also submitted public summaries of additional documents on January 4, 2021.

On January 5, 2021, CBP issued revised public versions of nine documents it had previously placed on the administrative record: (1) Initiation Memo, originally filed on March 27, 2018; (2) Foreign Location Preliminary Site Visit Report June 15, 2018_ Regarding Foreign Party, originally filed on June 15, 2018; (3) Importers 300-day-window import data, originally filed on June 20, 2018; (4) NTAG Import Data, originally filed on June 26, 2018; (5) Notice of Initiation and Interim Measures, originally filed on June 26, 2018; (6) RFI to Royal Brush, originally filed on August 10, 2018; (7) Foreign Party Site Visit Engagement Letter, originally filed on November 7, 2018; (8) Verification Report, originally filed on February 25, 2019; and (9) Notice of Final Determination of Evasion, originally filed on May 6, 2019.[67]

On January 5, 2021, CBP notified the parties to the investigation that the parties would be allowed until January 15, 2021 to submit rebuttal information pertinent to the revised public versions of the administrative record documents.[68] CBP instructed the parties that any submission "must cite to the specific factual information included in the revised public versions of administrative record documents" and that this was not "an opportunity to submit comments or information unrelated to the revised public versions of administrative record documents."[69] At Royal Brush's request, CBP extended the deadline until January 19, 2021.[70] On January 19,

[65] Email from Victoria Cho to Royal Brush, Dixon, and Philippine Shipper, (December 30, 2020, 18:45 EST)
[66] CBP requested revised public versions of 153 documents from Royal Brush, however Royal Brush submitted 149 documents. Email from Royal Brush to EAPA Allegations, (January 4, 2020, 17:53 EST)
[67] Email from Kristina Horgan to Counsel for Dixon and Royal Brush, (January 5, 2021, 15:37 EST).
[68] *Id.*
[69] *Id.*
[70] Email from Kareen Campbell to Counsel for Dixon and Royal Brush, (January 15, 2021, 13:47 EST)

2021, Royal Brush attempted to submit rebuttal information and challenged the sufficiency of public summaries placed on the record by CBP and Dixon.[71] Dixon did not submit any rebuttal information.

In its submission, Royal Brush included 12 exhibits with documents purported to rebut the revised public versions of administrative record documents.[72] Contrary to CBP's instructions, Royal Brush did not cite to the factual information included in the revised public versions of the administrative record documents reproduced during the remand proceedings. Instead, Royal Brush's submission consisted of the many of the same documents it had attempted to submit during the original investigation in order to rebut the Verification Report.[73] As discussed above, CBP continues to find that the CBP's Verification Report did not include any new factual information that would permit Royal Brush to submit a rebuttal pursuant to § 165.23(c)(2). Royal Brush would not have been allowed to submit the information contained in its January 19, 2021 submission pertaining the Verification Report during the original investigation even if the public version of the Verification Report had included public summaries.[74] Further, Royal Brush's January 19, 2021 submission did not contain specific citations to the portions of revised public versions administrative record documents. As such, CBP rejected Royal Brush's January 19, 2021 submission.

Royal Brush attempted to make another submission on January 26, 2021.[75] Because Royal Brush's submission still contained documents purporting to rebut the Verification Report, CBP rejected Exhibits A-D and F-I.[76] CBP however accepted Exhibits E and E1 as Royal Brush

---

[71] Email from Royal Brush to Kareen Campbell, (January 19, 2021, 16:58PM EST).
[72] *Id.*
[73] *Id.*
[74] Email from Kareen Campbell to Royal Brush, (January 22, 2021, 17:23 EST).
[75] Email from Royal Brush to Kareen Campbell (January 26, 2021, 11:43EST).
[76] Email from Kareen Campbell to Royal Brush, (January 27, 2021, 17:18 EST).

indicated that these exhibits were pertinent to the Attaché Site Visit Report.[77] Royal Brush subsequently clarified that Exhibits H, H1 and I were intended to rebut the Dixon Allegation, and as a result, CBP accepted those exhibits as well.[78]

On January 26, 2021, CBP informed the parties to the investigation of the opportunity to submit written arguments before January 29, 2021.[79] Royal Brush submitted its written arguments[80] on February 1, 2021 after CBP granted Royal Brush's request for an extension of time.[81] Dixon did not submit any written arguments.

**2. Analysis**

CBP's remand proceeding complied with the Court's Remand Order. The EAPA statute and applicable regulations do not provide for a mechanism, such as an administrative protective order (APO), for disclosure of confidential business information to interested parties.[82] As such, CBP is not authorized to disclose business confidential information to interested parties or their authorized representatives. Indeed, the Court did not order CBP to release business confidential information to Royal Brush.[83]

CBP promulgated § 165.4 with a goal to protect business confidential information while ensuring transparency of the investigation such that an alleged evader is notified of the allegation and parties to the investigation are able to participate in the proceeding.[84] As a result, while

---

[77] Email from Kareen Campbell to Royal Brush, (January 27, 2021, 17:18 EST).
[78] Email from Royal Brush to Kareen Campbell (January 28, 2021, 11:52 EST); Email from Kareen Campbell to Royal Brush (January 28, 2021, 13:46 EST). *See* Letter from Royal Brush, "Court Ordered Remand Proceedings for EAPA Case No. 7238 – Royal Brush's Partial Rebuttal (Second Re-Submission) and Challenge to Sufficiency of Published Public Summaries," dated January 28, 2021 (hereinafter, January 28, 2021 Submission)
[79] Email from Kareen Campbell to Royal Brush and Dixon, (January 26, 2021, 16:28EST).
[80] *See* Royal Brush Written Arguments.
[81] Email from Kareen Campbell to Royal Brush and Dixon, (January 28, 2021, 18:23 EST).
[82] *See generally* 19 U.S.C. § 1517; 19 C.F.R. Part 165.
[83] *See* Remand Order at 1308.
[84] Investigation of Claims of Evasion of Antidumping and Countervailing Duties, U.S. Customs and Border Protection, 81 Fed. Reg. 56477, 56479 (August 22, 2016)

EAPA regulations allow parties to claim confidential treatment over information submitted to CBP, parties must also submit a public summary of such confidential information.[85] As described in detail above, CBP complied with its regulations by requiring interested parties to place revised public versions on the record, allowing parties to submit information they would have submitted if they had access to the public summaries during the original investigation, and permitting parties to submit written arguments based on the public summaries.

Revised public versions of CBP-generated administrative record documents comply with the public summary requirements under § 165.4(a)(2). Specifically, § 165.4(a)(2) requires that the public summary of confidential business information contain "sufficient detail to permit a reasonable understanding of the substance of the information."[86]

CBP released revised public versions of nine documents that CBP previously placed on the administrative record: two documents containing confidential import data,[87] the Initiation Memorandum,[88] the Notice of Initiation and Interim Measures,[89] the Attaché Site Visit Report,[90] a set of RFI questions for Royal Brush, the Verification Engagement Letter,[91] the Verification Report,[92] and the Final Determination of Evasion.[93] In each document, CBP summarized business confidential information with reasonable specificity. The revised public versions of

---

[85] *See* 19 C.F.R. § 165.4; *see also I*nvestigation of Claims of Evasion of Antidumping and Countervailing Duties*,* U.S. Customs and Border Protection, 81 Fed. Reg. 56477, 56479 (August 22, 2016).
[86] 19 C.F.R. § 165.4(a)(2)
[87] "Importer's 300 Day Window – June 20, 2018," (P.R. 9) (CBP0000048-49) (revised, January 5, 2021); TRLED, "NTAG Import Data," (P.R. 13) (CBP0000059) (revised, January 5, 2021).
[88] TRLED, Initiation Memorandum, (P.R. 5), (CBP0000026-28), (March 28, 2018) (Revised, January 5, 2021)
[89] TRLED, Notice of Initiation and Interim Measures, (P.R. 14) (CBP0000060-66) (June 26, 2018) (Revised, January 5, 2021).
[90] Attaché Site Visit Report at CBP002541 (P.R. 5) (CBP0000035-47) (June 15, 2018) (Revised January 5, 2021) (hereinafter, Revised Attaché Report).
[91] Foreign Party Site Visit Engagement Letter, (P.R. 34) (CBP0001284-88) (November 7, 2018) (Revised January 5, 2021).
[92] Verification Memorandum, (P.R. 47) (CBP0002239-CBP0002239) (Feb. 25, 2019) (Revised January 5, 2021) (hereinafter, Revised Verification Memo).
[93] Final Determination of Evasion, (P.R. 57) (CBP0002385-CBP0002394) (April 29, 2019) (Revised January 5, 2019); Email from Kristina Horgan to Royal Brush and Dixon, (January 5, 2021, 3:37PM EST).

documents containing confidential import data describe the information included in each document, while explaining that the summarization of data itself is not possible.[94] Such summary permits reasonable understanding that the document contains business confidential import data, elements of such data, and relevant dates.

Public summaries of confidential information in the Attaché Site Visit Report and the Verification Report also include sufficient detail in compliance with § 165.4(a)(2). As a general matter, CBP summarized the subject of the bracketed information, *i.e.*, "manufacturer name" or "customer name," without revealing the business confidential information itself.[95] Further, CBP provided detailed descriptions of photographs captured by the Attaché during the visit. For example, CBP described one of the photos as "photo of box with labeled finished merchandise."[96] The caption below the picture further states "Evidence#1 – Made in China box, complete pencil product. Pencil and label in evidence in possession. Robert allowed me to take the item."[97] Releasing the photograph itself would reveal the name of one of the U.S. customers of the Philippine Shipper, however the description provides notice to parties that in order to rebut the findings of the Attaché Site Visit Report, Royal Brush would need to place information on the record demonstrating that its pencils are manufactured in the Philippines.

CBP described photographs accompanying the Verification Report in a similar manner. For example, "photo of section of facility labeled with steps of production process, with staff and machinery present" provides the subject of the photograph without revealing confidential information such as the type of machinery or the specific production step.[98] Such descriptions

[94] "Importer's 300 Day Window – June 20, 2018," (P.R. 9) (CBP0000048-49) (revised, January 5, 2021); TRLED, "NTAG Import Data," (P.R. 13) (CBP0000059) (revised, January 5, 2021).
[95] *See e.g.*, Revised Attaché Site Visit Report at 1-2.
[96] Revised Attaché Site Visit Report at 6.
[97] Revised Attaché site Visit Report at 6.
[98] Revised Verification Report, Attachment II, at 10.

notify the parties of the subject matter of the photograph such that the parties are able to determine what information CBP was considering during the verification.

Bracketed information in the Verification Report largely contained confidential numbers, such as invoice numbers, number of pencils produced in a day, number of machines in operation, and dates of payroll records.[99] CBP summarized confidential numbers as “number.”[100] Where dates were bracketed, CBP summarized them as “dates.”[101] The business confidential information included in the Verification Report belongs to the Philippine Shipper. CBP is not authorized by statute or regulation to release the bracketed business confidential information itself.

CBP found that the revised public versions of administrative record documents received from interested parties, contained public summaries of a similar degree of specificity. Because the public summaries of confidential information in these submissions included reasonable notice of the contents of the confidential information, CBP determined that the public summaries met the standards outlined in 19 C.F.R. § 165.4.

Royal Brush argues that the public summaries CBP provided are inadequate to allow Royal Brush to respond to the record evidence.[102] Specifically, Royal Brush maintains that the Attaché Report did not include the names of the recipients of Chinese origin products, and as such, “[w]ithout knowing the location of those companies and whether Royal Brush was one of them, it is impossible for Royal Brush to understand the bracketed information and adequately respond to it.”[103] CBP could not have provided the names of Philippine Shipper’s customers

[99] Revised Verification Report.
[100] *See e.g.*, Revised Verification Report at 5.
[101] *See e.g.*, Revised Verification Report at 2.
[102] Royal Brush Written Arguments.
[103] Royal Brush Written Arguments at 5.

without revealing business confidential information, and CBP was not required to do so by the Court's Remand Order. The public summary of the Attaché Site Visit includes sufficient detail to permit a reasonable understanding of the bracketed information because it provides notice to Royal Brush that CBP found Chinese origin pencils at its Philippine supplier's facility. This notice is sufficient to alert Royal Brush to place information on the record that would demonstrate that its imports of pencils are not made in China. Knowing the names of the Philippine Shipper's customers is not necessary for Royal Brush to obtain information on where the merchandise it imports into the United States is manufactured.

Royal Brush makes similar arguments regarding the sufficiency of public summaries CBP created for photographs in the Attaché Site Visit Report. Royal Brush argues that CBP should have provided Royal Brush with access to the photographs themselves.[104] In the alternative, Royal Brush contends that CBP should provide additional information identifying the recipients of the prepared shipments that the Attaché found at the Philippine Shipper's facility, include contents of the labels, and describe in detail the contents of boxes found at the Philippine Shipper's facility.[105] The public summaries included in the Attaché Site Visit Report allow for sufficient understanding that photographs show Chinese-origin finished pencils at Philippine Shipper's facility, thereby providing notice to Royal Brush as to the type of rebuttal information it may wish to file. In addition, Royal Brush fails to consider the public summaries in conjunction with the information already present in the public version of the document. For example, public summary of one photograph states "photo of subset of a facility," and the public information in the document states "Manufacturing Facility - not operating."[106] Another

[104] Royal Brush Written Arguments at 5.
[105] Royal Brush Written Arguments at 5-6.
[106] Revised Attaché Site Visit Report at 5.

photograph is described as "closeup photo of equipment" in a public summary, and the public description states "Finishing Facility - paint area w/dust, not operating "DUST" written by Attaché during sight visit."[107] Providing the actual photographs to Royal Brush would reveal confidential information on types and models of equipment that are present at the facility, but the public information shows that the painting equipment present in the facility at the time of the visit was not operational and covered with dust. Such public summary provides sufficient notice to Royal Brush to submit information demonstrating that Philippine Shipper actually produces pencils in its facility and the equipment in the facility is operated regularly. Another public summary of a photograph describes it as "closeup photo of a box," and the public description states "Evidence#3 – closer view of "Made in China" on the box."[108] Again, the name of the Philippine Shipper's customers and the destination of the box is not necessary, when the summary provides Royal Brush with notice that its supplier of pencils from has Chinese-origin finished merchandise at its facility. As such, Royal Brush could have submitted information demonstrating that its products are not made in China.

Finally, CBP relied on the Attaché Site Visit Report at the outset of the investigation to determine whether interim measures were warranted. During the original investigation, Royal Brush had plenty of opportunities to respond to requests for information from CBP and submit information to the record demonstrating that its products were not made in China. CBP based its final determination of evasion on the information collected from Royal Brush and the Philippines Shipper during the investigation and on the results of the onsite verification conducted at the Philippines Shipper's production facility.[109]

---

[107] Revised Attaché Site Visit Report at 6.
[108] Revised Attaché Site Visit Report at 7.
[109] *See generally* May 6 Determination.

Royal Brush also challenges public summaries that CBP provided for the Verification Report. Royal Brush Argues that CBP's public summaries did not reveal the actual values for production inputs that CBP used for calculating production capacity, and as a result, Royal Brush could not challenge CBP's calculations.[110] Royal Brush further argues that it does not have access to the information on the Philippines Shipper's payroll records or its affiliates, and as such, Royal Brush cannot meaningfully evaluate the accuracy of CBP's assumptions.[111] For the same reasons, Royal Brush takes issue with the public summaries of the confidential information related to the Philippines Shipper's production capacity that CBP provided in the revised public version of the May 6 Determination. [112]

In calculating the production capacity, CBP relied on confidential business information that belonged to the Philippines Shipper. The Philippines Shipper did not authorize CBP to release the actual values used in the calculations or the calculated production capacity in the verification report.[113] Because EAPA does not provide for a procedure to disclose confidential information to authorized representatives of interested parties under an APO, CBP cannot disclose business confidential information to Royal Brush. CBP's public summaries of confidential information in the Verification Report provide sufficient detail for Royal Brush to have notice of CBP's findings at the verification and to determine what arguments it would need to make to challenge such findings.

Royal Brush also takes issue with the public summaries of photographs taken by CBP officials during the verification. CBP took numerous photographs at the Philippines Shipper's production facility that contain business confidential information belonging to the Philippines

---

[110] Royal Brush Written Arguments at 22-23.
[111] Royal Brush Written Arguments at 6-7
[112] Royal Brush Written Arguments at 8
[113] *See* 18 U.S.C. § 1905.

Case 1:19-cv-00198-MAB Document 59-6 Filed 04/08/21 Page 113 of 427

Shipper. The Philippines Shipper did not authorize CBP to release the photographs on the public administrative record. By summarizing the subjects of the photographs, CBP described the contents with sufficient specificity to provide notice to the parties as to the contents of the photographs. For example, "photo of section of facility with step of production process, machinery present"[114] provides sufficient detail to permit a reasonable understanding that CBP was observing machinery used for production of pencils at the Philippines Shipper's facility. Providing any additional information regarding the type of machinery would reveal confidential business information.

Royal Brush also argues that CBP did not provide public summaries of exhibits accompanying the Verification Report.[115] However, the verification exhibits were submitted to CBP by the Philippines Shipper. In a December 18, 2020, Letter, CBP required the Philippines Shipper to submit revised public versions of the exhibits accompanying the Verification Report.[116] The Philippines Shipper submitted public summaries for the Verification Exhibits to CBP on December 30, 2021.[117]

Finally, Royal Brush challenges the confidential nature of the Allegation and the Exhibits filed by Dixon, arguing that the documents Dixon submitted to CBP must be public because such documents do not belong to Dixon.[118] Royal Brush points to the certification requirements outlined in § 165.4(d) that require the party filing a public version of a document to certify that the information it is providing in the public version is either its own or was obtained from the

---

[114] Revised Verification Report at 8.
[115] Royal Brush Written Arguments at 7.
[116] *See* Letter from Brian Hoxie to Counsel for Philippine Shipper, re: Royal Brush v. United States, Court No. 19-00198, Attachment at 2, December 18, 2020.
[117] *See* Philippine Shipper EAPA Case Number: 7238 Remand, Public Summary of Documents, at 2-4, December 30, 2021.
[118] Royal Brush Written Arguments at 8-9.

public domain.[119] Royal Brush's argument misses the point. The certifications required under § 165.4(d) pertain to the public versions of business confidential information submitted to CBP by interested parties. In essence, by requiring the submitting parties to certify that the information it is filing on the public record either belongs to the submitting party or was obtained from the public domain, CBP is ensuring that the public version does not disclose confidential business information that belongs to another entity. Contrary to what Royal Brush maintains, the regulation does not require that interested parties only submit business confidential information that belongs to the submitting party or exists in the public domain. The public summary of the purchase contract that Dixon provided does not reveal any information that would call into question the confidential nature of the information in the Allegation or its exhibits.[120] Dixon is only certifying to the fact that the public summary which reveals that there is a purchase contract between two Chinese companies does not disclose confidential business information of another entity.[121]

Alternatively, Royal Brush argues that Dixon's public summaries are inadequate. While Dixon chose to provide public summaries in a narrative format, as opposed to including public summaries between brackets of revised public versions, CBP found that the public summaries met the requirements under section § 165.4, as they permit reasonable understanding of the contents of bracketed confidential information in the Allegation and the Exhibits short of revealing the confidential information itself.

---

[119] 19 C.F.R. § 165.4(d) ("In accordance with paragraph (a)(2) of this section, when providing a public version of their submissions, interested parties must certify that the information they are providing is either their own information (i.e., information from their own business records and not business confidential information of another entity) or information that was publicly obtained or in the public domain.").
[120] *See* Submission by Dixon Ticonderoga, re: Public Summary of February 27, 2018 Email of Allegation Cover Letter and Attachments of Exhibits 1-7, December 28, 2020.
[121] *See* Submission by Dixon Ticonderoga, re: Public Summary of February 27, 2018 Email of Allegation Cover Letter and Attachments of Exhibits 1-7, at 2 (December 28, 2020).

**Comments from Interested Parties:**

*Royal Brush*

- CBP's public summaries of confidential information in the Attaché Report continue to extend confidential treatment to information that is not covered by Freedom of Information Act (FOIA) Exemption 4 in violation of § 165.4(a)(1) and, as such, deprives Royal Brush of due process. Specifically, information about the pencil type and destination and condition of boxes is not confidential because the Philippine Shipper freely shares similar information on its website. Further, information about condition of boxes at the property is not confidential.[122]
- CBP Attaché did not promise the Philippine Shipper that the photographs would be kept confidential, and as such Philippine Shipper could have no expectation of privacy under the circumstances.[123]
- To the extent the information is confidential, CBP's public summaries provide insufficient detail.[124] CBP's public summaries inconsistently apply the requirements of 19 C.F.R. § 165.4(a)(2), redacting information in some places, but providing additional detail regarding similar information in other places.[125]
- Summarizing numerical values as "number" is insufficient because Royal Brush cannot meaningfully assess CBP's calculations. CBP can provide ranges for each input CBP relies upon and conclusions thereof.[126]

---

122 *See* Comments on Draft Remand Redetermination at 9-11.
123 Comments on Draft Remand Redetermination at 11-12.
124 Comments on Draft Remand Redetermination at 12.
125 Comments on Draft Remand Redetermination at 12-13.
126 Comments on Draft Remand Redetermination at 13-14.

- CBP mischaracterizes Royal Brush's arguments on remand. *See, e.g.*, Draft Remand Redetermination at 15, 21. Royal Brush claims that it never requested CBP reveal the names of the Philippine Manufacturer's customers, but argued that general geographic location about the intended recipients of certain "Made in China" boxes, *i.e.*, within or outside the United States, is not confidential information and is necessary for Royal Brush to construct its defense.[127]
- Public summaries that Dixon submitted do not satisfy the requirements of § 165.4 despite being in narrative format.[128] Dixon's public summary of the sales contract does not contain key aspects about the contract such as whether the contract is properly executed, whether it bears a corporate or company seal, country of destination, or in what language it is written and fails to whether the contract and associated production, warehousing, delivery, and shipping records are accompanied by declarations from the issuing entities attesting to the summaries' validity.[129]
- The Contract does not constitute confidential information and Dixon must have obtained it from the public domain.[130]

**CBP's Position**

We disagree with Royal Brush's comments. CBP complied with the Court's Remand Order and the requirements of 19 C.F.R. § 165.4(a)(2) and (e). In addition, CBP finds that Dixon's public summaries comply with the requirements of § 165.4(a)(2).

Royal Brush argues that CBP is improperly bracketing the photographs in the Attaché Report because such photographs are not confidential information under FOIA Exemption 4.

[128] Comments on Draft Remand Redetermination at 14.
[129] Comments on Draft Remand Redetermination at 14-16.
[130] Comments on Draft Remand Redetermination at 16.

The regulations provide that "the information for which protection is sought consists of trade secrets and commercial or financial information obtained from any person, which is privileged or confidential in accordance with 5 U.S.C. 552(b)(4)." § 165.4(a). The Attaché Report contains information collected at Philippine Shipper's facility. The information collected at the facility belongs to the Philippine Shipper. Royal Brush itself cites to Supreme Court precedent stating that "it is hard to see how information could be deemed confidential if its owner shares it freely."[131] Philippine Shipper in this case has not shared any information relevant to this investigation freely. The parties have even bracketed the name of the Philippine Shipper during the EAPA proceedings. As explained in the Remand Redetermination, the photographs included in the Attaché Report contain information that would reveal layout production facilities, equipment, and customers of Philippine Shipper. This type of information falls under the definition of "commercial or financial information" as defined in case law cited by Royal Brush.[132] The Philippine Shipper has closely guarded this type of information throughout the investigation. We have received no indication from Philippine Shipper that it was willing to permit CBP to release the Attaché Report publicly. CBP does not have an authorization to release the information to Royal Brush. If it is willing, Royal Brush is free to obtain such consent from Philippine Shipper.

Royal Brush further argues that information about the pencil type and export destination, in this context, or the condition of boxes, does not qualify for confidential treatment. We disagree. As we explained, the photographs reveal more than pencil type, export destination or

[131] Comments on Draft Remand Redetermination at 10 (citing *Food Mktg. Inst. v. Argus Leader Media*, __ U.S. __, 139 S. Ct. 2,356, 2,363 (2019)).
[132] Comments on Draft Remand Redetermination at 9 (citing *Watkins v. U.S. Bureau of Customs & Border Protection*, 643 F.3d 1189 (9th Cir. 2011). ; *Pub. Citizen Health Research Group v. Food and Drug Admin.*, 704 F.2d 1280, 1290; (D.D.C. 1983), *Friends of Animals v. Bernhardt*, No. 19-cv-01443-MEH, 2020 WL 2041337, at *8 (D. Colo. 2020)).

condition of boxes. The photographs show boxes labeled with information revealing Philippine Shipper's U.S. customers.[133] Such customer information is generally considered as confidential, and we have not received any indication from Philippine Supplier that it is not.

Royal Brush also contends that CBP Attaché did not assure Philippine Shipper that information obtained during the site visit would remain confidential and as such, Philippine Shipper did not have an expectation of privacy. At the time the site visit took place, Philippine Shipper was not aware that an EAPA investigation was ongoing. When CBP Attachés conduct site visits, they identify themselves as U.S. government officials. As such, the Philippine Shipper was allowing the CBP Attaché in its facility with the understanding that the information was being provided to U.S. government, not to a member of the public. We do not know whether Philippine Shipper would have allowed a member of the public in its facility and provide similar level of access. While the CBP Attaché was allowed access to the facility, the information obtained during the visit is still such that would normally be considered as business confidential.

Royal Brush next argues that public summaries do not provide sufficient detail and inconsistently apply requirements of § 165.4(a)(2). Specifically, Royal Brush argues that public summaries of some documents provide more detail than public summaries of other documents.[134] We disagree. The regulation does not require public summaries of confidential information to be identical. The regulation only requires that public summaries provide "sufficient detail to permit a reasonable understanding of the substance of the information."[135] Just because two public summaries include varying degrees of detail, does not render either

[133] *See e.g.* Attaché Site Visit Report atCBP0002551-54
[134] Comments on Draft Remand Redetermination at 12-13.
[135] § 165.4(a)(2).

public summary insufficient, as long as they provide reasonable understanding of the substance of information. As explained in the Remand Redetermination, CBP's public summaries provide sufficient detail to the parties as to the contents of documents without releasing confidential information itself.

Royal Brush itself submitted public summaries with inconsistent levels of detail. For example, in public summaries of CF 28 exhibits, Royal Brush summarized an invoice as "Invoices and Shipping Documents relating to shipment of materials, including wood slats (13650 GRS - 16350 GRS), lead (18000GRS -22000GRS), and ferrules (23000 GRS - 27000GRS)—commercial and financial information, not susceptible to further pubic summary," providing ranged weight of raw materials purchased.[136] On the other hand, when summarizing a different set of documents, Royal Brush provided the following, less detailed, public summary for an invoice - "Invoice from May 2018, generated by and containing the Philippine Manufacturer s commercial and financial information, not susceptible to further public summary."[137] Here, Royal Brush chose not to provide additional detail on the contents of the invoice or ranged numbers. The fact that two public summaries of the same type of information are not identical, does not mean that each public summary, on its own, does not comply with § 165.4(a)(2).

Royal Brush also argues that summarizing numerical values as "number" is insufficient to understand the substance of CBP's calculations of Philippine Shipper's production capacity.[138] Royal Brush contends that in order to comply with § 165.4(a)(2), CBP should have provided

---

[136] Royal Brush, Public Summary of CF 28 Response – May 25, 2018 (7238) (dated 5/25/2018, originally submitted July 19, 2018), at 10, line 140.
[137] Royal Brush, Public Summary of Exhibits RFI Response Part 1 Questionnaire / Narrative – (dated, October 3, 2018), at 6, line 98.
[138] Comments on Draft Remand Redetermination at 13.

ranges for each input in its calculation.[139] We disagree. There is nothing in 19 C.F.R. Part 165, or in the statute that would require CBP, or the parties submitting information to CBP, to range confidential data or calculation inputs. As a result, CBP has not required parties to range data when submitting public versions of confidential documents. Further, in its calculations, CBP relied on confidential information of the Philippine Shipper. Even where other agencies' regulations require that parties range the data in public documents, only the parties that own the data may provide public ranges.[140] As such, even if regulations required ranging data, CBP would not summarize another parties' confidential information by ranging data, if that party had not done so already.

Overall, we disagree with Royal Brush that CBP's public summaries were insufficient and did not comply with § 165.4(a)(2). Royal Brush argues that it is not requesting that CBP reveal business confidential information, such as Philippine Shipper's customers.[141] Royal Brush is also arguing that the information in the CBP Attaché Report is not confidential and should be publicly released. We believe that CBP Attaché Report in fact contains business confidential information, and CBP does not have the authority to publicly release it to Royal Brush.

We also disagree with Royal Brush's contention that Dixon's public summaries did not comply with § 165.4(a)(2). Specifically, Royal Brush argues that the public summary of Exhibit 1 to the Allegation (the contract),[142] which is a contract between two Chinese companies,

---

[139] *Id.*
[140] 19 C.F.R. § 351.304(c)(1) ("Generally, numerical data will be considered adequately summarized if grouped or presented in terms of indices or figures within 10 percent of the actual figure. If an individual portion of the numerical data is voluminous, at least one percent representative of that portion must be summarized. A submitter should not create a public summary of business proprietary information of another person.")
[141] Comments on Draft Remand Redetermination at 14.
[142] *See* Dixon Allegation under the Enforce and Protect Act of 2015, Exhibit 1, (February 27, 2018), C.R. 1 at CBP0002474- CBP0002482.

provides insufficient detail for Royal Brush to mount a defense against the allegation of evasion against it.[143] Dixon provided the following public summary for this document:

> Exhibit 1 includes a contract between two Chinese companies – the "Chinese Trader" and "Chinese Manufacturer" listing item numbers of pencils to be manufactured, the value to be paid for the pencils, other terms such the name of the U.S. buyer Royal Brush, and specifications for how the pencils are to be marked with to show the country of origin as the Philippines.[144]

The above public summary meets the requirements of § 165.4(a)(2), because it allows for the reasonable understanding of the substance of the contract, *i.e.*, that the contract relates to the manufacturing of an order of pencils in China destined for Royal Brush. As explained above, such summary is sufficient for Royal Brush to be alerted of the substance of the allegation against it, and the types of documents it needs to submit to CBP to demonstrate that its products are actually manufactured in the Philippines. Indeed, Royal Brush had numerous opportunities to do so throughout the EAPA investigation.

Finally, Royal Brush argues that the contract must be publicly available, because otherwise, Dixon could not have submitted the certification under § 165.4 (d). When submitting its allegation, Dixon requested that CBP treat the contract as business confidential in compliance with § 165.4(a)(1).[145] CBP has accepted this claim and has treated the contract as business confidential. We have since found no indication that the contract is publicly available and Royal Brush has not put forth any evidence to support its claim that the contract Dixon submitted is available in the public domain, or that such contracts are made available to the public as a matter of general practice. As such, we continue to treat the contract as business confidential.

---

[143] Comments on Draft Remand Redetermination at 14-16.
[144] Dixon, Public Summary of February 27, 2018 Email of Allegation Cover Letter and Attachments of Exhibits 1-7 (December 28, 2020) at 1.
[145] Dixon Revised Allegation under the Enforce and Protect Act of 2015, (February 27, 2018), C.R. 1 at CBP0002473.

## IV. ROYAL BRUSH'S ADDITIONAL ARGUMENTS

Royal Brush raised two additional points in its argument submitted on remand. First, Royal Brush argues that CBP's Attaché Report draws unreasonable conclusions and, therefore, the report "cannot be relied upon on remand." Second, Royal Brush argues that the "Dixon-proffered contract is invalid and, as such, CBP cannot rely upon it in is [sic] remand redetermination."[146] Having considered the arguments submitted, CBP continues to find that Royal Brush evaded the AD/CVD order on pencils.

With respect to the Attaché Report, CBP stated in its May 6 Determination that "{t}he CBP Attaché observed, during his site visit to Philippines Shipper at the Subic Bay Facility, that Philippines Shipper's '{s}taff appeared to be repacking China origin product into boxes labeled, 'Made in Philippines' for export….' In his report, the CBP Attaché included photographs he identified as showing Chinese pencils repacked as 'made in the Philippines.'"[147] These observations were corroborated during verification, including by a statement from a Philippines Shipper official that the Chinese origin pencils present in the facility had been intended for shipment to the United States and by inventory receipt records from a Chinese supplier that included references to pencils.[148]

In its Administrative Review, CBP similarly stated that the "CBP Attaché's report, complete with observations and photographs, unequivocally demonstrates repacking of Chinese pencils into boxes labeled as made in the Philippines and destined for the United States."[149] As the Administrative Review decision explained:

> {CBP Attaché} saw retail packaged Chinese-made pencils being unpackaged and/or unpacked, and he saw unpackaged Chinese finished

[146] Royal Brush Written Arguments at 14-15.
[147] May 6 Determination at 6 (CBP0011648).
[148] May 6 Determination at 6 (CBP0011648).
[149] Admin. Review at 13-14 (CBP0002461-62).

> pencils in large boxes being unpacked and then being repacked / repackaged. He also saw the same green pencils that came from China, in the finishing facility, being used in the repacking process. He saw incoming packing cartons labeled made in China. He saw outgoing packing cartons labeled made in the Philippines. He saw no manufacturing activity and dusty equipment. In June of 2018, he saw materials apparently unused since April of 2017. The only activity he observed was the packing/packaging of finished pencils and some pencil sharpening.[150]

CBP rejects each of Royal Brush's arguments that these observations were unreasonable. First Royal Brush relies upon the translation of Chinese characters on *different* boxes present in the Philippines Shipper's facility five months after the Attaché's visit in support of its argument that the Attaché did not observe Chinese origin pencils being repackaged.[151] CBP does not find the translations of characters on different boxes to be relevant to the Attaché's observations. In any event, CBP did not find the meaning of the characters to be relevant in its determination.[152] Similarly, Royal Brush's argument that the Philippines Shipper reuses boxes in the movement of unfinished pencils does not speak to the Attaché's observations that he witnessed finished Chinese origin pencils being repackaged, described above.

Next, Royal Brush argues that the presence of dust indicates the equipment is being used, rather than the lack of production, and therefore the Attaché's observations about the lack of production due to dust were unreasonable.[153] CBP disputes the claim that dusty equipment would be indicative of operation rather than the non-use of machinery. CBP maintains that an observation that machinery is dusty could be indicative of non-use and therefore the Attaché's observation was reasonable. However, even if Royal Brush's claim were true, CBP maintains its

---

[150] Admin. Review at 14 (CBP0002462).
[151] *See* Royal Brush Written Arguments at 12 n.12 (noting that the characters it translated were on boxes present "five months after the CBP Attaché's visit").
[152] *See* Admin. Review at 13 (CBP0002461) ("CBP cannot dismiss what the CBP Attaché vividly saw … regardless of whether the CBP Attaché could understand the Chinese characters on the boxes").
[153] Royal Brush Written Arguments at 14.

reliance on the Attaché's observations regarding the lack of production at the Philippines Shipper's facility since he witnessed no manufacturing activity and only observed the packing and packaging of finished pencils and some pencil sharpening.

Finally, CBP does not find the type of pencils witnessed being repackaged, including whether they were the same type of pencils imported by Royal Brush, to be relevant. The CBP Attaché's observations were that he witnessed pencils being repackaged generally, not that he witnessed the Philippines Shipper repackaging pencils specifically for shipment to Royal Brush. For all of the forgoing reasons, CBP continues to rely upon the Attaché's observations.

CBP also rejects Royal Brush's arguments regarding the validity of the Dixon-proffered contract. CBP simply did not rely upon the Dixon-proffered contract in reaching its final determination of evasion.[154] Accordingly, the validity of the contract is plainly not relevant to CBP's determination of evasion.

**Interested Party Comments**[155]

*Royal Brush:*

- CBP's evasion investigation is specific to Royal Brush and therefore the type of pencils the CBP Attaché witnessed being re-packaged for shipment to the United States is relevant to CBP's evasion determination.
- The translation of Chinese characters on the boxes observed by the CBP Attaché was crucial to understanding whether the contents of the boxes matched the label information

[154] See May 6 Determination at 5-8 (CBP0011647-50). While the contract was included in Dixon's allegation and supported CBP's determination that the allegation "reasonably suggests" evasion, CBP did not rely upon the contract in reaching its evasion determination. May 6 Determination at 2 (CBP0011644); *see also*, Admin. Review at 14, n.14 (CBP0002461) ("the issue of the contract … is not the basis for our *de novo* determination of evasion.").
[155] Comments to Draft Remand Redetermination at 16-17.

on the boxes, whether the packaged materials were intended for export and whether the United States was the export destination.[156]

- CBP fails to identify a basis in the evidence for concluding that the pencils shipped to Royal Brush were manufactured in China rather than the Philippines.[157]

**CBP's Position**

CBP disagrees with Royal Brush's comments. As previously stated, the type of pencils the CBP Attaché witnessed being re-packaged at the Philippines Shipper's facility was not relevant to the CBP determination of evasion and CBP has never stated that they were the same type of pencil exported to Royal Brush. While CBP agrees that its investigation was "specific to Royal Brush," the CBP Attaché did not claim to observe the re-packaging of pencils specifically for shipment to Royal Brush and CBP's determination of evasion did not rely upon such a claim. Rather, the CBP Attaché witnessed the re-packaging of Chinese-origin pencils generally for shipment for the United States, which is consistent with the Philippines Shipper engaging in a scheme to transship Chinese-origin pencils to the United States. Evidence that the Philippines Shipper was engaging in an overall transshipment scheme was plainly relevant to whether the Philippines Shipper transshipped the specific pencils exported to Royal Brush.

CBP also disagrees with Royal Brush's assertion that the translation of the Chinese characters on the boxes observed was "crucial" to understanding the CBP Attaché's observations. The CBP Attaché's observations that he witnessed Chinese-origin pencils being repackaged was supported by multiple facts, including seeing repackaging of retail packaged Chinese made pencils, observing other boxes labelled "Made in China," as well as his witnessing of finished pencils in boxes with untranslated Chinese characters being repackaged. In light of

[156] Comments to Draft Remand Redetermination at 17-18.
[157] Comments to Draft Remand Redetermination at 19.

all of the evidence observed of Chinese-origin pencils being repackaged, CBP finds that the conclusions drawn in the Attaché's Report were reasonable, even if the Chinese characters on the boxes were not translated. Moreover, CBP continues to find the translation of Chinese characters on different boxes present at the Philippine Shipper's facility months later to be irrelevant.

Finally, Royal Brush argues that because the Philippines Shipper had the capacity to produce the pencils exported to Royal Brush, CBP fails to identify a basis in the evidence for concluding that the pencils shipped to Royal Brush were manufactured in China rather than the Philippines. However, this ignores all of the evidence supporting CBP's determination of evasion, including the CBP Attaché's additional observations regarding the lack of production at the Philippines Shipper's facility, which Royal Brush did not challenge in its comments. Moreover, the CBP Attaché's observations were only a small part of evidence supporting CBP's determination. While described in more detail in CBP's May 6 Determination and Admin. Review, the additional evidence included such things as CBP's conclusion that the Philippines Shipper's total exports exceed its overall production capacity, Royal Brush's certifications indicating its pencils were made in China, and the results of the verification trip. CBP has more than sufficiently identified a basis for its determination that the pencils shipped to Royal Brush were manufactured in China rather than the Philippines.

## V. CONCLUSION

In accordance with the Court's remand order, we have analyzed the issues CBP was instructed to reconsider or further explain in this remand redetermination. CBP reconsidered and further explained that the Verification Report did not contain "new factual information," and therefore Royal Brush is not being afforded an opportunity to submit rebuttal information to the

Verification Report. In addition, CBP placed revised public versions of business confidential documents on the administrative record and after requiring interested parties to do the same, CBP provided parties to the investigation an opportunity to submit rebuttal information and additional arguments. Upon review of the documents and arguments submitted, CBP continues to find that Royal Brush evaded the AD/CVD order on pencils.



Brian M. Hoxie
Director – Enforcement Operations Division
Trade Remedy Law Enforcement Directorate
Office of Trade, U.S. Customs & Border Protection

**Revised Public Version**

**CBP's Notice of Final Determination as to Evasion**

**(published, January 5, 2021)**

Case 1:19-cv-00198-MAB Document 59-6 Filed 04/08/21 Page 260 of 427

1300 Pennsylvania Avenue NW
Washington, DC 20229

U.S. Customs and
Border Protection

May 6, 2019

**PUBLIC VERSION**

EAPA Case Number: 7238

Liliana Farfan
Antonia Tzinova
Ronald A. Oleynik
On behalf of Royal Brush Manufacturing Inc. a/k/a Royal and Langnickel
Holland and Knight LLP
800 17th Street NW
Suite 1100
Washington, DC 20006

**Re: Notice of Final Determination as to Evasion**

---

Dear Ms. Farfan, Ms. Tzinova, and Mr. Oleynik:

Pursuant to an examination of the record in Enforce and Protect Act (EAPA) Investigation Number 7238, U.S. Customs and Border Protection (CBP) has determined that there is substantial evidence that Royal Brush Manufacturing Inc. ("Royal Brush"), entered into the customs territory of the United States through evasion merchandise covered by antidumping duty (AD) order on Certain Cased Pencils from the People's Republic of China A-570-827. Substantial evidence demonstrates that Royal Brush imported cased pencils made in China by transshipping the pencils through the Subic Bay, Philippines and falsely declaring the country of origin. As a result, no cash deposits were applied to the merchandise.

**Background**

On March 27, 2018, CBP initiated an investigation pursuant to Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the "Enforce and Protect Act" or "EAPA." On March 6, 2018 CBP confirmed receipt of an allegation filed by Dixon Ticonderoga Company ("Dixon" or "Alleger"), a domestic producer of pencils. The allegation, which was filed on February 27, 2018, reasonably suggested that Royal Brush evaded the payment of cash deposits on imports of cased pencils from China. In its allegation, Dixon

**CONFIDENTIAL INFORMATION REMOVED**

claimed that Royal Brush was transshipping Chinese-origin pencils through the Philippines in order to avoid the payment of antidumping duties. This investigation covers entries from March 6, 2017, one year before the receipt of allegation, through the pendency of this investigation that were entered for consumption, or withdrawn from a warehouse for consumption.

The antidumping duty order covers certain cased pencils of any shape or dimension that are manufactured in China and feature cores of graphite or other materials that are encased in wood and/or man-made materials.[1] Pencils subject to the AD Order are classifiable under subheading 9609.10.00, HTSUS. This classification is not dispositive as to the scope of the Order.

On June 26, 2018, CBP issued a notice of initiation (NOI) of investigation and notified the parties of CBP's decision to impose interim measures in accordance with 19 C.F.R. § 165.24 based on reasonable suspicion that Royal Brush entered covered merchandise into the customs territory of the United States through evasion. In reaching its decision to impose interim measures, CBP relied not only on the information provided by Dixon in the allegation and supplemental filings, but also on additional information CBP obtained from Royal Brush and its supplier [ name of PH shipper ], "Philippines Shipper").

In its allegation, Dixon claimed that multiple shipments of cased pencils subject to A-570-827 imported by Royal Brush were made in China by [ company ] (hereinafter, the "alleged Chinese Manufacturer"), but marked as "Made in Philippines." According to Dixon, the alleged Chinese Manufacturer had entered into a purchase contract with [ company ] (hereinafter "Trading Company"), where the Trading Company required the Chinese Manufacturer to mark the country of origin of the merchandise as Philippines.[2] The contract applied to item numbers RTN-157, RTN-158, and WPEN-12, which corresponded to item numbers used by Royal Brush its online catalog for colored pencils.[3]

Additionally Dixon alleged that the contract required the products to be certified to U.S. standards for levels of heavy metals and phthalates, and to bear Royal Brush's trademark "Royal & Langnickel."[4] The Trading Company provided specific instructions to the Chinese Manufacturer on how to mark pencil boxes as "Made in Philippines" for shipment.[5]

---

[1] *Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 FR 66909 (December 28, 1994) (Order); *see also Continuation of Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 82 FR 41608 (September 1, 2017).
[2] *See* Allegation, at Exh. 1 (demonstrating a "Purchase Contract" identified by number RT02902, between the Chinese Manufacturer and the Trading Company).
[3] *See* Notice of Initiation of Investigation and Interim Measures at 2 (fn 4) referencing http://www royalbrushstore.com/c/cool-art_pencils (last viewed June 22, 2018).
[4] *See* Allegation, at Exh. 3 (demonstrating a production order for 278 cartons of RTN 157; 322 cartons of RTN 158; and 139 cartons of WPEN-12, with product specifications and the trademarks indicated therein).
[5] *See* Allegation, at Exh. 2 (containing marking instructions for boxes in which the items in the contract would be shipped to Subic Bay).

**CONFIDENTIAL INFORMATION REMOVED**

Finally, Dixon provided publicly available shipping data showing that the pencils with matching description and amounts had been imported into the United States from the Philippines by the Philippines Shipper.[6] On March 13, 2018, Dixon supplemented the Allegation with additional evidence ("Supplement") demonstrating that the Trading Company was the Chinese Manufacturer's frequent customer.[7]

The Allegation and supporting documents, reasonably suggested that cased pencils covered by the Order had been entered for consumption into the customs territory of the United States through evasion. Consequently, CBP initiated EAPA investigation 7238 under 19 C.F.R. § 165.15(b).

On April 25, 2018, CBP issued a Form 28, Request for Information ("CF28") to Royal Brush requesting production records for Entry No. [ number ]7828, a shipment of art pencils. CBP reviewed the documents and found that the shipment contained cased pencils stamped with Royal Brush's trademark of "Royal & Langnickel." The documents identified pencils as "Sketching Pencils," item number SPEN-12, and indicated that [PH initials ], a shipper in the Philippines was the manufacturer.[8]

On May 25, 2018, Royal Brush responded to the CF28 for Entry No. [ number ]7828 ("Response"). In its Response, Royal Brush claimed that the pencil supplier and the Philippines Shipper manufactures pencils in its Subic Bay facility using wood slats and pencil cores from China, and paint and packaging from the Philippines.[9]

In addition, Royal Brush provided purchasing, invoicing, export, shipping, and entry documents for a transaction identified by contract number [ number ]. These documents show that Royal Brush's pencil supplier, the Shipper in the Philippines [ PH initials ], operates in the Subic Bay facility at the following address: [ address in the Philippines ]. The documents included invoices and bills of lading from the Trading Company [ company ] that Dixon described is involved in the transaction.

Royal Brush's Response contained internal contradictions that call into question whether the pencil shipments were actually manufactured in the Philippines. Specifically, the invoices and bills of lading from the Trading Company [ company ] in China to the Philippines Shipper at the Subic Bay facility for raw materials, such as pencil slats and colored lead, indicate that the quantities purchased did not match the production requirements and

[6] *See* Allegation, at Exh. 7
[7] *See* Supplement, at Exh. 3.
[8] *See* Notice of Initiation of Investigation and Interim Measures at 4 (fn 5) referencing http://www royalbrushstore.com/products/productdetail/SPEN-12+-+12+PC+SKETCHING+PENCILS/part_number=SPEN-12/201.0.1.1.67808.1006207.0.0.0 (last viewed June 22, 2018).
[9] *See* Response at 3.

**CONFIDENTIAL INFORMATION REMOVED**

processes at the Subic Bay facility.[10] Further, Royal Brush provided two certifications from a third party certification service indicating that the imported pencils complied with U.S. safety standards.[11] The certification service [ company ] that provided the documentation is located in China and appeared to have reviewed the pencils with an understanding that they were of Chinese origin.[12] Finally, the date of the certification not only post-dated the date of importation into the United States, but it was also issued after CBP sent CF 28s to Royal Brush.

On June 6, 2018, CBP Attaché ("Attaché") performed an unannounced site visit to the pencil supplier and the Philippines Shipper at the Subic Bay facility. During the visit, the Attaché observed the staff making minor alterations (*e.g.*, sharpening) to what appeared fully manufactured pencils. The Attaché did not observe any manufacturing of pencils or any presence of raw materials sufficient to manufacture pencils in the amount Royal Brush had described in its Response. The manufacturing equipment that Royal Brush had represented as being in use at the Subic Bay facility, both in the Response and on the website for the Philippines Shipper, appeared to have been covered in dust and cobwebs indicating that they had not been used for some time.

In addition to the absence of any apparent manufacturing operations, the Attaché also observed evidence of what appeared to be repacking operations for finished pencils from China. The Attaché found numerous boxes onsite, indicating the origin as China and filled with fully manufactured pencils. Moreover, the Attaché witnessed staff repacking what appeared to be Chinese origin products into boxes labeled, "Made in Philippines" for export to other U.S. companies.

Based on the evidence above, CBP found that it had reasonable suspicion that Royal Brush was evading the antidumping duty order on cased pencils by importing pencils manufactured in China and falsely marked as being of Philippines origin and imposed interim measures.[13]

After interim measures, CBP sent multiple Requests for Information (RFI) to The Philippines Shipper and Royal Brush. Both submitted RFI responses during October 2018. Between November 14 and November 17, 2018, CBP conducted an onsite verification at the Subic Bay facility to determine whether the Philippines Shipper could produce the amount of pencils that Royal Brush had imported into the United States and identify the country of origin for pencils exported by the Philippines Shipper. During the verification, CBP toured the Subic Bay facility

---

[10] Generally, and in the images provided by the Philippines Shipper, two pencil slats come together to form a "pencil sandwich" that ultimately yields at least 6 pencils. This process implies that a typical slat-to-core ratio should be, at a minimum, 2 slats for every 6 cores. *See* Response, at Exh. 3, Annex 12a. The invoice from the Philippines Shipper, and the "Bill of Materials" provided by Royal Brush indicate a ratio of approximately [ no. ] slats to [no.] core. *See* Response, at Exh. 3, Annexes 9 and 9a.

[11] *See* Response, at Exh. 3, Annex 13.

[12] *Id.*

[13] *See* 19 U.S.C. § 1517(e); 19 C.F.R. §165.24(a).

and reviewed production records and seven (7) invoices associated with imports by [ company ].

Given the complexities surrounding the federal government's lapse in funding and resulting shut down, CBP extended the deadline on February 25, 2019, for this final determination by sixty days, pursuant to 19 C.F.R §165.22(c)(1)(iii).[14] In reaching its determination, CBP considered the written arguments provided by Royal Brush and Dixon.[15]

**Final Determination as to Evasion**

19 CFR §165.27(a) requires CBP to "make a determination based on substantial evidence as to whether covered merchandise was entered into the United States through evasion." "Covered merchandise" is defined by 19 CFR §165.1 as "merchandise that is subject to a CVD order…and/or an AD order." As discussed below, the record of this investigation indicates that covered merchandise entered the United States through evasion, and that there is a basis for concluding that substantial evidence, in conjunction with an assumption of adverse inferences related to information requested but not provided, indicates Royal Brush's imports were merchandise entered through evasion.

Based on entry information and CBP's calculations of Philippines Shipper's production capacity using data supplied by Philippines Shipper and information obtained at verification, CBP determined that total U.S. imports of pencils by all importers during 2018 that were identified with Philippines Shipper as manufacturer exceeded the company's annual production capacity by [no.] percent.[16] Based on CBP's aforementioned calculations, Philippines Shipper must have

[14] *See* February 26, 2019, "Notice of Extension of Final Determination," which refers to the novelty of issues presented in the investigation, following the extension of the original deadline for written arguments to allow interested parties to address issues addressed in the on-site verification report that was issued several weeks after the end of the government shutdown. *See also* 19 C.F.R §165.22(c)(1)(iii).

[15] *See* Royal Brush's "Submission of Written Arguments to be Placed on the Administrative Record," dated March 25, 2019 ("Royal Brush Written Arguments") and Dixon's Response to Royal Brush's Written Arguments, dated April 9, 2019 ("Dixon Response"). Earlier, Royal Brush had filed a rebuttal containing new information in response to CBP's verification report, followed by an initial version of its written arguments. CBP clarified that the verification report (and verification exhibits), which are covered by §165.25 of the EAPA regulations, do not constitute "new factual information" as that expression is used earlier in the regulations under §165.23(c)(1), which allows rebuttal information to be submitted in response to "new factual information" placed on the record by CBP. Consequently, rejected Royal Brush's rebuttal submission. Furthermore, CBP also rejected the initial version of Royal Brush's written arguments, which referenced untimely new information in the rejected Royal Brush rebuttal submission, as §165.26(a)(1) of the EAPA regulations require that written arguments be based solely upon facts on the record. However, Royal Brush was provided additional time to submit its March 25, 2019 Written Arguments. *See* TRLED's email with subject line "EAPA Case # 7238: Submission of Written Arguments – Business Confidential Version," dated March 21, 2019.

[16] *See* February 11, 2019 on-site verification report ("Verification Report") at 8-9. Note also the record does not indicate, and neither Philippines Shipper nor Royal Brush have claimed, that Philippines Shipper had massive inventories at the outset of 2018, which, had they existed, might help explain the large difference between estimated Philippines Shipper production capacity and total U.S. imports of pencils for which the identified manufacturer was Philippines Shipper.

been shipping large volumes of pencils to the United States from sources other than its own production facilities because, while Philippines Shipper "has the capability to produce pencils,"[17] it does not have the capacity to produce pencils in "sufficient quantities as to account for the 2018 total imported pencils."[18]

Information on the record supports the conclusion that pencils imported into the United States by Royal Brush had been manufactured in China and transshipped through the Philippines. As noted in the Notice of Initiation and Interim Measures, Royal Brush's response to the CF28 included certifications supporting an origin of China for the pencils in question.[19] The CBP Attaché observed, during his site visit to Philippines Shipper at the Subic Bay Facility, that Philippines Shipper's "{s}taff appeared to be repacking China origin product into boxes labeled, 'Made in Philippines' for export…."[20] In his report, the CBP Attaché included photographs he identified as showing Chinese pencils repacked as "made in the Philippines."[21] Later, during the onsite verification, a Philippines Shipper official stated that Chinese origin pencils present in the facility had been intended for shipment to the United States.[22] In addition, during the verification CBP found inventory receipt records from a Chinese supplier that ostensibly covered raw materials, but which also included references to pencils.[23]

CBP's ability to determine the extent to which Philippines Shipper transshipped pencils from China was hindered by Philippines Shipper's failure to cooperate and comply to the best of its ability, a conclusion that can warrant the application of an inference adverse, as indicated in 19 CFR §165.6(a).[24] For example, Philippines Shipper failed to provide substantial amounts of information requested by CBP at verification, such as inventory bank records, payroll records, receipts records, export declarations, and invoices between Philippines Shipper and suppliers.[25] Regarding Philippines Shipper's sourcing of pencils from other suppliers, while Philippines Shipper provided various purchase orders and invoices referring to raw materials and pencils from suppliers, including Trading Company, Philippines Shipper did not provide documentation

---

[17] *See* Verification Report at 8.
[18] *Id.* at 8. Royal Brush appears to believe that CBP is comparing total imports by Royal Brush to [PH initials] production capacity, given its claim in this context that only "the 2018 total imported pencils by Royal Brush" are in the scope of this investigation. *See* Royal Brush Written Arguments at 11. However, CBP asked for information related to the Philippine Supplier's other customers and total U.S. exports in order to determine whether the supplier had capacity sufficient to produce pencils for all of its U.S. exports. That determination is relevant to whether the supplier had produced the pencils it exported to Royal Brush.
[19] *See* Notice of Initiation and Interim Measures at 5 (citing Royal Brush's May 25, 2018, CF28 Response at Exh. 3, Annex 13), which alludes to a certification indicating China as country of origin.
[20] *See* Site Visit Report at 2.
[21] *Id.* at attached photographs (including descriptive captions that are available in the public version as well as the business confidential version).
[22] *See* Verification Report at 4-5.
[23] *Id.* at 5.
[24] As noted under section 412(b)(1) of the Trade Facilitation and Trade Enforcement Act of 2015, such an adverse inference can be based on the failure to cooperate of the producer or exporter.
[25] *See* Verification Report at 6. Furthermore, one of the suppliers for which invoices were not provided was Trading Company, in China. *Id.*

showing where the pencils were recorded into inventory.[26] In addition, Philippines Shipper provided a purchase order and invoice for raw materials and pencils from Trading Company, but Philippines Shipper did not provide the requested inventory receipt records for the pencils, and CBP noted that documents reviewed included a handwritten reference to pencils that had been included in the inventory receipt count for one of the raw materials rather than pencils.[27] Furthermore, Philippines Shipper provided a purchase order and invoice for raw materials from Trading Company, but did not provide purchase orders or invoices for pencils, even though the inventory receipt records provided for the shipment included a reference to pencils supplied by a different supplier.[28] CBP concluded, based on its on-site verification, that Philippines Shipper "could not demonstrate inventory receipt records for purchased pencils from overseas."[29] In short, based on the absence or unreliability of such inventory records, there is no basis for relying on subsequent country of origin classifications for specific pencils that Philippines Shipper subsequently shipped to customers, including Royal Brush.

With regard to Philippines Shipper's production of pencils, in many instances at verification Philippines Shipper either did not provide requested documents, or provided records in a manner that was unusable to CBP because they had been redacted or otherwise altered. For the eight sample purchase orders and invoices between Philippines Shipper and Royal Brush reviewed at verification, the daily production reports provided by Philippine Shipper was missing information that had been redacted or whited-out by Philippines Shipper. For many of the sample transactions, Philippine Shipper did not provide inventory receipts for the raw materials, and inspection reports for raw materials were incomplete.[30] Given Philippines Shipper's failure to provide such requested production documentation, CBP could not verify that the pencils shipped to Royal Brush were actually produced by Philippines Shipper.

Further, the verification team found that the payroll records Philippines Shipper had submitted to CBP in its RFI responses were unsupported.[31] During verification, Philippines Shipper did not provide payroll records requested by CBP for significant periods of time.[32] Philippines Shipper also "could not provide any accounting records or financial documentation to support that employees were paid for any of the periods selected for review."[33] Philippines Shipper did not provide during verification the payroll records to support the production related to a sample invoice between Philippines Shipper and Royal Brush.[34] Furthermore, Philippine Shipper's employee hours/days worked log book covering approximately five months included whited-out

---

[26] *Id.* at 5.
[27] *Id.*
[28] *Id.*
[29] *Id.* at 4.
[30] *Id.* at 6-8.
[31] *Id.* at 9.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 10.

names and were missing other information.[35] CBP concluded that for time periods it was unable to verify that employees were paid or that production was occurring.[36]

In short, Philippines Shipper failed to cooperate and comply to the best of its ability, given its refusal to provide substantial amounts of information that were requested by CBP, including those relating to the purchasing, inventorying, and production of pencils, and an adverse inference is warranted. Consequently, CBP infers a) that Philippines Shipper's production records did not support its contention that the pencils that it shipped to Royal Brush were manufactured by Philippines Shipper; and b) that such pencils were manufactured in China, given Philippines Shipper's involvement with Chinese suppliers, including even the purchasing and repacking of pencils identified as manufactured in China.

In its written arguments, Royal Brush refers to information in daily production reports and sales documentation provided by Philippines Shipper, and concludes from that information that "the Record provides ample evidence that" Philippine Shipper "has more than sufficient capacity and actual production to manufacture pencils in the Philippines to meet Royal Brush's purchase orders."[37] However, Philippine Shipper had already been unable or unwilling to provide the necessary information, including original and complete production and sale documentation, to allow CBP to verify the extent to which Philippine shipper delivered pencils it had produced or that it had transshipped, which as noted above provides the basis for concluding Philippines Shipper failed to cooperate and comply to the best of its ability. Royal Brush claims that Philippines Shipper withheld information that CBP had requested because Philippines Shipper and Royal Brush believe such information is outside the scope of the investigation.[38] However, there is no way for CBP to conclude either that the information that was withheld or otherwise concealed (*e.g.*, by redacting) did not relate to Royal Brush, or that the information that was provided to CBP was reliable, given the failure of Philippines Shipper to provide complete original documentation at verification.

In conclusion, the record evidence, and the absence of information due to Philippines Shipper's failure to cooperate and comply to the best of its ability, support a conclusion that pencils shipped by Philippines Shipper to the United States and imported by Royal Brush, were manufactured in China rather than in the Philippines. Therefore, pursuant to 19 CFR §165.27(a), CBP finds that there is substantial evidence that Royal Brush entered covered merchandise in the U.S. through evasion, and that such imports are covered by A-570-827.

---

[35] *Id.*
[36] *Id.*
[37] *See* Royal Brush Written Arguments at 10-14.
[38] *Id.* at 20-21.

**CONFIDENTIAL INFORMATION REMOVED**

**Actions Taken Pursuant to the Affirmative Determination of Evasion**

In light of CBP's determination that Royal Brush entered merchandise into the customs territory of the United States through evasion, and pursuant to 19 U.S.C. §1517(d) and 19 C.F.R. §165.28, CBP will continue to suspend the liquidation for any entry imported by Royal Brush and assembled, shipped or otherwise processed by [PH initials ], that has entered on or after March 27, 2018, the date of initiation of this investigation. CBP will continue to extend the period for liquidation for all unliquidated entries that entered before that date until instructed to liquidate these entries. For future entries, CBP will continue to require live entry, which requires that the importers post the applicable cash deposits prior to the release. Finally, CBP will evaluate the continuous bond of the importer in accordance with CBP's policies, and may require single transaction bonds as appropriate. None of the above actions precludes CBP or other agencies from pursuing additional enforcement actions or penalties.

Sincerely,

*Africa R. Bell*

Africa R. Bell
Acting Director, Enforcement Operations Division
Trade Remedy & Law Enforcement Directorate
CBP Office of Trade

**USCIT Opinion (Remanding for Further Proceedings)**

**(*Royal Brush Manufacturing Inc. v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) ("*Royal Brush I*"))**

or producer. 19 U.S.C. § 1677e(a). Here, Commerce is rescinding the review, and declining to calculate a new dumping margin for NLMK. See Final Decision Memo at 17–18. The consequence is that the 184.56 percent rate continues to apply. Plaintiffs argue the rate is unreasonable as applied to them. Yet, the all-others rate went unchallenged upon termination of the Suspension Agreement. Parties had the opportunity to challenge the rate when Commerce issued the final results upon the lifting of the Suspension Agreement.[20] 19 U.S.C. § 1516a(a)(2)(A)(i)(II), (a)(2)(B)(i). Neither Plaintiffs nor any other participant to the proceedings did. The application of the rate in this case, as the all-others rate, is a function of the failure of Plaintiffs to make one or more bona fide sales.

## CONCLUSION

For the foregoing reasons, Commerce's final determination is supported by substantial evidence and in accordance with the law and is therefore sustained. Judgment will enter accordingly.

**ROYAL BRUSH MANUFACTURING, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant,**

**and**

**Dixon Ticonderoga Co., Defendant-intervenor.**

**Slip Op. 20-171**
**Court No. 19-00198**

United States Court of International Trade.

December 1, 2020

**Background:** Importer filed suit challenging Customs and Border Protection's affirmative determination of evasion of antidumping duty order on cased pencils from People's Republic of China issued pursuant to Customs' authority under Enforce and Protect Act (EAPA). Importer moved for judgment on agency record.

**Holdings:** The Court of International Trade, Mark A. Barnett, J., held that:

(1) Customs' rejection of importer's rebuttal submission required remand, and

(2) Customs denied importer's right to procedural due process.

Remanded.

**1. Customs Duties 84(6)**

The scope of review under the arbitrary and capricious standard is narrow, and Court of International Trade is not to

20. A party may challenge an ADD order based upon a final affirmative determination by filing in this Court both a summons, within 30 days of the order's publication in the Federal Register, and, within 30 days later, a complaint. See 19 U.S.C. § 1516a(a)(2)(A)(i)(II), (a)(2)(B)(i). Here, Commerce made a final affirmative determination that HRC from Russia is being sold at LTFV, and following the termination of the Suspension Agreement, published the ADD Order. See HRC from Russia, 64 Fed. Reg. at 38,641; ADD Order, 79 Fed. Reg. at 77,456. Neither Plaintiffs nor any participant to the proceeding commenced an action within 30 days of the publication of the ADD Order.

substitute its judgment for that of the agency.

**2. Customs Duties ⚷21.5(5)**

Customs and Border Protection must examine the relevant data and articulate a satisfactory explanation for its antidumping determination, including a rational connection between the facts found and the choice made.

**3. Customs Duties ⚷84(6)**

An abuse of discretion occurs when the agency's antidumping decision is based on an erroneous interpretation of the law, is based on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors.

**4. Customs Duties ⚷84(6)**

Court of International Trade looks for a reasoned analysis or explanation for an agency's antidumping decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.

**5. Customs Duties ⚷84(8.1)**

Customs and Border Protection's rejection of importer's rebuttal submission upon concluding that verification report did not contain new factual information required remand for reconsideration and further explanation, in issuing affirmative determination of evasion of antidumping duty order on cased pencils from China pursuant to Enforce and Protect Act (EAPA); Customs initially informed importer that verification report contained new information so importer was entitled to submit rebuttal information, but then Customs reversed its position without providing reasoned analysis or explanation and failed to identify standard used to define new factual information or application of that standard to verification report. 19 U.S.C.A. § 1517; 19 C.F.R. §§ 165.23(c)(1), 165.25.

**6. Customs Duties ⚷84(6)**

It is not the role of the Court of International Trade to supply a reasoned basis for Customs and Border Protection's action that Customs itself has not given.

**7. Customs Duties ⚷84(8.1)**

When the Court of International Trade is tasked with reviewing an antidumping decision based on an agency record, and that record does not support the contested decision, the court must remand for further proceedings.

**8. Constitutional Law ⚷3865**

The Fifth Amendment prohibits the deprivation of life, liberty, or property without due process of law. U.S. Const. Amend. 5.

**9. Constitutional Law ⚷3869**

The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty. U.S. Const. Amend. 5.

**10. Constitutional Law ⚷4267**

While engaging in foreign commerce is not a fundamental right protected by notions of substantive due process, an importer participating in an administrative proceeding has a procedural due process right to notice and a meaningful opportunity to be heard. U.S. Const. Amend. 5.

**11. Constitutional Law ⚷4150**

Generally, in order to comply with an importer's right to procedural due process in an antidumping administrative proceeding, notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections; such opportunity must occur at a meaningful time and in a meaningful manner. U.S. Const. Amend. 5.

**12. Customs Duties ⚷84(2)**

Waiver is not implicated when the parties' briefs on an issue do not deprive

the Court of International Trade in substantial measure of that assistance of counsel which the system assumes.

**13. Constitutional Law ⚷4150**
**Customs Duties ⚷21.5(5)**

Customs and Border Protection denied importer's right to procedural due process by failing to provide opportunity to be heard at meaningful time and in meaningful manner upon denying importer access to requested information, in issuing affirmative determination of evasion of antidumping duty order on cased pencils from China pursuant to Enforce and Protect Act (EAPA), since Customs failed to ensure that confidential filings were accompanied by required public summaries. U.S. Const. Amend. 5; 19 U.S.C.A. § 1517; 19 C.F.R. § 165.4.

**14. Constitutional Law ⚷4150**

While procedural due process guarantees do not require full-blown, trial-type proceedings in all administrative antidumping determinations, due process forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation. U.S. Const. Amend. 5.

**15. Constitutional Law ⚷4150**

To comply with due process, Customs and Border Protection's procedures in an antidumping administrative review must afford adequate opportunity for importers to respond to the evidence used against them. U.S. Const. Amend. 5.

---

Ronald A. Oleynik, Holland & Knight LLP, of Washington, DC, argued for Plaintiff. With him on the brief were Antonia I. Tzinova, Liliana V. Farfan, and Dariya V. Golubkova.

Ashley Akers, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Joseph F. Clark, Attorney, Office of the Chief Counsel, U.S. Customs and Border Protection.

Felicia L. Nowels, Akerman LLP, of Tallahassee, FL, argued for Defendant-Intervenor. With her on the brief was Sheryl D. Rosen.

## OPINION AND ORDER

BARNETT, Judge:

This matter is before the court on Plaintiff Royal Brush Manufacturing, Inc.'s ("Royal Brush") motion for judgment on the agency record pursuant to U.S. Court of International Trade ("USCIT" or "CIT") Rule 56.2. Confidential Pl. [Royal Brush's] Mot. for J. on the Agency R., ECF No. 33. Royal Brush challenges U.S. Customs and Border Protection's ("Customs" or "CBP") affirmative determination of evasion of the antidumping duty order on certain cased pencils from the People's Republic of China ("China") issued pursuant to Customs' authority under the Enforce and Protect Act ("EAPA"), 19 U.S.C. § 1517 (2018).[1] Confidential Pl. [Royal Brush's] Mem. in Supp. of its Mot. for J. on the Agency R. ("Pl.'s Mem.") at 1, ECF No. 33-1.[2] Customs issued two relevant determinations: (1) Notice of Final Deter-

1. All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the U.S. Code are to the 2018 edition unless otherwise specified. EAPA was enacted as part of the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114–125, § 421, 130 Stat. 122, 161 (2016).

2. The administrative record for the underlying proceeding is contained in a Confidential Administrative Record ("CR"), ECF Nos. 24-1

mination as to Evasion, EAPA Case No. 7238 (May 6, 2019) ("May 6 Determination"), CR 131, PR 57; and (2) Decision on Request for Admin. Review, EAPA Case No. 7238 (Sept. 24, 2019) ("Sept. 24 Determination"), PR 64 (Customs' *de novo* review of the May 6 Determination).

Royal Brush raises four overarching challenges to Customs' evasion determination. Royal Brush argues that: (1) Customs improperly rejected Royal Brush's filing seeking to rebut purportedly new factual information contained in Customs' verification report, Pl.'s Mem. at 9–13; (2) CBP denied Royal Brush procedural due process and redacted material evidence in an arbitrary and capricious manner, *id.* at 13–20; (3) CBP's use of an adverse inference constituted an abuse of discretion and was arbitrary and capricious, *id.* at 20–24; and (4) Customs drew irrational conclusions from the available evidence, *id.* at 24–26; *see also* Confidential Reply Br. of Pl. [Royal Brush] ("Pl.'s Reply"), ECF No. 43. Defendant United States ("the Government") and Defendant-Intervenor Dixon Ticonderoga Company ("Dixon") urge the court to sustain Customs' evasion determination. Confidential Def.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 38; Def.-Int.'s Resp. in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.-Int.'s Resp."), ECF No. 40. For the following reasons, the court remands Customs' determination for reconsideration and further explanation regarding the aforementioned arguments (1) and (2) and defers resolution of arguments (3) and (4) pending Customs' redetermination.

## Background

### I. Legal Framework for EAPA Investigations

As noted, EAPA investigations are governed by 19 U.S.C. § 1517.[3] Section 1517 directs Customs to initiate an investigation within 15 business days of receipt of an allegation that "reasonably suggests that covered merchandise has been entered into the customs territory of the United States through evasion." 19 U.S.C. § 1517(b)(1). "Covered merchandise" refers to "merchandise that is subject to" antidumping or countervailing duty orders issued pursuant to 19 U.S.C. § 1673e or 19 U.S.C. § 1671e, respectively. *Id.* § 1517(a)(3). "Evasion" is defined as:

> entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

*Id.* § 1517(a)(5)(A).[4]

Once Customs initiates an investigation, it has 90 calendar days to decide "if there

(CR 1–12), 24-2 (CR 13–14), 24-3 (CR 15–19), 24-4 (CR 20–27), 24-5 (CR 28–34), 24-6 (CR 35–37), 24-7 (CR 38–41), 24-8 (CR 42–44), 24-9 (CR 45–47), 24-10 (CR 48–50), 24-11 (CR 51), 24-12 (CR 52–54), 24-13 (CR 55–57), 24-14 (CR 58–69), 24-15 (CR 70–86), 24-16 (CR 87–122), 24-17 (CR 123–24), 24-18 (CR 125–26), 24-19 (CR 127–32), and a Public Administrative Record ("PR"), ECF Nos. 23-1 (PR 1–35), 23-2 (PR 36–43), 23-3 (PR 44–64). The court references the confidential version of the record document unless otherwise specified.

3. On August 22, 2016, CBP promulgated interim regulations that further guide Customs' conduct of EAPA investigations. *See Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 56,477 (CBP Aug. 22, 2016) (interim regulations; solicitation of cmts.); 19 C.F.R. pt. 165 (2017).

4. Section 1517(a)(5)(B) contains exceptions for clerical errors, which are not relevant here. 19 U.S.C. § 1517(a)(5)(B).

is a reasonable suspicion that such covered merchandise was entered into the customs territory of the United States through evasion" and, if so, to impose interim measures. *Id.* § 1517(e). Interim measures consist of:

> (1) suspend[ing] the liquidation of each unliquidated entry of such covered merchandise that entered on or after the date of the initiation of the investigation; (2) . . . extend[ing] the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation; and (3) . . . such additional measures as [Customs] determines necessary to protect the revenue of the United States . . . .

*Id.*

Pursuant to section 1517(c), Customs' determination whether covered merchandise entered the United States through evasion must be "based on substantial evidence." *Id.* § 1517(c)(1)(A). Customs may, however, "use an inference that is adverse to the interests of" the person alleged to have engaged in evasion or the foreign producer or exporter of the covered merchandise when "selecting from among the facts otherwise available" if that person "failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information." *Id.* § 1517(c)(3)(A).

Within 30 days of Customs' determination as to evasion, the person alleging evasion, or the person found to have engaged in evasion, may file an administrative appeal with Customs "for *de novo* review of the determination." *Id.* § 1517(f)(1). From the date that Customs completes that review, either of those persons have 30 business days in which to seek judicial review. *Id.* § 1517(g)(1).

## II. Factual and Procedural History

In 2015, Royal Brush, a U.S. importer, began importing pencils from a company located in the Republic of the Philippines ("the Philippines").[5] Importer Request for Information (Oct. 3, 2018) ("Importer RFI") at 3, CR 66, PR 26.[6] On February 27, 2018, Dixon lodged an allegation with CBP in which it averred that Royal Brush was transshipping pencils made in China—and subject to an antidumping duty order on certain cased pencils from China—through the Philippines. Allegation under [EAPA] (Feb. 27, 2018) ("Allegation") at 3–4, CR 1, PR 2; *see also Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 66,909 (Dep't Commerce Dec. 28, 1994) (antidumping duty order) ("*Pencils Order*"); *Certain Cased Pencils From the People's Republic of China*, 82 Fed. Reg. 41,608 (Dep't Commerce Sept. 1, 2017) (continuation of antidumping duty order). The scope of the *Pencils Order* covers "certain cased pencils . . . that feature cores of graphite or other materials encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (e.g., with erasers, etc.) in any fashion, and either sharpened or unsharpened." 59 Fed. Reg. at 66,909.

On March 27, 2018, CBP initiated an investigation in EAPA Case No. 7238. Initiation of Investigation in EAPA Case No. 7238 (Mar. 27, 2018), CR 4, PR 5. Because CBP had acknowledged receipt of Dixon's allegation on March 6, 2018, "the entries covered by this investigation are those that were entered for consumption, or with-

5. The name of the alleged manufacturer is treated as confidential in the parties' briefs and is immaterial to the outcome of this case; therefore, the court will refer to the company as "the Philippine Shipper."

6. When possible, the court refers to the page numbering embedded in the cited document. Otherwise, the court cites to the applicable CBP Bates stamp on the page(s).

drawn from a warehouse for consumption, from March 6, 2017 through the pendency of this investigation." Notice of Initiation of Investigation and Interim Measures (June 26, 2018) ("Initiation Notice") at 1, CR 8, PR 14.[7] On May 25, 2018 (with revisions submitted on July 19, 2018), Royal Brush responded to CBP's Form 28 Request for Information. EAPA Case No. 7238 – Resp. to CBP Form 28 (July 19, 2018), CR 10, PR 19.

On June 6, 2018, a CBP Attaché conducted an unannounced site visit at the Philippine Shipper's facility in Subic Bay, Philippines, and, thereafter, produced a report summarizing the Attaché's findings. EAPA 7238–Site Visit Report: [Philippine Shipper], Subic Bay, Philippines (June 15, 2018) ("Attaché Report"), CR 5, PR 8; *see also* May 6 Determination at 4 (identifying the date of the visit as June 6, 2018).[8] The Attaché concluded that the Philippine Shipper had "the capacity to finish some product, but the on-site evidence clearly reveal[ed] the repacking of completely finished products from China." Attaché Report at CBP0002540. During the visit, the Attaché observed the Philippine Shipper's "staff . . . making minor alterations or simply sharpening pencils" and "repacking China origin products into boxes labeled, 'Made in Philippines.' " *Id.* at CBP0002541. The Attaché noted that manufacturing equipment was covered in dust or cobwebs; the "manufacturing warehouse did not indicate production of any products for some time"; raw materials such as lead or cores were absent from the facility; and the storage area contained "boxes with Chinese characters and English language boxes stating, 'Made in the Philippines.' " *Id.*

On June 26, 2018, CBP informed Royal Brush of the initiation of the investigation and imposition of interim measures. Initiation Notice at 1, 3–6. With respect to the imposition of interim measures, Customs explained that evidence gathered during the Attaché site visit, documents provided by Royal Brush in its response to CBP's Form 28, and documents submitted by Dixon in support of its allegation[9] "collectively create[d] a reasonable suspicion as to evasion." *Id.* at 6. Accordingly, Customs suspended liquidation for any entries that entered on or after March 27, 2018, the date of initiation of this investigation, and extended liquidation for all unliquidated entries that entered before March 27, 2018. *Id.*

Following the imposition of interim measures, Royal Brush and the Philippine Shipper responded to Customs' further requests for information. *See, e.g.*, EAPA Case No. 7238 - Resp. to CBP Importer Request for Information (Part I) – Updated Submission per Request of Sept. 28, 2018 (Oct. 3, 2018), CR 12, PR 24 (submitted by the Philippine Shipper); Importer RFI (submitted by Royal Brush).

From November 14, 2018, through November 17, 2018, Customs conducted a scheduled verification at the Philippine

7. Pursuant to 19 C.F.R. § 165.2, subject entries "are those entries of allegedly covered merchandise made within one year before the receipt of an allegation," but, "at its discretion, CBP may investigate other entries of such covered merchandise."

8. The Attaché Report indicates that the visit occurred on July 6, 2018; however, this appears to be a typographical error given that the report is dated June 15, 2018. Attaché Report at CBP0002540.

9. Customs pointed to a purchase contract allegedly entered into between the alleged Chinese Manufacturer and a Trading Company that contained instructions on marking merchandise identified in Royal Brush's online catalog as "Made in Philippines." Initiation Notice at 2 (citing Allegation, Ex. 1). Customs pointed to additional documentation allegedly demonstrating that the merchandise would be shipped to Subic Bay. *Id.* (citing Allegation, Ex. 2).

Shipper's facility. On-Site Verification Report (Feb. 11, 2019) ("Verification Report") at 2, CR 129.[10] Prior to verification, Customs informed the Philippine Shipper that it would be required to discuss its production process and submit documentation corresponding to five identified invoice numbers. Site Verification Engagement Letter (Nov. 7, 2018) ("Verification Agenda") at 2, CR 121, PR 33–34.

In the report, Customs explained that it "[i]nterviewed company officials about their company operations and record keeping"; "[t]oured the facilities"; and "[r]eviewed original records to verify the on-the-record responses" submitted by the Philippine Shipper. Verification Report at 2. CBP summarized the "relevant facts and observations" with respect to the Philippine Shipper's: (1) company ownership, operations, and recordkeeping; (2) co-mingled raw material and Chinese pencils; (3) verification of the five identified invoices plus two additional invoices; (4) production capability and capacity; and (5) payroll records. *Id.* at 3–10. Customs also attached to the Verification Report 32 photographs taken inside the Philippine Shipper's facility. *Id.*, Attach. II.

Customs explained that the Philippine Shipper was unable to provide inventory receipt records for pencils purchased from Chinese suppliers and, at times, handwrote "pencils" with inventory receipts ostensibly related to the purchase of raw materials. *Id.* at 5. CBP encountered difficulties verifying the identified invoices as a result of the Philippine Shipper's failure to provide requested documents, deletion of documents, or provision of documents that had been altered or redacted. *Id.* at 6–8. CBP found that the Philippine Shipper's payroll records indicated that the company's production capacity was far less than the amount claimed and, thus, that the Philippine Shipper's amount of exports to the United States substantially exceeded its production capacity as calculated by CBP's verification team. *Id.* at 8–9. Lastly, "[e]vidence obtained during the verification" indicated that the Philippine Shipper's previously-submitted payroll documents "were unsupported." *Id.* at 9; *see also id.* at 10 (stating that the verification team was "unable to verify that the stated employees were, in fact, paid and/or that there was production during those time periods").

On March 6, 2019, Customs informed Royal Brush that because the Verification Report contained "new information," Royal Brush was entitled to submit rebuttal information "related specifically to the information that was provided in the verification report." Email from Kareen Campbell to Ron Oleynik (March 6, 2019, 16:04 EST) at CBP0002287, PR 49. While Royal Brush timely filed its rebuttal, on March 19, 2019, Customs informed Royal Brush that it was rejecting the submission. Email from Kareen Campbell to Ron Oleynik (March 19, 2019, 20:34 EST) at CBP0002295, PR 50. Customs explained that it rejected the rebuttal, in part, because of the inclusion of new factual information that was "not furnished during the verification." *Id.* On March 21, 2019, Customs stated that it had previously misinterpreted its regulation, 19 C.F.R. § 165.23(c),[11] and now determined that because "the verification report does

**10.** Customs released a public version of the verification report on February 25, 2019. *See* On-Site Verification Report (Feb. 25, 2019), PR 47.

**11.** Section 165.23(c) provides that

> [i]f CBP places new factual information on the administrative record on or after the 200th calendar day after the initiation of the investigation (or if such information is placed on the record at CBP's request), the parties to the investigation will have ten calendar days to provide rebuttal information to the new factual information.

19 C.F.R. § 165.23(c)(1).

not contain new information," Royal Brush's "rebuttal to the verification report [was] not warranted." Email from Kareen Campbell to Liliana Farfan (March 21, 2019, 15:14 EST) ("2nd Rejection Email") at CBP0002290, PR 50.

On March 25, 2019, Royal Brush submitted written arguments pursuant to 19 C.F.R. § 165.26.[12] EAPA Case No. 7238 – Resubmission of Written Arguments to be Placed on the Admin. R. (March 25, 2019) ("Royal Brush's Case Br."), CR 130, PR 51. Among other things, Royal Brush argued that its procedural due process rights had been violated by virtue of the extensive redactions to the Allegation, Attaché Report, and Verification Report and CBP's rejection of Royal Brush's rebuttal submission. *Id.* at 22–29. CBP further argued that CBP's rejection of the rebuttal was arbitrary and capricious. *Id.* at 29–35.

On May 6, 2019, Customs issued an affirmative determination as to evasion. *See* May 6 Determination. Customs found "that substantial evidence, in conjunction with an assumption of adverse inferences related to information requested but not provided, indicates [that] Royal Brush's imports were merchandise entered through evasion." *Id.* at 5; *see also id.* at 8 (finding substantial evidence to support a finding of evasion based on the available evidence "and the absence of information due to [the] Philippine[ ] Shipper's failure to cooperate and comply to the best of its ability"). Customs did not address Royal Brush's due process arguments except to state that the information and findings contained in the verification report were "covered by" Customs' regulation, 19 C.F.R. § 165.25. *Id.* at 5 n.15.[13]

On June 18, 2019, Royal Brush filed a request for an administrative review of Customs' Determination. Request for Admin. Review (June 18, 2019) ("Req. for Admin. Review"), CR 132, PR 58. On September 24, 2019, CBP completed its *de novo* review. Sept. 24 Determination at 1. CBP concluded that substantial evidence supported a finding that the pencils imported by Royal Brush during the period of investigation were manufactured in China. *Id.* at 11, 18–19; *see also id.* at 12–18 (discussing the evidence). Further, while stating that they were not necessary to its decision, CBP concluded that "adverse inferences were warranted, inasmuch as the importer, as well as the alleged foreign producer and exporter, *failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines." *Id.* at 18. CBP thus "reasonably filled those evidentiary gaps with some adverse inferences." *Id.*

Royal Brush timely sought judicial review pursuant to 19 U.S.C. § 1517(g)(1). *See* Summons, ECF No. 1; Compl., ECF No. 2. The court heard confidential oral argument on October 6, 2020. Docket Entry, ECF No. 49.

### Jurisdiction and Standard of Review

The court has jurisdiction pursuant to section 517(g) of the Tariff Act of 1930, as

12. Customs permits "parties to the investigation" to submit "written arguments that contain all arguments that are relevant to the determination as to evasion and based solely upon facts already on the administrative record in that proceeding." 19 C.F.R. § 165.26(a)(1). The term "[p]arties to the investigation" encompasses both the person "who filed the allegation of evasion and the importer … who allegedly engaged in evasion." 19 C.F.R. § 165.1. The term "interested party" is defined more broadly to include, among others, the parties to the investigation and the "foreign manufacturer, producer, or exporter … of covered merchandise." *Id.*

13. The regulation states that, following a verification, "CBP will place any relevant information on the administrative record and provide a public summary." 19 C.F.R. § 165.25(b).

amended, 19 U.S.C. § 1517(g), and 28 U.S.C. § 1581(c).

EAPA directs the court to determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or an administrative review issued pursuant to 19 U.S.C. § 1517(f) was "conducted in accordance with those subsections." 19 U.S.C. § 1517(g)(1). In so doing, the court "shall examine . . . whether [CBP] fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 1517(g)(2).[14]

**[1–4]** "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). However, Customs "must examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). "An abuse of discretion occurs [when] the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (citation omitted). "Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

## Discussion

## I. CBP's Rejection of Royal Brush's Rebuttal Submission

### A. Parties' Contentions

Royal Brush contends that CBP's Verification Report contained new factual information and, thus, CBP's rejection of its rebuttal submission was arbitrary, capricious, and an abuse of discretion. Pl.'s Mem. at 9–13; Pl.'s Reply at 2–3.[15] Recognizing that neither the EAPA statute nor CBP's regulations define "factual information," Royal Brush finds support for its

**14.** Customs' regulation refers to an "initial determination," 19 C.F.R. § 165.41, and a "final administrative determination" that is subject to judicial review, *id.* § 165.46. The statute does not use those terms or explicitly limit the scope of judicial review to Customs' *de novo* review of the earlier determination. *See* 19 U.S.C. § 1517(g). At oral argument, Royal Brush opined that only the September 24 Determination is judicially reviewable because it constitutes CBP's *de novo* reconsideration of the May 6 Determination. Oral Arg. 4:40–4:48 (reflecting the time stamp of the recording); *see also* Pl.'s Mem. at 1; Pl.'s Reply at 10 n.11. The Government and Dixon argued that both determinations are subject to judicial review. Oral Arg. 11:05–11:15, 19:11–19:55. The court's disposition of the matter herein on procedural grounds rather than the substantive merits of Customs' affirmative evasion determination does not require the court to resolve these competing arguments.

**15.** Royal Brush also contends that Customs' rejection of the rebuttal submission denied Royal Brush "a meaningful opportunity to be heard." Pl.'s Mem. at 9; *see also* Pl.'s Reply at 4. Royal Brush did not, however, substantiate its due process concerns with respect to this issue and, thus, the court does not further address the contention. *See, e.g., United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

position in the definition used by the U.S. Department of Commerce ("Commerce") in antidumping and countervailing duty proceedings. Pl.'s Mem. at 10–11 (discussing 19 C.F.R. § 351.102(b)(21) and related case law). Royal Brush further contends that Customs' assertion that the contents of the Verification Report are "covered by 19 C.F.R. § 165.25" lacks merit because the regulation does not preclude information in the Verification Report from constituting "new factual information." *Id.* at 12 n.7.

The Government contends that Customs properly rejected Royal Brush's rebuttal submission because the Verification Report did not contain new factual information. Def.'s Resp. at 14–15. Rather, the Government contends, CBP conducted "a quintessential verification" in order to test the accuracy of the submitted data, *id.* at 16, and simply "summarized its findings in the [V]erification [R]eport," *id.* at 18. The Government further contends that Customs provided an adequate explanation for its decision to reject Royal Brush's rebuttal submission. *Id.* at 19–20. Dixon advances substantially similar arguments. Def.-Int.'s Resp. at 4–5.

### B. CBP Must Reconsider and Further Explain its Rejection of Royal Brush's Rebuttal Submission

[5] Customs' rejection of Royal Brush's rebuttal submission turned on Customs' conclusion that the Verification Report did not contain new factual information. 2nd Rejection Email at CBP0002290. CBP is required to provide "a reasoned analysis or explanation" for that decision, *Wheatland Tube*, 161 F.3d at 1369, but has not done so here.

Customs' regulations permit parties to the investigation "to provide rebuttal information" to any "new factual information" that Customs "places ... on the administrative record on or after the 200th calendar day after the initiation of the investigation." 19 C.F.R. § 165.23(c)(1). Customs' conclusory statement that "the verification report does not contain new information," 2nd Rejection Email at CBP0002290, lacks any identification of the standard CBP used to define "new factual information" or application of that standard to the Verification Report. Customs' subsequent assertion that the Verification Report and its exhibits "are covered by [19 C.F.R.] § 165.25" fares no better. May 6 Determination at 5 n.15; Sept. 24 Determination 16 n.16. While the regulation directs CBP to "place any relevant [verification] information on the administrative record and provide a public summary," 19 C.F.R. § 165.25, it does not explicitly preclude that information from being "new" for purposes of 19 C.F.R. § 165.23(c)(1).

The Government's argument that the purpose of verification is to test the accuracy of submitted data is not persuasive. Def.'s Resp. at 15–16 (citing *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 39 CIT ——, ——, 61 F.Supp.3d 1306, 1349 (2015); *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 41 CIT ——, ——, 273 F.Supp.3d 1225, 1242 (2017); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 28 C.I.T. 1635, 353 F. Supp. 2d 1294, 1304 (2004)). The cited cases indicate Commerce's views on verification, not Customs' views. *See, e.g., Borusan*, 61 F. Supp. 3d at 1349. Further, at oral argument, the Government explained that CBP does not take the position that the contents of a verification report may never constitute new factual information. Oral Arg. at 28:00–28:07. Thus, the Government's argument sheds no light on CBP's basis for deciding that the Verification Report at issue here did not contain new factual information.

**[6, 7]** It is not the court's role to "supply a reasoned basis for [Customs'] action that [Customs] itself has not given." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947)). Accordingly, the court may not adopt Commerce's definition of factual information for purposes of an EAPA proceeding and apply that definition to the Verification Report to resolve the issue.[16] When, as here, the court is tasked with reviewing a decision based on an agency record, and that record does not support the contested decision, the court must remand for further proceedings. *See, e.g.*, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."); *Nippon Steel Corp. v. Int'l Trade Comm'n*, 345 F.3d 1379, 1381–82 (Fed. Cir. 2003). Accordingly, this issue is remanded to CBP for reconsideration and further explanation.[17]

## II. Royal Brush's Procedural Due Process Claims

### A. Parties' Contentions

Royal Brush contends that CBP's administration of the EAPA proceeding denied Royal Brush procedural due process and was arbitrary and capricious. Pl.'s Mem. at 13–20; *see also* Pl.'s Reply at 5–9. In particular, Royal Brush argues: (1) CBP redacted or otherwise withheld substantial amounts of record information, some of which CBP relied on to support its affirmative evasion determination, Pl.'s Mem. at 14–17; (2) Royal Brush lacked adequate notice concerning the information that would be requested or was considered missing from the record, *id.* at 17–18; (3) CBP "maintain[ed] a secret administrative record" to which Royal Brush lacked full access until it obtained judicial review, *id.* at 18–19; and (4) Customs' regulatory definition of "parties to the investigation" as a subset of "interested parties" prevented the Philippine Shipper "from fully participating in the proceedings," *Id.* at 19–20. Royal Brush further contends that Customs' failure to explain why it redacted or withheld information from Royal Brush amounts to arbitrary and capricious action. *Id.* at 20.

The Government contends that Royal Brush has failed to "identify any protected interest of which it was allegedly deprived" by CBP's management of the administra-

16. At oral argument, the Government opined that, in the absence of a Customs definition of "factual information," the court may find Commerce's definition instructive. Oral Arg. 22:57–23:11, 24:07–24:10.

17. Because the court is remanding this issue, the court does not reach Royal Brush's alternative argument that Customs failed to weigh the factors set forth in *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 C.I.T. 98, 123, 815 F. Supp. 2d 1342, 1365 (2012), regarding the acceptance of untimely information. Pl.'s Mem. at 12–13; *see also* Pl.'s Reply at 4–5. Additionally, Dixon's contention that CBP's determination should be affirmed even if the Verification Report contains new information because CBP relied on evidence other than the information contained in the Verification Report lacks merit. Def.-Int.'s Resp. at 5. If the Verification Report contains new information that Royal Brush is entitled to rebut, CBP will need to incorporate that rebuttal information into its remand redetermination.

tive record and, thus, Royal Brush's due process claims must fail. Def.'s Resp. at 24; *id.* at 27. The Government further contends that Royal Brush had adequate notice of the claim against it, *id.* at 23–24, and its "generalized complaints about the EAPA process do not entitle it to relief," *id.* at 25.[18]

### B. A Remand is Required for CBP to Comply with Procedural Requirements Concerning Royal Brush's Access to Information

While Royal Brush raises various challenges to CBP's administration of the underlying proceeding, at oral argument, it inferred that each claim is grounded in Royal Brush's overarching concern that CBP procedurally erred in failing to disclose information that CBP relied on in its determination. *See* Oral Arg. 1:41:45–1:42:37, 1:56:04–1:57:39, 2:29:22–2:31:07, 2:35:25–2:36:15. As discussed below, the record indicates that Customs failed to ensure that confidential filings were accompanied by the requisite public summaries. Thus, on remand, CBP must address and remedy this deficiency.

**[8–12]** "The Fifth Amendment prohibits the deprivation of life, liberty, or property without due process of law." *U.S. Auto Parts Network, Inc. v. United States*, 42 CIT ––––, ––––, 319 F. Supp. 3d 1303, 1310 (2018) (citing U.S. Const. amend. V). Thus, "[t]he first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty." *Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (citation omitted). While "engaging in foreign commerce is not a fundamental right protected by notions of substantive due process," *NEC Corp. v. United States*, 151 F.3d 1361, 1369 (Fed. Cir. 1998), an importer participating in an administrative proceeding has a procedural due process right to "notice and a meaningful opportunity to be heard," *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012) [hereinafter *Avisma*] (quoting *LaChance v. Erickson*, 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998));[19] *see also Nereida Trading Co. v. United States*, 34 C.I.T. 241, 248, 683 F. Supp. 2d 1348, 1355 (2010) (assuming that the plaintiff had "a protected interest in the proper assessment of tariffs on goods already imported" and further examining "what process is due") (citation omitted); *Transcom, Inc. v. United States*, 24 C.I.T. 1253, 1271, 121 F. Supp. 2d 690, 707 (2000) ("It is impossible to comprehend how an importer's lack of a vested right to import merchandise in the future negates the obligation to provide the importer with notice prior to imposing an antidumping duty for the merchandise already imported."). In general, "notice [must be] reasonably calculated, under all the circumstances, to appri[s]e interested

**18.** Dixon did not respond to Royal Brush's due process arguments.

**19.** The Government argues that the court should not address Royal Brush's arguments because Royal Brush failed to adequately identify a protected interest. Def.'s Resp. at 24, 27. Royal Brush argued, however, that as "an importer[ ] participating in an administrative proceeding" it had a due process right to "notice and a meaningful opportunity to be heard." Pl.'s Mem. at 13 (quoting *Avisma*, 688 F.3d at 761–62). Waiver is not implicated when the parties' briefs on an issue "do[ ] not deprive [the court] in substantial measure of that assistance of counsel which the system assumes." *MTZ Polyfilms, Ltd. v. United States*, 33 C.I.T. 1575, 1579, 659 F. Supp. 2d 1303, 1308 (2009) (alteration original) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)) (discussing, but ultimately declining to apply, the doctrine of waiver). While Royal Brush could have been more explicit as to the nature of the protected interest, the parties' briefing on these matters is sufficient for the court to address the competing arguments.

parties of the pendency of the action and afford them an opportunity to present their objections." *Transcom*, 24 C.I.T. at 1272, 121 F. Supp. 2d at 708 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Such opportunity must occur "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

**[13]** During the investigation, Royal Brush alerted Customs to its concerns regarding the extent of the redactions to various documents and Royal Brush's corresponding inability to fully defend its position. *See* Submission of Written Args. to be Placed on the Admin. R. (Nov. 13, 2018), PR 36 (arguing that due process required CBP to provide copies of the photographs of the Philippine Shipper's facility attached to the Attaché Report to Royal Brush or to the Philippine Shipper before verification, and there was no reason to withhold the photographs from the Philippine Shipper since the photographs pertained to that company's business information); Royal Brush's Case Br. at 4, 22–25 (arguing that Royal Brush had been denied procedural due process based on CBP's treatment of confidential information in the Allegation, Attaché Report, and Verification Report); Req. for Admin. Review at 24 (same). Customs did not respond to Royal Brush's request for disclosure of the photographs attached to the Attaché Report or address Royal Brush's due process arguments in the May 6 Determination or the September 24 Determination. Customs therefore "failed to consider an important aspect of the problem," resulting in a determination that is arbitrary and capricious. *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856).

**[14, 15]** Further, while "procedural due process guarantees do not require full-blown, trial-type proceedings in all administrative determinations," *Kemira Fibres Oy v. United States*, 18 C.I.T. 687, 694, 858 F. Supp. 229, 235 (1994), due process "forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary presentation," *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 289 n.4, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Thus, to comply with due process, Customs' procedures must afford adequate opportunity for importers to respond to the evidence used against them.

EAPA does not require or establish a procedure for the issuance of an administrative protective order ("APO") akin to the procedure used in antidumping and countervailing duty proceedings or otherwise address Customs' management of confidential information. *Compare* 19 U.S.C. § 1517 (governing EAPA investigations), *with* 19 U.S.C. § 1677f(c)(1)(A)–(B) (establishing procedures for the disclosure of proprietary information pursuant to a protective order in Commerce proceedings). However, Customs has promulgated a regulation governing the release of information provided by interested parties, 19 C.F.R. § 165.4. Subsection (a)(1) of the regulation contains instructions for interested parties to request business confidential treatment of information contained in submissions and states the requirements that must be met. 19 C.F.R. § 165.4(a)(1). Subsection (a)(2) further requires the submitter to file "a public version of the submission" that, when possible, "contain[s] a summary of the bracketed information in sufficient detail to permit a reasonable understanding of the substance of the information." *Id.* § 165.4(a)(2). Subsection (e) also directs that "[a]ny information that CBP places on the administrative record, when obtained other than from an interested party subject to the requirements of this section, will include a public summary

of the business confidential information." *Id.* § 165.4(e).

While Royal Brush did not explicitly reference 19 C.F.R. § 165.4 in its papers, CBP's compliance with its regulation concerning public summarization of confidential information is relevant to assessing Royal Brush's claim that CBP denied Royal Brush a meaningful opportunity to participate in the administrative proceeding. *See Sichuan Changhong Elec. Co. v. United States*, 30 C.I.T. 1886, 1890–92, 466 F. Supp. 2d 1323, 1327–29 (2006) (due process claim did not succeed when the agency complied with its statutory and regulatory obligations, which otherwise constituted "a reasonable means to bring an administrative procedure to closure"); *Kemira Fibres*, 18 C.I.T. at 694–95, 858 F. Supp. at 235–36 (failure to comply with regulatory procedures constituted "arbitrary and capricious" conduct that "deprived [the plaintiff] of its constitutional due process right"). The court's review of the administrative record reveals CBP's inattention to the requirement for a public summary of information designated business confidential.

The record shows, for example, that the public version of Dixon's Allegation redacts the confidential information in the narrative portion and omits the exhibits but does not separately summarize the confidential information in a public document. *See generally* Allegation (public version). Likewise, there are no public summaries of the confidential information redacted from the Attaché Report or Verification Report, including their respective photographs or exhibits. *See generally* Attaché Report (public version); Verification Report (public version); Foreign Party – Verification Exhibits (Nov. 30, 2018), PR 39–46. The lack of public summaries accompanying the Attaché Report and Verification Report are particularly concerning given CBP's reliance on those reports in its determination. *See, e.g.*, Sept. 24 Determination at 13–14 ("The CBP Attaché's Report, complete with observations and photographs, unequivocally demonstrates repackaging of Chinese pencils into boxes labeled as made in the Philippines and destined for the United States."). There is no indication that the redacted information was not susceptible to public summarization and CBP has not indicated that is the case. Thus, the court finds that, in this respect, CBP failed to afford Royal Brush "the opportunity to be heard at a meaningful time and in a meaningful manner."[20] *Eldridge*, 424 U.S. at 333, 96 S.Ct. 893.[21]

**20.** The Government asserted at oral argument that Royal Brush, after obtaining access to the complete administrative record on judicial review, has failed to articulate arguments it would have made if given greater access during the investigation. Oral Arg. 1:31:53–1:32:43. While Royal Brush's *counsel* has access to sealed filings during judicial review pursuant to a protective order, counsel is not able to share that information with Royal Brush for the purpose of forming arguments. *See generally* Protective Order (Dec. 16, 2019), ECF No. 22. Thus, the Government's argument fails to persuade the court that a remand to produce public summaries in accordance with CBP's regulation is not required. Furthermore, access to the complete record on judicial review cannot cure improper withholding of information by Customs because the court applies a deferential standard of review to Customs' evasion determination. *Cf. S.D. v. U.S. Dept. of Interior*, 787 F. Supp. 2d 981, 996–99 (D.S.D. 2011) (failure by administrative agency to provide plaintiffs with 23 documents on which the agency based its decision constituted a due process violation that was not cured by review of the decision by an appellate board before which plaintiffs had access to the complete record because the board applied a deferential standard of review).

**21.** As previously noted, Plaintiff's additional due process arguments are facets of its overarching claim regarding the lack of access to relevant evidence. Because the court is re-

Accordingly, the court remands the matter to Customs to address and remedy the lack of public summaries by providing Royal Brush an opportunity to participate on the basis of information that it should have received during the underlying proceeding. To be clear, the court does not hold that Royal Brush is entitled to receive business confidential information. Congress has not mandated that Royal Brush be afforded such access and Royal Brush has not shown that due process requires it. However, Customs must ensure compliance with the public summarization requirements provided in its own regulations.[22]

### Conclusion and Order

In accordance with the foregoing, it is hereby

**ORDERED** that Customs' evasion determination is remanded to CBP for reconsideration and further explanation regarding the existence of new factual information in the Verification Report and, to the extent the Verification Report contains new factual information, Royal Brush must be afforded an opportunity to rebut that information; it is further

**ORDERED** that Customs' evasion determination is remanded for CBP to comply with the public summary requirement set forth in 19 C.F.R. § 165.4 and afford Royal Brush an opportunity to present arguments based on that information; it is further

**ORDERED** that the court will defer resolution of Royal Brush's remaining arguments pending Customs' redetermination; it is further

**ORDERED** that Customs shall file its remand redetermination on or before March 1, 2021; it is further

**ORDERED** that, within 14 days of the date of filing of Customs' remand redetermination, Customs must file an index and copies of any new administrative record documents; it is further

**ORDERED** that the deadline for filing comments after remand shall be governed by USCIT Rule 56.2(h)(2)–(3); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words.

manding the matter for CBP to remedy this deficiency, the court declines to address Royal Brush's remaining arguments. To the extent these arguments continue to represent live controversies, Royal Brush must renew the arguments on remand to ensure that CBP has adequate opportunity to respond and, thus, produce a judicially reviewable determination on those issues.

22. The court is mindful that parties sometimes question whether Commerce always complies with a substantially similar requirement in its regulations, 19 C.F.R. § 351.304(c)(1). Commerce's actions are not now before the court and the court cannot ignore the robust APO procedures that mitigate any impact that might result in the case of Commerce's noncompliance.

# CBP's Administrative Determination on Appeal
# (September 24, 2019)

U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and Border Protection

September 24, 2019

**PUBLIC DOCUMENT**

OT: RR: BSTC: PEN H304466 RDJ

Ronald A. Oleynik, Esq.
Liliana Farfan, Esq.
Antonia Tzinova, Esq.
On behalf of Royal Brush Manufacturing Inc. a/k/a Royal and Langnickel
Holland and Knight LLP
800 17th Street NW
Suite 1100
Washington, DC 20060

Felicia Leborgne Nowels, Esq.
On behalf of Dixon Ticonderoga Company
Akerman LLP
Suite 1200
106 East College Avenue
Tallahassee, FL 32301

Re: Enforce and Protect Act ("EAPA") Case Number 7238; Royal Brush Manufacturing Inc. a/k/a Royal and Langnickel; 19 U.S.C. § 1517

Dear Mr. Oleynik, Ms. Farfan, Ms. Tzinova, and Ms. Lebcorge Nowels:

This decision is made in response to a timely request for administrative review ("Request for Administrative Review") made pursuant to Title 19, United States Code ("U.S.C.") Section 1517(f) and Title 19, Code of Federal Regulations ("C.F.R.") Section 165.41, dated June 18, 2019, filed by Royal Brush Manufacturing Inc., a/k/a Royal and Langnickel (hereinafter referred to as "Royal Brush"). Royal Brush requests the review of a determination of evasion made on May 6, 2019 by U.S. Customs and Border Protection's ("CBP") Enforcement Operations Division, Trade Remedy & Law Enforcement Directorate ("TRLED" or "EAPA Branch"), CBP Office of Trade ("OT"), in a Notice of Final Determination as to Evasion (hereinafter referred to as the "May 6-Determination").

In said document, TRLED determined there was substantial evidence in the administrative record that Royal Brush entered cased pencils ("pencils") made in the People's Republic of China ("PRC" or "China") into the customs territory of the United States through evasion. Specifically, TRLED determined that, contrary to its obligations under law, Royal Brush failed to declare the goods as subject to a U.S. Department of Commerce ("DOC" or "Commerce") antidumping duty ("AD") order (*Certain Cased Pencils from the People's Republic of China* Antidumping Duty Order A-570-827) (the "*Order*") and, failed to post cash deposits with CBP for the merchandise in question.[1]

In its Request for Administrative Review, Royal Brush requested that the May 6-Determination be reversed because CBP purportedly did not consider the evidence refuting the allegation of evasion by not following the "substantial evidence" standard that is required by 19 C.F.R. § 165.27, and because CBP's EAPA Branch had purportedly conducted its proceedings in an arbitrary and capricious manner. In addition, Royal Brush requested that, pursuant to 19 C.F.R. § 165.46, all interim measures taken under the authority of 19 C.F.R. § 165.24 be discontinued and the affected entries be allowed to liquidate "in the normal course."

The findings made in the May 6-Determination resulted from a CBP investigation of Royal Brush imports that was initiated on March 27, 2018 by the EAPA Branch, pursuant to Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the "Enforce and Protect Act" or "EAPA." CBP assigned case number 7238 ("EAPA Case No. 7238") to CBP's investigation of Royal Brush's imports during the period under investigation, which started on March 6, 2017. The CBP investigation was commenced in view of allegations received from domestic producer, Dixon Ticonderoga Company ("Dixon" or the "alleger"), on March 6, 2018, claiming that Royal Brush was importing Chinese-made pencils into the United States by evasion. On June 26, 2018, upon issuing its notice of initiation ("NOI"), TRLED notified Royal Brush that CBP would take interim measures in accordance with 19 C.F.R. § 165.24, based on a reasonable suspicion of evasion. Upon concluding its investigation, and based on the administrative record, TRLED issued its May 6-Determination, finding that substantial evidence on the record demonstrated that Royal Brush had entered cased pencils of Chinese origin into the customs territory of the United States through evasion. As Chinese-made, the pencils were subject to the *Order*. CBP determined that Royal Brush had failed to identify the entries as subject to the *Order* and failed to post the cash deposits for the antidumping duties by falsely claiming the pencils as "Made in the Philippines."

On June 18, 2019, Counsel filed, on behalf of Royal Brush, a Request for Administrative Review pursuant to 19 U.S.C. § 1517(f) and 19 C.F.R. § 165.41. Royal Brush requested that CBP's determination as to evasion be reversed.

---

[1] *Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 FR 66909 (December 28, 1994); *see also*, *Continuation of Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 82 FR 41608 (September 1, 2017).

Case: 22-1236 Document: 42 Page: 157 Filed: 09/09/2022

Consistent with 19 C.F.R. § 165.41(d), Royal Brush's Request for Administrative Review was timely submitted within 30 business days after the May 6-Determination. Upon receipt, OT's Regulations and Rulings ("RR"), Penalties Branch, assigned Headquarters Case Number H304466 ("H304466") to review the matter. This Headquarters case number was electronically transmitted to the interested parties to the investigation on July 1, 2019. Accordingly, CBP's 60-business-day review period for the administrative review of the May 6-Determination commenced on July 1, 2019. On July 12 and on July 15, 2019, Dixon Ticonderoga Company ("Dixon" or the "alleger") provided its Response to the Request for Administrative Review. Under the aforementioned submission, Dixon repeated its claims as the "alleger," and opined that there was substantial evidence of evasion by Royal Brush. Dixon was also of the opinion that Royal Brush had been provided an ample opportunity to present its case to CBP. With the submissions considered timely made, the case is ripe for our administrative review.

**FACTS:**

Inasmuch as the facts in this case are fully set forth in the May 6-Determination/EAPA Case Number 7238, we will not repeat the entire factual history in this decision. However, briefly stated, on March 27, 2018, CBP initiated an EAPA investigation into Royal Brush's import activities in response to an allegation made by Dixon, a domestic producer of pencils, where the alleger reasonably suggested to CBP that Royal Brush was transshipping Chinese-origin pencils through the Philippines, and claiming the pencils as "Made in the Philippines" to avoid the payment of antidumping duties under the *Order*.[2] CBP's investigation covered Royal Brush's entries from March 6, 2017, one year before the receipt of Dixon's allegations, through the pendency of the investigation, for merchandise entered for consumption or withdrawn from a warehouse for consumption. 19 C.F.R. § 165.2. The AD Case Number A-570-827 covers cased pencils of any shape or dimension that are manufactured in China and feature cores of graphite or other materials that are encased in wood and/or man-made materials. Pencils subject to the *Order* are classifiable under subheading 9609.10.00, Harmonized Tariff Schedule of the United States ("HTSUS").[3]

On June 26, 2018, in accordance with 19 C.F.R. § 165.24(c), CBP issued an NOI and notified Royal Brush of CBP's decision that it would to take interim measures based on reasonable suspicion that Royal Brush, as the importer of record, had entered said merchandise into the customs territory of the United States through evasion. CBP considered relevant Dixon's claim that a Chinese manufacturer had allegedly entered into a purchase contract with a trading company that required the Chinese manufacturer to mark the product "Made in Philippines" in order to circumvent the *Order*. The contract was allegedly said to apply to item numbers RTN-157, RTN-158, and WPEN-12, that is, for pencils that corresponded to the item numbers used by Royal Brush in its online catalog for colored pencils.[4] The contract also allegedly required the products to be

[2] *See*, Dixon's Allegation ("Allegation") under the Enforce and Protect Act of 2015, dated February 27, 2018.
[3] The May 6-Determination correctly made clear that the classification is not dispositive as to the scope of the AD order.
[4] *See*, Allegation, Exh 1 and 2 referencing contract RT02902 between the Chinese manufacturer and the trading company.

certified to U.S. standards for levels of heavy metals and phthalates and to bear Royal Brush's trademark logo design, "Royal & Langnickel." Dixon provided publicly available shipping data showing that pencils with matching descriptions and amounts were imported into the United States from the Philippines using a Philippine shipper.[5] Dixon alleged that the trading company was a frequent customer of the Chinese manufacturer. Based on reasonable suspicion, CBP's investigation was initiated on March 27, 2018 and, subsequently, CBP issued requests for information to Royal Brush and, some time thereafter, to the Philippine entity.

CBP's investigation included an unannounced visit made on June 6, 2018 and announced visits made between November 14, 2018 through November 17, 2018, to the Philippine entity's facility in the Philippines. Upon concluding its investigation, CBP determined that the Philippine entity was unable to provide sufficient documentary evidence that it had sufficient manufacturing capabilities to produce the quantities allegedly produced for Royal Brush. Moreover, for the invoices/purchase orders that CBP tried to verify during the November visit, the Philippine entity's proof of manufacture was found inadequate or insufficient. Consequently, in its May 6-Determination, CBP found sufficient evidence that Royal Brush had imported cased pencils made in China that were transshipped through a facility in the Philippines and were imported by Royal Brush as pencils "Made in the Philippines" when, in fact, the cased pencils were of Chinese origin. Because of what CBP witnessed during the unannounced visit to the Philippine entity on June 6, 2018, and the inability of the Philippine entity to provide adequate production records during CBP's November visits to the facility in question, along with the overlapping associations maintained between the Philippine company officers with trading companies in China, CBP determined the totality of the evidence showed that evasion was demonstrated when Royal Brush entered covered merchandise (pencils from China) into the customs territory of the United States by a written or oral statement that was material and false, and an omission that was material and false, inasmuch as Royal Brush failed to identify entries of Chinese-made pencils, failed to identify the applicable AD Case Number (A-570-827), and failed to post the applicable cash deposits for the AD duties on the merchandise.

**LAW:**

Title 19 U.S.C. § 1517(c)(1) provides, in relevant part, as follows:

(1) Determination of Evasion

(A) In general

> Except as provided in subparagraph (B), not later than 300 calendar days after the date on which the Commissioner initiates an investigation under subsection (b) with respect to covered merchandise, the Commissioner shall make a determination, based on substantial evidence, with respect to whether such covered merchandise was entered into the customs territory of the United States through evasion.

[5] *See* Allegation, Exh 6 referencing shipping documents.

The term evasion is defined in 19 U.S.C. § 1517(a)(5), as follows:

> (5) Evasion
>
> (A) In general
>
> Except as provided in subparagraph (B), the term "evasion" refers to entering covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material, and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise.

*See also*, 19 C.F.R. § 165.1.

Thus, CBP must determine whether a party has entered merchandise that is subject to an AD [antidumping duty] or CVD [countervailing duty] order into the United States for consumption by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material that resulted in the reduction or avoidance of applicable AD or CVD cash deposits or duties being collected on such merchandise.

Pursuant to 19 U.S.C. § 1517(c)(3), an adverse inference is defined, in part, as follows:

> (A) In general
>
> If the Commissioner finds that a party or person described in clause (i), (ii), or (iii) of paragraph (2)(A) has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information, the Commissioner may, in making a determination under paragraph (1), use an inference that is adverse to the interests of that party or person in selecting from among the facts otherwise available to make the determination.
>
> (B) Application
>
> An inference described in subparagraph (A) may be used under that subparagraph with respect to a person described in clause (ii) or (iii) of paragraph (2)(A) without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation.

## ARGUMENTS MADE BY ROYAL BRUSH IN ITS REQUEST FOR ADMINISTRATIVE REVIEW:

Royal Brush requested that the May 6-Determination be reversed because, contrary to the findings made by CBP's EAPA Branch, Royal Brush claimed there is no proof that the pencils imported by Royal Brush into the United States were made in China. Royal Brush stated that the EAPA investigation was triggered by Dixon's unfounded allegations, a filing "by an interested party that alleges an act of evasion by an importer." However, according to Royal Brush, there is no proof of evasion as it claimed that the Philippine entity (the alleged "manufacturer") had the capacity to manufacture the pencils in the quantities that were reflected in Royal Brush's purchase orders and more. Royal Brush claimed that the alleged Philippine manufacturer purchased raw materials and supplies from China. Royal Brush also claimed that the Philippine entity employed sufficient workforce to accomplish the manufacture of its pencils in the Philippines. In its request that the May 6-Determination be reversed, Royal Brush specifically stated that:

- The EAPA Branch did not consider the evidence on record that was provided by Royal Brush to refute the allegations of evasion; the EAPA Branch did not follow the "substantial evidence standard," and consequently, the EAPA Branch conducted its review in an "arbitrary and capricious" manner.

- The EAPA Branch should not have accepted the allegations made for evasion, inasmuch as Dixon did not submit any evidence as proof that the pencils subject to CBP's investigation were manufactured in China, as indicated on the alleged "Contract No. RT02902," a contract ("a copy of which has not been disclosed to Royal Brush") that involved *another* party, *not* Royal Brush, and the authenticity of which has not been established. Royal Brush refers to this contract as the "Unauthenticated Contract," but acknowledged, nonetheless, that it *did* obtain a copy of said contract through the Philippine entity. Royal Brush claimed that "neither Royal Brush nor Royal & Langnickel is a party to, or mentioned in the contract." Royal Brush claimed the Chinese manufacturer and the trading company associated with such contract provided signed declarations stating that Royal Brush was not involved in said Unauthenticated Contract. Royal Brush claimed that pencils in such contract were not destined to the United States but to another [specifically-named] country. Consequently, according to Royal Brush, there is "no link" on the part of Royal Brush to said contract. Furthermore, the EAPA Branch should not have accepted Dixon's claims of evasion based on the "shipping data" supplied by Dixon for pencils that were imported into the United States with matching descriptions and amounts, or on the claims made by Dixon that the trading company was a "frequent customer" of the Chinese manufacturer.

- The EAPA Branch should have accepted the physical evidence as well as business records (which "squarely support") that the pencils imported by Royal Brush were manufactured in the Philippines by the alleged Philippine

Case: 22-1236 Document: 42 Page: 161 Filed: 09/09/2022

manufacturer. Contrary to the findings made, the Philippine manufacturer had the manufacturing capabilities and the ability to acquire sufficient raw materials (wood slats, leads or cores, paints, stamping foils and packaging materials, etc.) to produce the pencil quantities ordered by Royal Brush and more. As for documents that the Philippine manufacturer was unable to provide during CBP's November visits, the reason was because of, among other reasons, alleged confidentiality issues, and because certain documents, such as shipping documents, were actually kept by the trading company. Therefore, there were valid reasons for the Philippine manufacturer not to have provided those documents to CBP.

- Royal Brush claimed to have provided the precise "Gross,"[6] the precise number of pencils produced, and the correct number of production "shifts" that the alleged Philippine manufacturer achieved for the year 2018. Royal Brush claimed that production quantities *exceed* what Royal Brush imported to the United States. Royal Brush claimed that the EAPA Branch's calculations of the "ratio of wood slats to cores are incorrect and cannot be used to support an inference of Chinese origin for pencils." Royal Brush claimed that the EAPA Branch improperly considered that "two pencils slats come together to form a "pencils sandwich" that ultimately yields at least 6 pencils" (2 slats yielding at least 6 pencils). Royal Brush claimed that CBP's verification team calculations were erroneous and ignored the information provided by Royal Brush in its "RFI Part I, Factual Submission and Written Arguments," where Royal Brush informed that the Philippine manufacturer purchased the pencil cores and slats in "Gross."

- Royal Brush claimed that with respect to the "certification service providers" that were based in China and were used by Royal Brush to certify compliance with U.S. Consumer Product Safety Commission ("CPSC") safety standards for its pencils, any reference to "China" on the forms was due to a clerical error made on the part of Royal Brush upon filing "pre-populated test request forms." Moreover, Royal Brush claimed that the CPSC does not require that such service providers and laboratories be located in the "respective country of origin" {Philippines} or in the United States. Royal Brush claimed that it submitted two test reports, one dated 2017 and another dated 2018. Royal Brush claimed that CBP did not accept these reports because CBP focused on the "irrelevant fact" of the "timing" of the reports. Royal Brush stated that the 2017 report was prepared "before the relevant pencils had made entry into the United States."

- Royal Brush claimed that the CBP Attaché report findings cannot be relied upon for the alleged evasion because the CBP Attaché did not consider the fact that the manufacturing process for pencils is "seasonal." Moreover, the Philippine manufacturer "has documented that it purchased sufficient raw materials to manufacture all of the pencils purchased by Royal Brush." With regard to the boxes that the CBP Attaché saw being filled with Chinese pencils and depicting

[6] A "Gross" being a unit equal to 144 items (or 12 dozen).

Chinese characters, Royal Brush claimed that those boxes were being used by the facility workers to move the Philippine-made pencils from "one production stage" to another. Royal Brush claimed that the CBP Attaché could not translate and did not understand the meaning of the Chinese characters written on the boxes.

- Royal Brush claimed that it was not provided with an opportunity to comment or rebut any factual inaccuracies. The EAPA Branch should have considered that Royal Brush was not present during the on-site verification visit ("Site Verification") conducted between November 14, 2018 and November 17, 2018, and that Royal Brush received only a redacted report (the February 25, 2019 "Verification Report") upon which CBP based its findings of evasion. The EAPA Branch also purportedly relied on inaccurate statements made by the Philippine company officers to reach the conclusion that the goods were made in China. As an example, the CBP verification team considered that a Philippine company officer had stated that the Chinese-origin pencils viewed by the CBP verifiers at the time of their November visits were intended "for U.S. markets." However, Royal Brush claimed that the Philippine entity had mentioned during the visit and in a PowerPoint presentation made during such visit, pencils that were Chinese-made but had failed toxicology reports for the region intended (purportedly, *not* for U.S. markets). As for other Chinese-made pencils mentioned in CBP's Verification Report, Royal Brush claimed those were not intended for the U.S. market but for the Philippine market.

- Royal Brush claimed that, although the EAPA Branch had initially determined that the Verification Report contained "new information" and had purportedly allowed time for Royal Brush to file a rebuttal ("Rebuttal"), the EAPA Branch thereafter changed its position and refused to accept Royal Brush's Rebuttal. Royal Brush claimed that in said Rebuttal, Royal Brush intended to address the purported inaccuracies that were attributed by CBP to the Philippines' manufacturer and its employees in CBP's Verification Report.

- Royal Brush claimed it is being held accountable for actions made by third parties involving transactions as to which Royal Brush neither participated nor had knowledge. Royal Brush claimed that the EAPA Branch erroneously shifted the inquiry away from Royal Brush with respect to its imports and issued its findings based on all imports made into the United States from the Philippine manufacturer, not just on Royal Brush's imports. Royal Brush claimed that, once the EAPA investigation expanded or shifted, Royal Brush was not provided with an opportunity to respond, contrary to due process.

- The EAPA Branch made conclusions and made adverse inferences that were inappropriate. An adverse inference about the Philippine manufacturer's cooperation (or lack thereof) should not be used against Royal Brush. Nonetheless, the evidence does not support an adverse inference against the Philippine manufacturer inasmuch as it cooperated with CBP to the "best of its ability." The inferences of 19 U.S.C. § 1677e(b), an almost identical provision

that is applicable to antidumping investigations, should be applicable with respect to the use of adverse inferences under the EAPA.

## ARGUMENTS MADE BY DIXON TICONDEROGA COMPANY IN RESPONSE TO THE REQUEST FOR ADMINISTRATIVE REVIEW:

In submissions dated July 12 and July 15, 2019 (the last submission made to include the required certifications pursuant to 19 C.F.R. § 165.5), Dixon stated that, contrary to Royal Brush's allegations, CBP properly relied on multiple forms of substantial evidence in reaching its determination of evasion, such as (1) the CBP Attaché's visit to the Philippine facility, (2) the responses received by CBP from the Philippine entity, (3) what transpired during CBP's verification visits to the Philippine facility, and (4) the analysis of the Philippine facility's manufacturing capacity compared to U.S. import data. Dixon provided the following specific comments:

- The CBP Attaché witnessed and made findings that, during the unannounced visit, the Philippine facility was not conducting proper manufacturing activities. Moreover, the CBP Attaché noticed a lack of raw materials, the facility's machinery was seen covered in dust and cobwebs, plus, there were boxes with Chinese-made pencils, and repacking activities were observed. As for the November announced visits, CBP considered an admission made by a Philippine entity official stating that Chinese-origin pencils were intended for export to the United States, there were references to inventory receipt records that included references to pencils, and that CBP had analyzed the Philippine facility's manufacturing capacity and had found that the total pencils exported exceeded the Philippine entity's capacity to produce such pencil quantities.

- CBP's investigation was "frustrated" by the Philippine entity's failure to cooperate in order to provide complete and unredacted documentation. There was a lack of production reports, a lack of inventory receipts for raw materials, a lack of inspection reports for raw materials, and a lack of full payroll records. The lack of records prevented CBP from verifying that the pencils exported by the Philippine entity to Royal Brush were indeed manufactured by the Philippine entity.

- CBP's determination was not arbitrary or capricious and it complied with due process by allowing Royal Brush to make submissions pursuant to 19 C.F.R. Part 165. CBP conducted an extensive review of the allegations and the records and responses obtained from Royal Brush and other entities. CBP made a thorough on-site verification and considered arguments from Royal Brush before making its determination of evasion.

## ADMINISTRATIVE REVIEW ANALYSIS:

Pursuant to 19 U.S.C. § 1517(f)(1) and 19 C.F.R. § 165.45, the Office of Trade, Regulations and Rulings, has performed its *de novo* review based on the facts and circumstances of the administrative record in this proceeding. In making our determination, we reviewed (1) the administrative record upon which the May 6-Determination was made, and (2) the timely and properly filed requests for review and responses. Pursuant to 19 C.F.R. § 165.45, the administrative review of this case has been completed in a timely manner within sixty (60) business days of the commencement of the review period.

Evasion is defined as "the entry of covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise." *See* 19 C.F.R. § 165.1; *see also*, 19 U.S.C. § 1517(a)(5).

We note that the EAPA statute does not require a finding that all of an importer's entries have been made through evasion. Rather, if CBP finds substantial evidence that evasion has occurred with respect to some entries of covered merchandise, the statute requires CBP to take appropriate action to ensure that entries by that importer do not escape payment of antidumping duties. In this case, having found sufficient evidence of entries of covered merchandise made through evasion, CBP has required live entry, posting of cash deposits, and suspension of liquidation. The DOC's role is to determine the assessment rates for the calculation of the ultimate antidumping duties, if any, that are owed.

I. "Covered merchandise" under 19 U.S.C. § 1517(c)(1).

A. The *Order*

The U.S. Department of Commerce issued an antidumping duty order on imports of certain cased pencils from the PRC. *See Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 FR 66909 (December 28, 1994).

On June 1, 2016, Commerce published notice of initiation of the fourth sunset review of the *Order*, pursuant to section 751(c) of the Tariff Act of 1930, as amended (the Act).[7] As a result of its review, Commerce determined that revocation of the *Order* would likely lead to a continuation or recurrence of dumping.[8] Commerce, therefore, notified the U.S. International Trade Commission ("ITC") of the magnitude of the margins likely to prevail should the *Order* be revoked. On August 17, 2017, the ITC determined that revoking the

[7] *See, Initiation of Five-Year (Sunset) Review*, 81 FR 34974 (June 1, 2016).
[8] *See, Certain Cased Pencils from the People's Republic of China: Final Results of Expedited Sunset Review of the Antidumping Duty Order*, 81 FR 69513 (October 6, 2016), and accompanying Issues and Decision Memorandum.

*Order* on certain cased pencils from the PRC would likely lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.[9]

B. The Scope

On September 1, 2017, Commerce ordered the continuation of the *Order* on certain cased pencils from the PRC.[10] In that notice, Commerce defined the scope of the *Order* as follows:

> . . . [C]ertain cased pencils of any shape or dimension (except as described below) which are writing and/or drawing instruments that feature cores of graphite or other materials, encased in wood and/or man-made materials, whether or not decorated and whether or not tipped (*e.g.*, with erasers, etc.) in any fashion, and either sharpened or unsharpened. The pencils. . . are currently classifiable under subheading 9609.10.00 of the Harmonized Tariff Schedule of the United States (HTSUS). Specifically excluded. . .are mechanical pencils, cosmetic pencils, pens, non-cased crayons (wax), pastels, charcoals, chalks, and pencils produced under U.S. patent number 6,217,242, from paper infused with scents by the means covered in the above-referenced patent, thereby having odors distinct from those that may emanate from pencils lacking the scent infusion. Also excluded. . .are pencils with all of the following physical characteristics: (1) Length: 13.5 or more inches; (2) sheath diameter: Not less than one-and-one quarter inches at any point (before sharpening); and (3) core length: Not more than 15 percent of the length of the pencil. In addition, pencils with all of the following physical characteristics are excluded. . .: Novelty jumbo pencils that are octagonal in shape, approximately ten inches long, one inch in diameter before sharpening, and three-and-one eighth inches in circumference, composed of turned wood encasing one-and-one half inches of sharpened lead on one end and a rubber eraser on the other end. The HTSUS subheadings are provided for convenience and customs purposes only; the written description of the merchandise. . . is dispositive.

As stated above, the *Order* covers cased pencils of any shape or dimension that are manufactured in China and feature cores of graphite or other materials that are encased in wood and/or man-made materials.

II. Evasion.

The record evidence establishes that Royal Brush imported cased pencils described by the *Order*. Further, the record as a whole does <u>not</u> support a conclusion that the pencils imported by Royal Brush during the period under investigation were manufactured in the Philippines. Moreover, there is also substantial record evidence to support the conclusion that pencils imported by Royal Brush were not made in the Philippines, but were instead made in China. Consequently, there is substantial record evidence that Royal Brush

---

[9] *See, Cased Pencils from China*, Inv. No. 731-TA-669 (Fourth Review), 82 FR 40019 (August 23, 2017).
[10] *See, Certain Cased Pencils from the People's Republic of China: Continuation of Antidumping Order*, 82 FR 41608 (September 1, 2017).

imported Chinese-origin pencils into the customs territory of the United States that were covered by the scope of the *Order*.

Evasion is defined as "the entry of covered merchandise into the customs territory of the United States by means of any document or electronically transmitted data or information, written or oral statement, or act that is material and false, or any omission that is material and that results in any cash deposit or other security or any amount of applicable antidumping or countervailing duties being reduced or not being applied with respect to the merchandise." *See* 19 C.F.R. § 165.1; *see also*, 19 U.S.C. § 1517(a)(5).

Based on the findings made by the CBP Attaché and CBP's verification team, we are of the position that the record fails to adequately establish that the Philippine entity manufactured the pencils that were associated with the Royal Brush invoices/purchase orders that were reviewed by CBP at the Philippine entity's facility. Furthermore, there is substantial evidence that the country of manufacture can be said to have been China for entries during the period under investigation.

The EAPA investigation as to Royal Brush was initiated on March 27, 2018. On April 25, 2018, and before Royal Brush was notified that it was the subject of an EAPA investigation, CBP issued a request for information ("RFI") or "CBP Form 28" to Royal Brush requesting production records for a certain entry that had been filed with CBP for art pencils declared as of Philippine origin.[11] Upon review of the documents received from Royal Brush, it was noted that the shipment in question contained cased pencils ("Sketching Pencils," item number "SPEN-12") stamped with Royal Brush's trademark (Royal & Langnickel). In its response to the CBP Form 28, Royal Brush claimed that the Philippine shipper was the supplier as well as the manufacturer of said pencils. Royal Brush made a claim that the Philippine entity manufactured the pencils in its facility using wood slats and pencil cores from China and paint and packaging obtained from the Philippines. Royal Brush provided the purported purchase order, invoice, export document, shipping documents and entry document for said shipment. The documents included invoices and bills of lading from the trading company in China, and which Dixon had identified in its allegations.

CBP found inconsistencies that called into question whether the goods had been manufactured in the Philippines. For example, Royal Brush provided copies of "certification service provider forms" (to certify quality-compliance in the making of the pencils). CBP found that Royal Brush had identified China to be the country of origin for the merchandise being tested. CBP also found that the dates of such certifications post-dated the date of importation and, moreover, appeared to have been issued *after* the issuance of the CBP Form 28. Royal Brush claims that CBP's focus on the "timing" of these forms is irrelevant, however, the timing *is* relevant because CBP expects that documents provided should temporally correlate to the relevant dates for the importations it reviews. Moreover, what was even more relevant was the fact that Chinese certification forms considered the pencils

---

[11] The EAPA authorizes CBP to collect such information as is necessary to make its determination using methods that CBP may consider appropriate. *See*, 81 FR 56477 (August 22, 2016). To that end, CBP's regulations allow for a delay in issuance of a notice of investigation.

to be of Chinese-origin, a statement *made by* Royal Brush in the form requests and which Royal Brush later claimed was the result of a "clerical error" *on its part* when it filled "pre-populated test request" forms to its Chinese service providers. Even if CBP considered the "China" statement on the forms not determinative as to "country of origin," Royal Brush's claimed "error" elevated, in our opinion, the suspicion of evasion above the claims initially made by the alleger.

The indicators for evasion became even more significant on June 6, 2018, when the CBP Attaché performed an unannounced visit to the entity in the Philippines at its facility; again, this occurred before the NOI was issued. During the visit, the CBP Attaché witnessed that the Philippine entity was *not* conducting manufacturing activities for pencils and, moreover, it appeared *not* to have done so for some time, given the idle state of the machines located at the facility.[12] The CBP Attaché witnessed that the machinery appeared dusty and covered in cobwebs (the machines appeared to have been the ones shown in company pictures). The CBP Attaché witnessed the Philippine entity's personnel opening cartons containing Chinese-origin pencils and, after conducting minor alterations, such as sharpening, the workers were seen repackaging/repacking the pencils into cartons labeled "Made in Philippines." The CBP Attaché learned from the escorting staff that the pencils were intended for exportation, including to some major U.S. companies. The CBP Attaché noted that, at least one of two staff managers escorting him, could not describe the pencil manufacturing process, despite self-identifying as the manager on duty and having worked for the company since 2015. During the unannounced visit, the company managers (one manager was available by cellular phone) who directed the tour of the facilities claimed that the raw materials used for manufacture were brought from various specific countries, however, there was virtually no evidence of raw materials at the site at the time of said visit. According to the CBP Attaché, the pictures taken during the visit provided a clear story line of repackaged Chinese pencils bound for the United States in boxes labeled "Made in the Philippines." When the CBP Attaché specifically asked the escorting company managers about the repackaging activities being witnessed by all during the tour, the company managers bore silenced looks and, with at least one of them, the CBP Attaché felt, a tacit confirmation of what he was witnessing.

The question for further development thus became the capacity of the Philippine entity to manufacture at the level described, given the lack of resources observed during the first on-site visit. Even if CBP considered the possibility that during the unannounced visit, the Philippine entity was not operating at season's peak, from a CBP standpoint, it would still have expected to see some constancy of production at the facility, particularly in light of production capacity representations made by the Philippine entity at a later date. However, there appeared to be little or no manufacture going on at the time. Therefore, CBP cannot dismiss what the CBP Attaché vividly saw at the time of the visit to the Philippine entity's facility, regardless of whether the CBP Attaché could understand the Chinese characters on the boxes. The CBP Attaché's report, complete with observations and photographs,

[12] Notably, this was consistent with U.S. Embassy records reviewed by the CBP Attaché prior to the visit which records showed that there was only one known manufacturer of pencils in the Philippines and it was not the Philippine entity. See, June 5, 2018 CBP Attaché report at page 1.

unequivocally demonstrates repackaging of Chinese pencils into boxes labeled as made in the Philippines and destined for the United States.

We do not agree with Royal Brush's assertions that the CBP Attaché misconstrued what he saw during the initial site visit. He saw retail packaged Chinese-made pencils being unpackaged and/or unpacked, and he saw unpackaged Chinese finished pencils in large boxes being unpacked and then being repacked/repackaged. He also saw the same green pencils that came from China, in the finishing facility, being used in the repacking process. He saw incoming packing cartons labeled made in China. He saw outgoing packing cartons labeled made in the Philippines. He saw no manufacturing activity and dusty equipment. In June of 2018, he saw materials apparently unused since April of 2017.[13] The only activity he observed was the packing/packaging of finished pencils and some pencil sharpening. Had he observed manufacturing or were there evidence of recent manufacturing, it might credibly be argued that some of the packing/packaging activity was for Philippine-made pencils. However, there was only evidence to the contrary. Moreover, there was no explanation for why retail packaged pencils from China were being unpacked and then repacked for export. We note that the CBP Attaché had no vested interest in this matter, except to report exactly what he had observed. Thus, for the entries prior to June of 2018, the record supports a conclusion that entries of Chinese pencils were being made in the United States with the Philippines being falsely stated to be the country of origin.[14] Notwithstanding, CBP sought to gather additional information, specific to Royal Brush's entries.

After the interim measures went into effect, CBP sent RFIs to both the Philippine entity as well as to Royal Brush. Responses from both parties were filed with CBP in October of 2018. Thereinafter, when CBP performed its announced visit to the Philippine facility between November 14 and 17, 2018, CBP determined that some manufacturing capability appeared to be evident but not to the extent alleged by the affected parties.[15] The purpose for the CBP announced visit ("verification visit") was to determine whether the Philippine supplier could show that it was capable of producing the amount of pencils allegedly manufactured for Royal Brush, as well as to clarify the country of origin for pencils imported by Royal Brush. During its verification visit, CBP reviewed the production records on seven invoices and purchase orders pertinent to Royal Brush. The CBP verification team found numerous inconsistencies and/or discrepancies in the documentation, raising questions regarding the Philippine entity's capabilities to manufacture the pencils at issue. We give credence to CBP's on-site verification team's findings that resulted from the interviews conducted with company officers, a tour of the Philippine facility, and a review of its production records. In particular, we find highly relevant, the facts discussed below.

---

[13] Notably, the CBP period of investigation covered entries from March 6, 2017 forward.

[14] The CBP Attaché's visit supports our ultimate determination of evasion. The issue of the contract, which Royal Brush raises in its claims of error on the part of CBP, while supportive of the EAPA Branch's findings, is not the basis for our *de novo* determination of evasion. Nevertheless, it is a fact of record that certainly does not detract from our conclusion.

[15] Members of CBP's verification team included personnel from TRLED and CBP's Regulatory Audit and Agency Advisory Services ("RAAAS").

The Verification Report described how the Philippine entity's officers were closely associated with certain trading companies in China, and the company officers described how the company and partners operated in the Philippines. The CBP verification team also attempted to complete a verification of the information received from the Philippine entity's RFI responses. It became clear that the positions of certain officers at the Philippine facility overlapped with the positions they held within certain Chinese trading companies. For example, a part-owner of the Philippine entity as well as its sales director was also the part-owner of at least two Chinese trading companies that allegedly provided raw materials to the Philippine entity. The sales director acknowledged traveling frequently from China to the Philippines, and more so during the alleged "busy season" but, otherwise, the sales director and part-owner claimed being based ("physically located") in China. The aforementioned sales director was also the officer deciding which selling company to use for the purchase of raw materials on behalf of the Philippine entity. Given the proximity of the Philippine entity with the Chinese trading partners, we would expect that such closely associated companies would make an effort to maintain records properly separated and to maintain built-in functionalities so as to allow the documentation to remain separated while still be able to cross-reference one another if any of the companies were audited.

CBP's verification team requested production records and made specific findings on each of seven Royal Brush invoices/purchase orders that were reviewed during the November 2018 visits. The Philippine entity officers, including the sales director/part-owner associated with the trading companies doing business in the Philippines, were not able to satisfactorily respond to the production questions posed by the CBP verification team. CBP found invoices where the Philippine entity could not provide the inventory receipt records for merchandise described (such as woodless graphite pencils, sharpeners and charcoal pencils) and found that with other invoices, the Philippine facility could not respond to discrepancies that were noted by CBP's verification team, including questions about the receipt of the raw materials essential to the manufacturing process. Some documents were found by the CBP verification team to have been altered by "white-out" marks or were revised with ink marks. The explanations provided at the time for the alterations were not responsive to the issue, or were deemed incomplete, conflictive, unverifiable or unreliable.

The CBP verification team also verified the list of the machinery located at the facility, their functions, their daily production capacity and the production cycles. The information was found short or inadequate. The CBP verification team found that while the Philippine facility did appear to have the capability to produce pencils, it did not appear to be able to produce pencils in the quantities alleged for the company's 2018 production.

In some instances, when the CBP verification team requested that certain production records be provided, the Philippine officers claimed that such documents, if any, were kept at the trading company's "China office," and not at the Philippine office, an odd claim to make because not only were the November 2018 visits *announced* to the Philippine entity, so that the Philippine entity could prepare in advance, but the Philippine entity also thus gave up an opportunity to provide to CBP information that CBP could have found acceptable and sufficient, if existent. It also raised the question as to why a certain entity in one country would keep its production records in *another* country, in this case, China, a country facing an antidumping order from the United States, while the Philippines faced none.

Although Royal Brush claims arbitrary or capricious actions on the part of CBP, opportunities were afforded to Royal Brush, as well as to the Philippine supplier, to prove their claims of production, notwithstanding, both entities fell short to establish the production capabilities of the Philippines entity.[16]

The central issue was whether the Philippine manufacturer could sustain sufficient pencil production commensurate to the quantities of Royal Brush's imports to the United States and whether production records could be tied to Royal Brush's imports. The observations and calculations made by CBP's verification team regarding the Philippine entity's production sufficiency, as well as for the "ratio" and "gross" units considered by CBP, were measures that were based on the information provided by the Philippine company officers to CBP's verification team, including the information about the machinery daily capacity (using the "gross" times the number of machines times the number of shifts). The question is not whether CBP erroneously calculated the production (we think not), the question is whether the Philippine entity misinformed the CBP verification team as to the entity's production capacity and why so. If Royal Brush claims that the CBP production calculation numbers are not accurate, how can CBP consider Royal Brush's numbers to be correct, if all numbers came from the same source, purportedly, the Philippine entity? If Royal Brush made an independent review of the Philippine entity's production records, it must have surely encountered what the CBP verification team found: missing documents relating to transportation documents, missing documents for incoming raw materials (including from overseas) used in the production, missing sales invoices between trading partners, altered documents (due, allegedly, to the Philippine entity's incorrect usage of units of measure ("gross" versus "pieces")) or from alleged complications in getting the data on a timely basis, documents relating to receipt of merchandise that were incomplete or absent, documents that appeared to have been redacted and documents that the Philippine entity even refused to provide after the CBP verification team requested the unredacted versions and documents that were said to have been long ago deleted. There is no guarantee to CBP that the information claimed to be the correct information was not redacted, tainted, manipulated, or re-created in or outside the Philippines and/or made to appear to correspond to a legitimate production cycle in the Philippines for the commodity at issue.

As for Royal Brush's claim that production was "seasonal," the claim does nothing to explain the reasons for the discrepancies. Even if CBP had considered some explanations plausible, the weight of the evidence for evasion is still substantial as was revealed upon review of the seven invoices and purchase orders by CBP during the November 2018 announced visits. The production in the Philippines for Royal Brush's imports remains unsubstantiated, as amply demonstrated in the verification report drafted by trained CBP auditors.

---

[16] In regard to the EAPA Branch's decision not to accept Royal Brush's rebuttal (allegedly said to contain additional explanations as to the production in the Philippines), CBP's denial to accept was made because CBP's verification report and exhibits were deemed covered under 19 C.F.R. § 165.25 and did not constitute "new factual information." Notwithstanding, the EAPA Branch allowed more time for Royal Brush to submit its March 25, 2019 Written Arguments, as stated in footnote number 15 of the May 6 Determination.

In particular, the Verification Report, at pages 9-10, demonstrates how/why the production calculated by the Philippine entity's official was inflated, and how a corrected calculation based on the payroll records provided to CBP resulted in a capacity figure far less than the entity's shipments to the United States. We also note that the entity's calculation was based on a certain number of shifts a day, operating a certain number of days a week, for the entire year. However, the CBP Attaché's visit clearly revealed no production at that time or approximate to the time of the visit, thus further demonstrating that the calculation, which presumed continuous production, was inflated. Continuous operation is also inconsistent with the claims of seasonality made to CBP.

In its arguments, Royal Brush misses the mark by citing its RFI responses when it comes to production information. The point is that this is unverified information, presumably supplied to Royal Brush by the Philippine entity. At verification, CBP auditors could not verify, i.e., did not find evidence to substantiate, the actual production claimed. Instead, CBP found, not only evidentiary gaps, but many indicators pointing away from the accuracy of the claims.

Finally, the fact that CBP's verification team may have inquired about other non-Royal Brush shipments while touring the Philippine facilities does not mean that the investigation was being expanded or that Royal Brush is being held liable for acts attributable to other companies. CBP needed to verify total production as one aspect of determining whether the quantities imported by Royal Brush could have been produced by the Philippine entity.

Furthermore, CBP is not required to establish the existence of a scheme or coordinated intent to enter goods contrary to law, nor is knowledge by the importer required.[17] CBP simply has to establish that entries were made, of goods subject to an antidumping order, and that the importer entered covered merchandise into the United States by means of any document or information, written or oral statement, or act that is material and false, or any omission that is material and that results in any cash deposit or another security or any amount of applicable antidumping duties being reduced or not paid with respect to the covered merchandise. In so doing, CBP must consider the record, as a whole. Evasion is found when goods that are subject to antidumping orders are entered into the United States without reference to the applicable AD/CVD order in the entry documents, since that constitutes material omission. Accordingly, we find that the definition of evasion under the regulations and statute has been met based upon substantial evidence in the record.[18] Therefore, CBP properly found evasion.

---

[17] We note that an importer is required to exercise reasonable care when making entry to the United States. 19 U.S.C. § 1484. As such, an importer cannot hide behind a claim that it did not know about its supplier's sourcing and production. Contrary to Royal Brush's assertions (*see*, Request for Review at 8), Royal Brush is, within the bounds of reasonable care, responsible for making reasonable inquiries of others in its supply chain to ensure, vis-a-vis products imported into the United States, that those imported products comply with U.S. law.

[18] Substantial evidence is not defined in the statute. The Federal Circuit has stated that "substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *A.L. Patterson, Inc. v. United States*, 585 Fed. Appx. 778, 781-82 (Fed. Cir. 2014) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). Even considering the claims raised by Royal Brush regarding the Philippine facility's alleged production capabilities, the record *as a whole* indicates it was reasonable for the CBP verification team to reach the conclusions it did given the extent of the evidence.

The discussions below and in the May 6-Determination address the adverse references that CBP made because of the insufficiencies in the data that was provided at the time. However, it is our position that, even without adverse inferences, the record as a whole adequately and reasonably supports a conclusion that entries made by Royal Brush were declared as of Philippine origin but actually included covered pencils from China.

III. Adverse Inferences.

The EAPA statute authorizes CBP to employ adverse inferences against any party to the investigation that fails to cooperate or does not act to the best of its ability to comply with information requests (19 U.S.C. § 1517(c)(3)). 19 C.F.R. § 165.6(a) also states that adverse inferences may be applied to any importer or foreign producer/exporter that fails to "cooperate and comply to the best of its ability with a request for information made by CBP." Pursuant to 19 C.F.R. § 165.5(b)(3), "(a)ny interested party that provides a material false statement or makes a material omission or otherwise attempts to conceal material facts at this point in the proceedings may be subject to adverse inferences. . . and prosecution pursuant to 18 U.S.C. § 1001." Moreover, an adverse inference may be used with respect to the U.S. importer, foreign producers, and manufacturers "without regard to whether another person involved in the same transactions under examination has provided the information sought...". 19 U.S.C. § 1517(c)(3)(B). Thus, Congress provided CBP with specific guidance as to CBP's adverse inference authority in an EAPA case. In this case, adverse inferences were warranted, inasmuch as the importer, as well as the alleged foreign producer and exporter, *failed* to provide sufficient evidence to demonstrate that the pencils imported by Royal Brush were manufactured in the Philippines. CBP reasonably filled those evidentiary gaps with some adverse inferences.

The evidence supports the conclusion that neither Royal Brush nor the Philippine entity could prove or was able to provide CBP's verification team with sufficient evidence that would reasonably assure CBP's verification team that the Philippine supplier had sufficient manufacturing capabilities to produce all of the pencils during the period at issue. CBP found some evidence of manufacture in the Philippines but the evidence failed to demonstrate that the pencils in the seven entries that CBP attempted to verify were manufactured in the Philippines, let alone that all pencils declared by Royal Brush as of Philippine origin were made in the Philippines. The November visits did not sufficiently counter what the CBP Attaché had seen, namely, the reboxing of Chinese-origin pencils for exportation to the United States into cartons labeled as made in the Philippines. Thus, the evidence supports the conclusion that goods that were entered into the United States as Philippine-made pencils, were, in fact, Chinese-made pencils. Therefore, Royal Brush failed to comply with its obligation to identify its entries as subject to an antidumping duty order (A-570-827) and failed to post the applicable cash deposits for the commodity and time period at issue.

## CONCLUSION:

Based upon our *de novo* review of the administrative record in this case, including the timely and properly filed request for administrative review and responses, we **AFFIRM** the determination made by the Director of Enforcement Operations, Trade Remedy & Law

Enforcement Directorate, Office of Trade, that pursuant to 19 U.S.C. § 1517 and 19 C.F.R. § 165, substantial evidence exists to support a finding that Royal Brush Manufacturing Inc. imported pencils from China into the United States through evasion. This decision does not preclude CBP or other agencies from pursuing additional enforcement actions or penalties. Pursuant to 19 C.F.R. § 165.46(a), this final administrative determination is subject to judicial review pursuant to section 421 of the EAPA.

Sincerely,

CORALY SCHREIBER Digitally signed by CORALY SCHREIBER Date: 2019.09.24 12:54:41 -04'00'

Coraly Schreiber
Acting Chief Penalties Branch
Office of Trade-Regulations & Rulings
U.S. Customs & Border Protection

Approved by:

Alice A. Kipel
Executive Director, Regulations & Rulings
Office of Trade
U.S. Customs & Border Protection

# CBP's Notice of Final Determination as to Evasion
# (May 6, 2019)

1300 Pennsylvania Avenue NW
Washington, DC 20229

U.S. Customs and
Border Protection

May 6, 2019

**PUBLIC VERSION**

EAPA Case Number: 7238

Liliana Farfan
Antonia Tzinova
Ronald A. Oleynik
On behalf of Royal Brush Manufacturing Inc. a/k/a Royal and Langnickel
Holland and Knight LLP
800 17th Street NW
Suite 1100
Washington, DC 20006

**Re: Notice of Final Determination as to Evasion**

---

Dear Ms. Farfan, Ms. Tzinova, and Mr. Oleynik:

Pursuant to an examination of the record in Enforce and Protect Act (EAPA) Investigation Number 7238, U.S. Customs and Border Protection (CBP) has determined that there is substantial evidence that Royal Brush Manufacturing Inc. ("Royal Brush"), entered into the customs territory of the United States through evasion merchandise covered by antidumping duty (AD) order on Certain Cased Pencils from the People's Republic of China A-570-827. Substantial evidence demonstrates that Royal Brush imported cased pencils made in China by transshipping the pencils through the Subic Bay, Philippines and falsely declaring the country of origin. As a result, no cash deposits were applied to the merchandise.

**Background**

On March 27, 2018, CBP initiated an investigation pursuant to Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015, commonly referred to as the "Enforce and Protect Act" or "EAPA." On March 6, 2018 CBP confirmed receipt of an allegation filed by Dixon Ticonderoga Company ("Dixon" or "Alleger"), a domestic producer of pencils. The allegation, which was filed on February 27, 2018, reasonably suggested that Royal Brush evaded the payment of cash deposits on imports of cased pencils from China. In its allegation, Dixon

**CONFIDENTIAL INFORMATION REMOVED**

claimed that Royal Brush was transshipping Chinese-origin pencils through the Philippines in order to avoid the payment of antidumping duties. This investigation covers entries from March 6, 2017, one year before the receipt of allegation, through the pendency of this investigation that were entered for consumption, or withdrawn from a warehouse for consumption.

The antidumping duty order covers certain cased pencils of any shape or dimension that are manufactured in China and feature cores of graphite or other materials that are encased in wood and/or man-made materials.[1] Pencils subject to the AD Order are classifiable under subheading 9609.10.00, HTSUS. This classification is not dispositive as to the scope of the Order.

On June 26, 2018, CBP issued a notice of initiation (NOI) of investigation and notified the parties of CBP's decision to impose interim measures in accordance with 19 C.F.R. § 165.24 based on reasonable suspicion that Royal Brush entered covered merchandise into the customs territory of the United States through evasion. In reaching its decision to impose interim measures, CBP relied not only on the information provided by Dixon in the allegation and supplemental filings, but also on additional information CBP obtained from Royal Brush and its supplier [ ], "Philippines Shipper").

In its allegation, Dixon claimed that multiple shipments of cased pencils subject to A-570-827 imported by Royal Brush were made in China by [ ] (hereinafter, the "alleged Chinese Manufacturer"), but marked as "Made in Philippines." According to Dixon, the alleged Chinese Manufacturer had entered into a purchase contract with [ ] (hereinafter "Trading Company"), where the Trading Company required the Chinese Manufacturer to mark the country of origin of the merchandise as Philippines.[2] The contract applied to item numbers RTN-157, RTN-158, and WPEN-12, which corresponded to item numbers used by Royal Brush its online catalog for colored pencils.[3]

Additionally Dixon alleged that the contract required the products to be certified to U.S. standards for levels of heavy metals and phthalates, and to bear Royal Brush's trademark "Royal & Langnickel."[4] The Trading Company provided specific instructions to the Chinese Manufacturer on how to mark pencil boxes as "Made in Philippines" for shipment.[5]

---

[1] *Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 59 FR 66909 (December 28, 1994) (Order); *see also Continuation of Antidumping Duty Order: Certain Cased Pencils from the People's Republic of China*, 82 FR 41608 (September 1, 2017).
[2] *See* Allegation, at Exh. 1 (demonstrating a "Purchase Contract" identified by number RT02902, between the Chinese Manufacturer and the Trading Company).
[3] *See* Notice of Initiation of Investigation and Interim Measures at 2 (fn 4) referencing http://www royalbrushstore.com/c/cool-art_pencils (last viewed June 22, 2018).
[4] *See* Allegation, at Exh. 3 (demonstrating a production order for 278 cartons of RTN 157; 322 cartons of RTN 158; and 139 cartons of WPEN-12, with product specifications and the trademarks indicated therein).
[5] *See* Allegation, at Exh. 2 (containing marking instructions for boxes in which the items in the contract would be shipped to Subic Bay).

**CONFIDENTIAL INFORMATION REMOVED**

Finally, Dixon provided publicly available shipping data showing that the pencils with matching description and amounts had been imported into the United States from the Philippines by the Philippines Shipper.[6] On March 13, 2018, Dixon supplemented the Allegation with additional evidence ("Supplement") demonstrating that the Trading Company was the Chinese Manufacturer's frequent customer.[7]

The Allegation and supporting documents, reasonably suggested that cased pencils covered by the Order had been entered for consumption into the customs territory of the United States through evasion. Consequently, CBP initiated EAPA investigation 7238 under 19 C.F.R. § 165.15(b).

On April 25, 2018, CBP issued a Form 28, Request for Information ("CF28") to Royal Brush requesting production records for Entry No. [ ]7828, a shipment of art pencils. CBP reviewed the documents and found that the shipment contained cased pencils stamped with Royal Brush's trademark of "Royal & Langnickel." The documents identified pencils as "Sketching Pencils," item number SPEN-12, and indicated that [ ], a shipper in the Philippines was the manufacturer.[8]

On May 25, 2018, Royal Brush responded to the CF28 for Entry No. [ ]7828 ("Response"). In its Response, Royal Brush claimed that the pencil supplier and the Philippines Shipper manufactures pencils in its Subic Bay facility using wood slats and pencil cores from China, and paint and packaging from the Philippines.[9]

In addition, Royal Brush provided purchasing, invoicing, export, shipping, and entry documents for a transaction identified by contract number [ ]. These documents show that Royal Brush's pencil supplier, the Shipper in the Philippines [ ], operates in the Subic Bay facility at the following address: [ ]. The documents included invoices and bills of lading from the Trading Company [ ] that Dixon described is involved in the transaction.

Royal Brush's Response contained internal contradictions that call into question whether the pencil shipments were actually manufactured in the Philippines. Specifically, the invoices and bills of lading from the Trading Company [ ] in China to the Philippines Shipper at the Subic Bay facility for raw materials, such as pencil slats and colored lead, indicate that the quantities purchased did not match the production requirements and

[6] *See* Allegation, at Exh. 7
[7] *See* Supplement, at Exh. 3.
[8] *See* Notice of Initiation of Investigation and Interim Measures at 4 (fn 5) referencing http://www royalbrushstore.com/products/productdetail/SPEN-12+-+12+PC+SKETCHING+PENCILS/part_number=SPEN-12/201.0.1.1.67808.1006207.0.0.0 (last viewed June 22, 2018).
[9] *See* Response at 3.

**CONFIDENTIAL INFORMATION REMOVED**

processes at the Subic Bay facility.[10] Further, Royal Brush provided two certifications from a third party certification service indicating that the imported pencils complied with U.S. safety standards.[11] The certification service [ ] that provided the documentation is located in China and appeared to have reviewed the pencils with an understanding that they were of Chinese origin.[12] Finally, the date of the certification not only post-dated the date of importation into the United States, but it was also issued after CBP sent CF 28s to Royal Brush.

On June 6, 2018, CBP Attaché ("Attaché") performed an unannounced site visit to the pencil supplier and the Philippines Shipper at the Subic Bay facility. During the visit, the Attaché observed the staff making minor alterations (*e.g.*, sharpening) to what appeared fully manufactured pencils. The Attaché did not observe any manufacturing of pencils or any presence of raw materials sufficient to manufacture pencils in the amount Royal Brush had described in its Response. The manufacturing equipment that Royal Brush had represented as being in use at the Subic Bay facility, both in the Response and on the website for the Philippines Shipper, appeared to have been covered in dust and cobwebs indicating that they had not been used for some time.

In addition to the absence of any apparent manufacturing operations, the Attaché also observed evidence of what appeared to be repacking operations for finished pencils from China. The Attaché found numerous boxes onsite, indicating the origin as China and filled with fully manufactured pencils. Moreover, the Attaché witnessed staff repacking what appeared to be Chinese origin products into boxes labeled, "Made in Philippines" for export to other U.S. companies.

Based on the evidence above, CBP found that it had reasonable suspicion that Royal Brush was evading the antidumping duty order on cased pencils by importing pencils manufactured in China and falsely marked as being of Philippines origin and imposed interim measures.[13]

After interim measures, CBP sent multiple Requests for Information (RFI) to The Philippines Shipper and Royal Brush. Both submitted RFI responses during October 2018. Between November 14 and November 17, 2018, CBP conducted an onsite verification at the Subic Bay facility to determine whether the Philippines Shipper could produce the amount of pencils that Royal Brush had imported into the United States and identify the country of origin for pencils exported by the Philippines Shipper. During the verification, CBP toured the Subic Bay facility

---

[10] Generally, and in the images provided by the Philippines Shipper, two pencil slats come together to form a "pencil sandwich" that ultimately yields at least 6 pencils. This process implies that a typical slat-to-core ratio should be, at a minimum, 2 slats for every 6 cores. *See* Response, at Exh. 3, Annex 12a. The invoice from the Philippines Shipper, and the "Bill of Materials" provided by Royal Brush indicate a ratio of approximately [ ] slats to [ ] core. *See* Response, at Exh. 3, Annexes 9 and 9a.

[11] *See* Response, at Exh. 3, Annex 13.

[12] *Id.*

[13] *See* 19 U.S.C. § 1517(e); 19 C.F.R. §165.24(a).

and reviewed production records and seven (7) invoices associated with imports by [ ].

Given the complexities surrounding the federal government's lapse in funding and resulting shut down, CBP extended the deadline on February 25, 2019, for this final determination by sixty days, pursuant to 19 C.F.R §165.22(c)(1)(iii).[14] In reaching its determination, CBP considered the written arguments provided by Royal Brush and Dixon.[15]

**Final Determination as to Evasion**

19 CFR §165.27(a) requires CBP to "make a determination based on substantial evidence as to whether covered merchandise was entered into the United States through evasion." "Covered merchandise" is defined by 19 CFR §165.1 as "merchandise that is subject to a CVD order…and/or an AD order." As discussed below, the record of this investigation indicates that covered merchandise entered the United States through evasion, and that there is a basis for concluding that substantial evidence, in conjunction with an assumption of adverse inferences related to information requested but not provided, indicates Royal Brush's imports were merchandise entered through evasion.

Based on entry information and CBP's calculations of Philippines Shipper's production capacity using data supplied by Philippines Shipper and information obtained at verification, CBP determined that total U.S. imports of pencils by all importers during 2018 that were identified with Philippines Shipper as manufacturer exceeded the company's annual production capacity by [ ] percent.[16] Based on CBP's aforementioned calculations, Philippines Shipper must have

---

[14] *See* February 26, 2019, "Notice of Extension of Final Determination," which refers to the novelty of issues presented in the investigation, following the extension of the original deadline for written arguments to allow interested parties to address issues addressed in the on-site verification report that was issued several weeks after the end of the government shutdown. *See also* 19 C.F.R §165.22(c)(1)(iii).

[15] *See* Royal Brush's "Submission of Written Arguments to be Placed on the Administrative Record," dated March 25, 2019 ("Royal Brush Written Arguments") and Dixon's Response to Royal Brush's Written Arguments, dated April 9, 2019 ("Dixon Response"). Earlier, Royal Brush had filed a rebuttal containing new information in response to CBP's verification report, followed by an initial version of its written arguments. CBP clarified that the verification report (and verification exhibits), which are covered by §165.25 of the EAPA regulations, do not constitute "new factual information" as that expression is used earlier in the regulations under §165.23(c)(1), which allows rebuttal information to be submitted in response to "new factual information" placed on the record by CBP. Consequently, rejected Royal Brush's rebuttal submission. Furthermore, CBP also rejected the initial version of Royal Brush's written arguments, which referenced untimely new information in the rejected Royal Brush rebuttal submission, as §165.26(a)(1) of the EAPA regulations require that written arguments be based solely upon facts on the record. However, Royal Brush was provided additional time to submit its March 25, 2019 Written Arguments. *See* TRLED's email with subject line "EAPA Case # 7238: Submission of Written Arguments – Business Confidential Version," dated March 21, 2019.

[16] *See* February 11, 2019 on-site verification report ("Verification Report") at 8-9. Note also the record does not indicate, and neither Philippines Shipper nor Royal Brush have claimed, that Philippines Shipper had massive inventories at the outset of 2018, which, had they existed, might help explain the large difference between estimated Philippines Shipper production capacity and total U.S. imports of pencils for which the identified manufacturer was Philippines Shipper.

**CONFIDENTIAL INFORMATION REMOVED**

been shipping large volumes of pencils to the United States from sources other than its own production facilities because, while Philippines Shipper "has the capability to produce pencils,"[17] it does not have the capacity to produce pencils in "sufficient quantities as to account for the 2018 total imported pencils."[18]

Information on the record supports the conclusion that pencils imported into the United States by Royal Brush had been manufactured in China and transshipped through the Philippines. As noted in the Notice of Initiation and Interim Measures, Royal Brush's response to the CF28 included certifications supporting an origin of China for the pencils in question.[19] The CBP Attaché observed, during his site visit to Philippines Shipper at the Subic Bay Facility, that Philippines Shipper's "{s}taff appeared to be repacking China origin product into boxes labeled, 'Made in Philippines' for export…."[20] In his report, the CBP Attaché included photographs he identified as showing Chinese pencils repacked as "made in the Philippines."[21] Later, during the onsite verification, a Philippines Shipper official stated that Chinese origin pencils present in the facility had been intended for shipment to the United States.[22] In addition, during the verification CBP found inventory receipt records from a Chinese supplier that ostensibly covered raw materials, but which also included references to pencils.[23]

CBP's ability to determine the extent to which Philippines Shipper transshipped pencils from China was hindered by Philippines Shipper's failure to cooperate and comply to the best of its ability, a conclusion that can warrant the application of an inference adverse, as indicated in 19 CFR §165.6(a).[24] For example, Philippines Shipper failed to provide substantial amounts of information requested by CBP at verification, such as inventory bank records, payroll records, receipts records, export declarations, and invoices between Philippines Shipper and suppliers.[25] Regarding Philippines Shipper's sourcing of pencils from other suppliers, while Philippines Shipper provided various purchase orders and invoices referring to raw materials and pencils from suppliers, including Trading Company, Philippines Shipper did not provide documentation

[17] *See* Verification Report at 8.
[18] *Id.* at 8. Royal Brush appears to believe that CBP is comparing total imports by Royal Brush to [ ] production capacity, given its claim in this context that only "the 2018 total imported pencils by Royal Brush" are in the scope of this investigation. *See* Royal Brush Written Arguments at 11. However, CBP asked for information related to the Philippine Supplier's other customers and total U.S. exports in order to determine whether the supplier had capacity sufficient to produce pencils for all of its U.S. exports. That determination is relevant to whether the supplier had produced the pencils it exported to Royal Brush.
[19] *See* Notice of Initiation and Interim Measures at 5 (citing Royal Brush's May 25, 2018, CF28 Response at Exh. 3, Annex 13), which alludes to a certification indicating China as country of origin.
[20] *See* Site Visit Report at 2.
[21] *Id.* at attached photographs (including descriptive captions that are available in the public version as well as the business confidential version).
[22] *See* Verification Report at 4-5.
[23] *Id.* at 5.
[24] As noted under section 412(b)(1) of the Trade Facilitation and Trade Enforcement Act of 2015, such an adverse inference can be based on the failure to cooperate of the producer or exporter.
[25] *See* Verification Report at 6. Furthermore, one of the suppliers for which invoices were not provided was Trading Company, in China. *Id.*

showing where the pencils were recorded into inventory.[26] In addition, Philippines Shipper provided a purchase order and invoice for raw materials and pencils from Trading Company, but Philippines Shipper did not provide the requested inventory receipt records for the pencils, and CBP noted that documents reviewed included a handwritten reference to pencils that had been included in the inventory receipt count for one of the raw materials rather than pencils.[27] Furthermore, Philippines Shipper provided a purchase order and invoice for raw materials from Trading Company, but did not provide purchase orders or invoices for pencils, even though the inventory receipt records provided for the shipment included a reference to pencils supplied by a different supplier.[28] CBP concluded, based on its on-site verification, that Philippines Shipper "could not demonstrate inventory receipt records for purchased pencils from overseas."[29] In short, based on the absence or unreliability of such inventory records, there is no basis for relying on subsequent country of origin classifications for specific pencils that Philippines Shipper subsequently shipped to customers, including Royal Brush.

With regard to Philippines Shipper's production of pencils, in many instances at verification Philippines Shipper either did not provide requested documents, or provided records in a manner that was unusable to CBP because they had been redacted or otherwise altered. For the eight sample purchase orders and invoices between Philippines Shipper and Royal Brush reviewed at verification, the daily production reports provided by Philippine Shipper was missing information that had been redacted or whited-out by Philippines Shipper. For many of the sample transactions, Philippine Shipper did not provide inventory receipts for the raw materials, and inspection reports for raw materials were incomplete.[30] Given Philippines Shipper's failure to provide such requested production documentation, CBP could not verify that the pencils shipped to Royal Brush were actually produced by Philippines Shipper.

Further, the verification team found that the payroll records Philippines Shipper had submitted to CBP in its RFI responses were unsupported.[31] During verification, Philippines Shipper did not provide payroll records requested by CBP for significant periods of time.[32] Philippines Shipper also "could not provide any accounting records or financial documentation to support that employees were paid for any of the periods selected for review."[33] Philippines Shipper did not provide during verification the payroll records to support the production related to a sample invoice between Philippines Shipper and Royal Brush.[34] Furthermore, Philippine Shipper's employee hours/days worked log book covering approximately five months included whited-out

---

[26] *Id.* at 5.
[27] *Id.*
[28] *Id.*
[29] *Id.* at 4.
[30] *Id.* at 6-8.
[31] *Id.* at 9.
[32] *Id.*
[33] *Id.*
[34] *Id.* at 10.

names and were missing other information.[35] CBP concluded that for time periods it was unable to verify that employees were paid or that production was occurring.[36]

In short, Philippines Shipper failed to cooperate and comply to the best of its ability, given its refusal to provide substantial amounts of information that were requested by CBP, including those relating to the purchasing, inventorying, and production of pencils, and an adverse inference is warranted. Consequently, CBP infers a) that Philippines Shipper's production records did not support its contention that the pencils that it shipped to Royal Brush were manufactured by Philippines Shipper; and b) that such pencils were manufactured in China, given Philippines Shipper's involvement with Chinese suppliers, including even the purchasing and repacking of pencils identified as manufactured in China.

In its written arguments, Royal Brush refers to information in daily production reports and sales documentation provided by Philippines Shipper, and concludes from that information that "the Record provides ample evidence that" Philippine Shipper "has more than sufficient capacity and actual production to manufacture pencils in the Philippines to meet Royal Brush's purchase orders."[37] However, Philippine Shipper had already been unable or unwilling to provide the necessary information, including original and complete production and sale documentation, to allow CBP to verify the extent to which Philippine shipper delivered pencils it had produced or that it had transshipped, which as noted above provides the basis for concluding Philippines Shipper failed to cooperate and comply to the best of its ability. Royal Brush claims that Philippines Shipper withheld information that CBP had requested because Philippines Shipper and Royal Brush believe such information is outside the scope of the investigation.[38] However, there is no way for CBP to conclude either that the information that was withheld or otherwise concealed (*e.g.*, by redacting) did not relate to Royal Brush, or that the information that was provided to CBP was reliable, given the failure of Philippines Shipper to provide complete original documentation at verification.

In conclusion, the record evidence, and the absence of information due to Philippines Shipper's failure to cooperate and comply to the best of its ability, support a conclusion that pencils shipped by Philippines Shipper to the United States and imported by Royal Brush, were manufactured in China rather than in the Philippines. Therefore, pursuant to 19 CFR §165.27(a), CBP finds that there is substantial evidence that Royal Brush entered covered merchandise in the U.S. through evasion, and that such imports are covered by A-570-827.

---

[35] *Id.*
[36] *Id.*
[37] *See* Royal Brush Written Arguments at 10-14.
[38] *Id.* at 20-21.

**CONFIDENTIAL INFORMATION REMOVED**

**Actions Taken Pursuant to the Affirmative Determination of Evasion**

In light of CBP's determination that Royal Brush entered merchandise into the customs territory of the United States through evasion, and pursuant to 19 U.S.C. §1517(d) and 19 C.F.R. §165.28, CBP will continue to suspend the liquidation for any entry imported by Royal Brush and assembled, shipped or otherwise processed by [ ], that has entered on or after March 27, 2018, the date of initiation of this investigation. CBP will continue to extend the period for liquidation for all unliquidated entries that entered before that date until instructed to liquidate these entries. For future entries, CBP will continue to require live entry, which requires that the importers post the applicable cash deposits prior to the release. Finally, CBP will evaluate the continuous bond of the importer in accordance with CBP's policies, and may require single transaction bonds as appropriate. None of the above actions precludes CBP or other agencies from pursuing additional enforcement actions or penalties.

Sincerely,

*Africa R. Bell*

Africa R. Bell
Acting Director, Enforcement Operations Division
Trade Remedy & Law Enforcement Directorate
CBP Office of Trade

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 22-1226

**Short Case Caption:** Royal Brush Manufacturing, Inc. v. US

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 9,410 words.

☐ the filing has been prepared using a monospaced typeface and includes ___________ lines of text.

☐ the filing contains ___________ pages / ___________ words / ___________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ___________).

Date: 09/09/2022

Signature: /s/ Steven D. Gordon

Name: Steven D. Gordon

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 22-1226

**Short Case Caption:** Royal Brush Manufacturing, Inc. v. US

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 29 number of unique words (including numbers) marked confidential.

☐ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☑ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 09/09/2022

Signature: /s/ Steven D. Gordon

Name: Steven D. Gordon

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2022, a true and correct copy of the foregoing was served upon counsel of record via email through the U.S. Court of Appeals for the Federal Circuit's CM/ECF system.

/s/ Steven D. Gordon